UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| AMERICAN KITCHEN CABINET ALLIANCE, | ) | |
| *Plaintiff,* | ) | |
| v. | ) | |
| UNITED STATES, | ) | Before: Stephen Alexander Vaden, Judge |
| *Defendant,* | ) | Court No. 23-00140 |
| and | ) | |
| SCIOTO VALLEY WOODWORKING, INC. d/b/a VALLEYWOOD CABINETRY, | ) | |
| *Defendant-Intervenor.* | ) | |

## Order

Upon consideration of the Motion for a Preliminary Injunction filed by Plaintiff American Kitchen Cabinet Alliance ("Plaintiff"), and all other papers and proceedings herein, it is hereby

**ORDERED** that Plaintiff's Motion for a Preliminary Injunction is **GRANTED**; and it is further

**ORDERED** that Defendant, United States, together with the delegates, officers, agents, and employees of the United States Customs and Border Protection ("CBP"), shall be, and are hereby, **ENJOINED**, pending a final and conclusive court decision in this litigation, including all appeals and remand proceedings, from causing or permitting liquidation of unliquidated entries of wooden cabinets and vanities and components thereof ("WCV") from Malaysia that:

- were subject to Enforce and Protect Act Investigation Number 7705, Enforcement Operations Division, Trade Remedy & Law Enforcement Directorate, CBP Office of Trade, re: *Notice of Final Determination as to Evasion* (Jan. 31, 2023), and the

subsequent *de novo* administrative review, Letter from Jacinto P. Juarez Jr., Supervisory Attorney-Advisor re: Enforce and Protect Act ("EAPA") Case Number 7705; *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Antidumping Duty Order*, 85 Fed. Reg. 22,126 (Apr. 21, 2020) and *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Countervailing Duty Order*, 85 Fed. Reg. 22,134 (Apr. 21, 2020); Scioto Valley Woodworking, Inc. d/b/a Valleywood Cabinetry; 19 U.S.C. § 1517 (June 12, 2023) ("Administrative Review Determination"); and

- were entered, or withdrawn from warehouse for consumption, on or after March 9, 2021 through January 31, 2023; and

- were imported by Scioto Valley Woodworking, Inc. d/b/a Valleywood Cabinetry; and

- remain unliquidated as of 5:00 p.m. on the day the Court enters this order on the docket in this case.

And it is further:

  **ORDERED** that this injunction shall dissolve upon entry of a final court decision in this litigation, including all appeals and remand proceedings, and that the entries covered by this injunction shall be liquidated in accordance with that final decision.

Date:_____

  New York, New York          _____

                   Stephen Alexander Vaden, Judge

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AMERICAN KITCHEN CABINET ALLIANCE, ) | |
| *Plaintiff,* ) | |
| v. ) | |
| UNITED STATES, ) | Before: Stephen Alexander Vaden, Judge |
| *Defendant,* ) | Court No. 23-00140 |
| and ) | |
| SCIOTO VALLEY WOODWORKING, INC. )<br>d/b/a VALLEYWOOD CABINETRY, ) | |
| *Defendant-Intervenor.* ) | |

## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

Pursuant to Rules 7, 56.2(a), and 65(a) of the Rules of the United States Court of International Trade, American Kitchen Cabinet Alliance ("Plaintiff"), by and through its attorneys, respectfully moves this Court to preliminarily enjoin the Defendant, the United States, together with its delegates, officers, agents, servants, and employees of the United States Customs and Border Protection ("CBP"), pending a final and conclusive court decision in this litigation, from causing or permitting liquidation of unliquidated entries of wooden cabinets and vanities and components thereof ("WCV") from Malaysia that:

- were subject to Enforce and Protect Act Investigation Number 7705, Enforcement Operations Division, Trade Remedy & Law Enforcement Directorate ("TRLED"), CBP Office of Trade, re: *Notice of Final Determination as to Evasion* (Jan. 31, 2023), and the subsequent *de novo* administrative review, Letter from Jacinto P. Juarez Jr., Supervisory Attorney-Advisor re: Enforce and Protect Act ("EAPA") Case Number 7705; *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Antidumping Duty Order*, 85 Fed. Reg. 22,126 (Apr. 21, 2020) and *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:*

*Countervailing Duty Order*, 85 Fed. Reg. 22,134 (Apr. 21, 2020); Scioto Valley
Woodworking, Inc. d/b/a Valleywood Cabinetry; 19 U.S.C. § 1517 (June 12, 2023)
("Administrative Review Determination"); and

- were entered, or withdrawn from warehouse for consumption, on or after March 9, 2021
  through January 31, 2023; and

- were imported by Scioto Valley Woodworking, Inc. d/b/a Valleywood Cabinetry; and

- remain unliquidated as of 5:00 p.m. on the day the Court enters this order on the docket
  in this case.

The Court has the authority to grant the requested injunctive relief pursuant to 28 U.S.C.

§ 1585. As discussed in Plaintiff's Complaint, Plaintiff is a coalition of U.S. producers of

WCV and is an interested party as defined in 19 U.S.C. § 1517(a)(6)(A)(iv). Plaintiff was also

a participant in CBP's underlying EAPA investigation and subsequent *de novo* administrative

review. Plaintiff filed the allegation of evasion that resulted in the initiation of the underlying

investigation. Accordingly, Plaintiff has standing to commence this action pursuant to 19

U.S.C. § 1517(g).

This motion is timely filed. Pursuant to Rule 56.2(a) of this Court, "{a}ny motion for a

statutory injunction . . . to enjoin the liquidation of entries that are the subject of the action

must be filed by a party to the action within 30 days after service of the complaint, or at such

later time, for good cause shown." Plaintiff's Complaint was timely filed and served on July

11, 2023. Accordingly, this motion is timely.

## I.      LEGAL STANDARD FOR PRELIMINARY INJUNCTION

In order to prevail on a motion for a preliminary injunction, the moving party must

show that: (1) without the requested relief, Plaintiff will be immediately and irreparably

injured; (2) the balance of hardships on the parties favors Plaintiff; (3) Plaintiff is likely to

succeed on the merits; and (4) the public interest would be better served by granting the

requested relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *U.S. Ass'n of Imps. of Textiles & Apparel v. United States*, 413 F.3d 1344, 1346 (Fed. Cir. 2005); *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983).

As the Court has observed, "before issuing a preliminary injunction inquiry must first be made as to the nature of the administrative determination under judicial consideration." *Spring Wire Corp. v. United States*, 7 CIT 2, 6, 578 F. Supp. 1405, 1408 (1984). In this regard, it should be noted that the EAPA statute does not contain explicit statutory authority for the granting of an injunction against liquidation. By way of contrast, the governing statute for trade remedy cases does provide for a statutory injunction against liquidation. *Compare* 19 U.S.C. § 1516a(c)(2) (providing that this Court "may enjoin the liquidation of some or all entries of merchandise covered by a determination of [the Secretary of the Treasury], [Commerce] or the Commission, upon a request by an interested party for such relief and a proper showing that the requested relief should be granted under the circumstances"), *with* 19 U.S.C. § 1517(g) (providing for judicial review of EAPA determinations by this Court, with no mention of the opportunity to seek an injunction). Thus, the Court must decide this motion pursuant to its equity powers. *See* 28 U.S.C. § 1585 (endowing the Court with "all the powers in law and equity" possessed by district courts); *id.* § 2643(c)(1) ("[T]he Court of International Trade may . . . order any other form of relief that is appropriate in a civil action, including, but not limited to . . . injunctions ").

When considering the four-factor preliminary injunction test, "the most compelling reason in favor of entering {an injunction} order is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act." *Id.* § 2947. With respect to irreparable and immediate injury, the court must consider whether liquidation of the

unliquidated subject entries prior to the court's ruling on the merits of Plaintiff's claims would "impair the court's ability to grant an effective remedy." *Id.* § 2948.1 ("Only when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief.").

As to a likelihood of success on the merits, "{s}ince *Winter*, {the Federal Circuit has} held that the party seeking the injunction must be able to 'demonstrate that it has at least a fair chance of success on the merits for a preliminary injunction to be appropriate.'" *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1345 (Fed. Cir. 2018) (affirming denial of preliminary injunction in Section 301 case) (quoting *Wind Tower Trade Coal. v. United States*, 741 F.3d 89, 96 (Fed. Cir. 2014)); *see also Qingdao Taifa Grp. Co. v. United States*, 581 F.3d 1375, 1381 (Fed. Cir. 2009). Nonetheless, courts have recognized a "sliding scale" approach when considering injunction applications. Under the sliding scale approach, "the more the balance of irreparable harm inclines in the plaintiff's favor, the smaller the likelihood of prevailing on the merits he need show in order to get the injunction." *Qingdao*, 581 F.3d at 1378-79 (quoting *Kowalski v. Chicago Tribune Co.*, 854 F.2d 168, 170 (7th Cir. 1988)).

## II.   PLAINTIFF MEETS ALL FOUR CRITERIA FOR ISSUING A PRELIMINARY INJUNCTION

As demonstrated below, the criteria for issuing an injunction are satisfied in this case. Specifically, absent an injunction preventing liquidation, CBP will liquidate the relevant entries of merchandise at issue in the underlying EAPA investigation and could deprive Plaintiff of its right to meaningful judicial review of the challenged final administrative determination. Accordingly, an injunction to prevent liquidation is sought until a final judicial resolution of this action.

**A.**     **Plaintiff Will Be Immediately and Irreparably Injured Without the Requested Injunctive Relief Against Liquidation**

Plaintiff will be immediately and irreparably harmed unless this preliminary injunction is granted. Courts have previously held that the prospect of mootness due to the liquidation of entries constitutes grounds for finding immediate and irreparable harm in the absence of an injunction. *See Nucor Corp. v. United States*, 29 CIT 1452, 1461, 412 F. Supp. 2d 1341, 1349 (2005); *see also Canadian Wheat Bd. v. United States*, 31 CIT 650, 491 F. Supp. 2d 1234 (2007). Liquidating the subject entries prior to the resolution of this proceeding could render Plaintiff's claims moot if it eliminates Plaintiff's only available remedy in an action contesting the results of a final determination. *See Zenith*, 710 F.2d at 810 (noting that "the consequences of liquidation {faced by the domestic producer} do constitute irreparable injury."); *Carpenter Tech. Corp. v. United States*, 31 CIT 1, 8, 469 F. Supp. 2d 1313, 1320 (2007). Indeed, preliminary injunctions issue "almost reflexively" in proceedings like this to avoid depriving a party of the opportunity for meaningful judicial review. *See Nucor Corp.*, 29 CIT at 1459, 412 F. Supp. 2d at 1348; *see also Qingdao Taifa Grp. Co. v. United States*, 581 F.3d 1375, 1378 (Fed. Cir. 2009) ("It has long been established that liquidation of entries after a final determination of duties for a particular period, before the merits can be litigated, is sufficient harm.") (citing *Zenith*, 710 F.2d at 810).

In this action, Plaintiff is challenging the reversal by CBP, Office of Trade ("OT"), Regulations and Rulings ("ORR"), of the initial determination of evasion made by the CBP TRLED with respect to entries of WCV made by Scioto. *See* Administrative Review Determination.  As detailed in Plaintiff's Complaint, the CBP TRLED initially determined that entries of WCV by Scioto made during the agency's period of investigation are subject to the payment of antidumping ("AD") and countervailing duties ("CVD") pursuant to the

AD/CVD orders on WCV from China.[1] The entries covered by the EAPA investigation included all imports of wooden cabinets and vanities and components thereof imported by Scioto on or after March 9, 2021, through the pendency of the investigation, *i.e.*, January 31, 2023. *See* Attachment 2 (TRLED's January 31, 2023 final Notice of Determination as to Evasion - EAPA Case 7705) at p.4, fn. 27. If these entries are not suspended by the Court but are instead liquidated without paying the AD/CVD duties as indicated in the reversal, Plaintiff will not be able litigate this appeal, thereby undermining the relief owed to the domestic industry. In this instance, absent an injunction, CBP will proceed with liquidation of certain subject entries on the basis of an administrative review by ORR that Plaintiff intends to show was arbitrary, capricious, an abuse of discretion, and other not in accordance with law.

This Court recently granted a plaintiff's motion for preliminary injunction under circumstances almost identical to those presented in this case. *Aluminum Extrusions Fair Trade Comm. v. United States*, 607 F. Supp. 3d 1332, 1335 (Ct. Int'l Trade 2022). There, the plaintiff was a coalition of domestic producers of aluminum extrusions that challenged ORR's determination that substantial record evidence did not support a finding that Kingtom Aluminio S.R.L. ("Kingtom") imported Chinese-origin aluminum extrusions into the United States through evasion. *Id.* There, as here, TRLED had initially determined that substantial evidence did support an affirmative determination of evasion, but ORR later reversed that decision. *Id.* The plaintiff filed a motion for a preliminary injunction seeking an order enjoining CBP from liquidating entries of Kingtom's imports during the pendency of the litigation. *Id.* In granting the motion, the court found that the plaintiff had sufficiently shown

---

[1]   TRLED's July 6, 2022 Notice of Initiation of Investigation and Interim Measures is attached as **Attachment 1**, and TRLED's January 31, 2023 final Notice of Determination as to Evasion - EAPA Case 7705 is attached as **Attachment 2**.

that it would be immediately and irreparably injured if the subject entries liquidate before a final court decision were made in the case. *Id.* The court explained that should CBP ultimately make an affirmative evasion determination in the case, it would be required to suspend liquidation with respect to unliquidated entries subject to that determination. *Id.* at 1341. On the other hand, if the subject entries were already liquidated by the time judicial review is complete, there will be no merchandise for Customs to liquidate and to which it can apply higher duties. *Id.* Because liquidation prior to a decision by the court would effectively eliminate Plaintiff's right to judicial review of the contested determination by eliminating the only meaningful relief sought by Plaintiff, the immediate and irreparable injury factor favored granting an injunction. *Id.* Those are precisely the facts here.

B.      **Plaintiff is Likely to Prevail on the Merits**

Plaintiff is likely to succeed on the merits of its case-in-chief. Where, as here, irreparable injury is firmly established, "it will ordinarily be sufficient that the movant has raised questions which are 'serious, substantial, difficult and doubtful.'" *Timken Co.*, 6 CIT at 80, 569 F. Supp. at 70; *see also Qingdao Taifa Grp.*, 581 F.3d at 1378-79 ("A request for a preliminary injunction is evaluated in accordance with a 'sliding scale' approach: the more the balance of irreparable harm inclines in the plaintiff's favor, the smaller the likelihood of prevailing on the merits he need show in order to get the injunction.") (quoting *Kowalski v. Chi. Tribune Co.*, 854 F.2d 168, 170 (7th Cir. 1988)).

In its Complaint filed in this proceeding, Plaintiff raises questions that are serious and substantial. As detailed in Plaintiff's Complaint, ORR's final administrative determination is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. Specifically, in the case at bar, ORR exceeded CBP's authority in concluding that Scioto did

not evade the Orders – even when substantial evidence supported an affirmative finding of

evasion and even when Scioto's Malaysian supplier, Alno, failed to cooperate to the best of its

ability during the verification of its responses to CBP's requests for information. *See*

Complaint at para. 9. In fact, during the on-site verification of Alno, TRLED had uncovered a

wide array of discrepancies and reporting failures by Alno, including but not limited to:

- discrepancies between the value of cabinets that Scioto claimed to have imported from Alno and the lesser value that Alno claimed to have exported to Scioto over the same time period;

- Alno's failure to disclose the existence of a warehouse in Malaysia where Chinese WCV sold to the United States was being stored;

- Alno's failure to explain the significance of certain lettering in the company's SKUs that was relevant to the country of origin;

- Alno's failure to account for its lack of purchases of glass needed to make certain cabinet doors that were sold to the United States; and

- numerous missing documents that related to the purchase of finished goods.

*Id.* Based on these and other problems, TRLED applied adverse inferences to Alno as it was not

able to verify the accuracy of certain information that was critical to determining whether Alno

transshipped Chinese WCV to the United States. *Id.*

    As discussed above and as will be further detailed in Plaintiff's Rule 56.2 Brief,

ORR's final administrative determination is arbitrary, capricious, an abuse of discretion, and

is otherwise not in accordance with law, with respect to the claims advanced by Plaintiff in its

Complaint. Plaintiff respectfully submits that it has therefore satisfied the standard for

demonstrating the likelihood of success on the merits in a case such as this, where the other

requisites of an injunction are met.

    In *Aluminum Extrusions*, the court noted that "{b}riefing on the merits of Plaintiff's

claims in this case has not begun, so the precise contours of Plaintiff's argument are not

known to the court," but found that the allegations in the complaint showed the Plaintiff had demonstrated a "fair chance" of success on the merits under the sliding scale approach in *Qingdao*. *Aluminum Extrusions*, 607 F. Supp. 3d at 1342 (citing *Qingdao*, 581 F.3d at 1378-79 (other citation omitted)). Here, as well, Plaintiff has raised serious allegations in its complaint that show at least a fair chance of success on the merits and, as a result, that granting a preliminary injunction is appropriate.

### C.      The Balance of Hardships Favors Plaintiff

Balancing the hardships that each party would suffer necessarily requires this Court to determine which party would be most adversely affected by the decision to either grant or deny a preliminary injunction. *See Ugine-Savoie Imphy v. United States*, 24 CIT 1246, 1250, 121 F. Supp. 2d 684, 688-89 (2000); *see also Kwo Lee, Inc. v. United States*, 24 F. Supp. 3d 1322, 1331 (Ct. Int'l Trade 2014); *Canadian Wheat Bd.*, 31 CIT at 663, 491 F. Supp. 2d at 1247. Here, any hardship to other parties that would be caused by a delay in liquidation is outweighed by the irreparable harm to Plaintiff that would occur if an injunction were denied. As discussed above, the denial of injunctive relief could deprive Plaintiff of its statutory right to challenge the final administrative determination in light of the Court's precedent.

By contrast, neither Defendant United States nor any prospective defendant-intervenor will suffer any hardship because of the Court granting the requested injunction. As this Court has observed, suspension of liquidation is, at most, an "inconvenience" to the Government. *See Timken Co. v. United States*, 6 CIT 76, 81, 569 F. Supp. 65, 70-71 (1983). Similarly, any interested private party would only be inconvenienced by a delay in liquidation. If any refunds of duties are ultimately owed to private parties, they will receive the amounts with interest, thereby compensating for any delay. *See* 19 U.S.C. § 1677g(a). Thus, the balance of hardships

clearly favors Plaintiff.

In *Aluminum Extrusions*, the court weighed the potential loss of Plaintiff's ability to obtain a judicial remedy if the preliminary injunction did not issue against the importer Kingtom's claim that if an injunction issued, the company would suffer hardship because, notwithstanding its negative final evasion determination, CBP had continued to issue liquidated damages notices, demanding payment of unpaid duties. *Aluminum Extrusions*, 607 F. Supp. 3d at 1342-43. The Court found that the valance of hardships weighed in favor of granting the injunction. *Id.* at 1343.

> ### D.  <u>Granting an Injunction Will Serve the Public Interest</u>

The public interest is best served by effective enforcement of the trade laws and by ensuring that accurate duties are assessed on entries covered by antidumping and countervailing duty orders. *See Smith-Corona Grp. Consumer Prods. Div. v. United States*, 1 CIT 89, 98, 507 F. Supp. 1015, 1023 (1980), *aff'd*, 713 F.2d 1568 (Fed. Cir. 1983), *cert. denied*, 465 U.S. 1022 (1984) (stating that the public interest is served "by the procedural safeguard of an injunction *pendente lite* to maintain the *status quo* of the unliquidated entries until a final resolution of the merits"); *see also Kwo Lee, Inc.*, 24 F. Supp. 3d at 1332 ("The public interest is served by the accurate and effective, uniform and fair enforcement of trade laws") (citing *Union Steel v. United States*, 33 CIT 614, 622, 617 F. Supp.2d 1373, 1381 (2009); *Ceramica Regiomontana, S.A. v. United States*, 7 CIT 390, 397, 590 F. Supp. 1260, 1265 (1984)). Indeed, the very purpose of the EAPA is to investigate the evasion of antidumping and countervailing duty orders. *See* 19 U.S.C. § 1517.

In this case, absent an injunction, the final administrative determination will result in liquidation of certain entries when, as a matter of law and fact, the decision is flawed, in part.

The public interest would be ill-served by permitting liquidation of entries without judicial review under these circumstances. In contrast, the public interest would be well-served by enjoining liquidation of entries, maintaining the *status quo*, and allowing a resolution of the issues presented on their merits.

Accordingly, the public interest is served here by enjoining liquidation of the entries at issue in the final administrative determination pending a final and conclusive court decision in this litigation. This is the same conclusion that the court reached in *Aluminum Extrusions*. *Aluminum Extrusions*, 607 F. Supp. 3d at 1343.

## III. <u>CONSENT OF THE PARTIES</u>

Pursuant to Rules 7(b) and 7(f) of the Rules of this Court, on August 1, 2023, counsel for Plaintiff contacted Defendant the United States by email regarding consent for this motion. On August 10, 2023, Counsel for Defendant the United States, Ashley Akers, informed Plaintiff that Defendant consents only to the exact terms of the attached proposed order, pursuant to the framework established in Qingdao Taifa Group Co., Ltd. v. United States, 581 F.3d 1375, 1378-82 (Fed. Cir. 2009). Therefore, without conceding any likelihood of Plaintiff's success on the merits and notwithstanding the USCIT Rule 65 factors for issuance of ordinary injunctions, Defendant consents to Plaintiff's injunction. Defendant has also consented to Plaintiff's request that the preliminary injunction extend pending a final and conclusive court decision in this litigation, including all appeals and remand proceedings. Defendant notes that the United States Court of Appeals for the Federal Circuit recently issued an opinion in *Royal Brush Manufacturing, Inc. v. United States*, No. 2022-1226, 2023 WL 4772550 (Fed. Cir. July 27, 2023), which may be relevant to the first criteria for issuing a preliminary injunction. *See Royal Brush*, 2023 WL 4772550 at *3-4. However, this decision is

not yet final.

In addition, on August 7, 2013, counsel for Plaintiff contacted counsel to the Defendant-Intervenor, Scioto Valley Woodworking, Inc. d/b/a/ Valleywood Cabinetry, by email regarding consent for this motion. On August 9, 2023, Counsel for the Defendant-Intervenor, Jamie Shookman, informed Plaintiff that Defendant-Intervenor consents to the motion.

## IV.     **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that its motion for a preliminary injunction against liquidation be granted.

Respectfully submitted,

 /s/ Luke A. Meisner
Roger B. Schagrin
Luke A. Meisner

**SCHAGRIN ASSOCIATES**
900 7th Street, N.W.
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel to the American Kitchen Cabinet Alliance*

Dated: August 10, 2023

# ATTACHMENT 1



1300 Pennsylvania Avenue, NW
Washington, DC 20229

**U.S. Customs and Border Protection**

PUBLIC VERSION

July 6, 2022

Cortney Morgan
On behalf of Scioto Valley Woodworking, Inc.
Husch Blackwell1801 Pennsylvania Ave NW, Suite 1000
Washington, DC 20006
cortney.morgan@huschblackwell.com

Luke Meisner
On behalf of the Kitchen Cabinet
Manufacturers Association
Schagrin Associates
900 Seventh Street, NW, Suite 500
Washington, D.C.  20001
lmeisner@schagrinassociates.com

Re: Notice of Initiation of Investigation and Interim Measures - EAPA Case 7705

---

To the Counsel and Representatives of the above-referenced entities:

This letter is to inform you that U.S. Customs and Border Protection (CBP) has commenced a formal investigation under Title IV, Section 421 of the Trade Facilitation and Trade Enforcement Act of 2015, commonly referred to as the Enforce and Protect Act (EAPA), against Scioto Valley Woodworking, Inc. d/b/a Valleywood Cabinetry (Valleywood).  CBP is investigating whether Valleywood evaded antidumping duty (AD) and countervailing duty (CVD) orders A-570-106 and C-570-107[1] on wooden cabinets and vanities and components thereof (cabinets and vanities) from the People's Republic of China (China) when importing cabinets and vanities into the United States.  CBP has found that reasonable suspicion exists that Valleywood entered covered merchandise into the customs territory of the United States through evasion, CBP has imposed interim measures.[2]

**Period of Investigation**

Pursuant to 19 CFR 165.2, entries covered by an EAPA investigation are those "entries of allegedly covered merchandise made within one year before the receipt of an allegation...."

---

[1] *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Antidumping Duty Order*, 85 FR 22,126 (Dep't Commerce Apr. 21, 2020); *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Countervailing Duty Order*, 85 FR. 22,134 (Dep't Commerce Apr. 21, 2020) (collectively, the *Orders*).
[2] *See* 19 USC 1517(e); *see also* 19 CFR 165.24.

Entry is defined as an "entry, or withdrawal from warehouse for consumption, of merchandise in the customs territory of the United States."[3]  CBP acknowledged receipt of the properly filed allegation against Valleywood on March 9, 2022.[4]  The entries covered by this investigation are those entered for consumption, or withdrawn from warehouse for consumption, from March 9, 2021, through the pendency of this investigation.[5]

## Initiation

On March 30, 2022, the Trade Remedy Law Enforcement Directorate (TRLED), within CBP's Office of Trade, initiated this investigation under EAPA as a result of an allegation submitted by the American Kitchen Cabinet Alliance (AKCA or Alleger)[6] concerning the evasion of AD/CVD duties by Valleywood.[7]  In the Allegation, the AKCA asserts that Valleywood evaded the *Orders* by importing Chinese-origin cabinets and vanities into the United States that were transshipped through Malaysia.[8]

The AKCA submitted evidence reasonably available to it to substantiate its Allegation that Valleywood engaged in evasion of AD/CVD duties.  The AKCA states that Cabinets to Go, one of largest importers and distributers of cabinets and vanities into the United States, filed a civil suit against supplier Alno[9] and importer Valleywood in the U.S. District Court for the Middle District of Tennessee.[10]  The AKCA states that the Cabinets to Go lawsuit stems from Cabinets to Go discovering that Valleywood was involved in evasion activities.[11]  The Alleger states Cabinets to Go provided AKCA evidence of Valleywood's evasion of the *Orders*, including direct admissions of facts that would implicate Valleywood in an evasion scheme.[12]  As a result of the lawsuit, the AKCA alleges that Valleywood imported Chinese-origin cabinets and vanities subject to the *Orders* that have been transshipped through Malaysia.[13]

---

[3] *See* 19 USC 1517(a)(4); *see also* 19 CFR 165.1.

[4] *See* email "EAPA 7705 - Receipt of EAPA Allegation 7705:  Receipt of Properly Filed Allegation," dated March 9, 2022.

[5] *See* 19 CFR 165.2.

[6] The alleger is a trade or business association in which a majority of the members manufacture, produce, or wholesale a domestic like product in the United States; thus, pursuant to 19 CFR 165.1(4), the alleger meets the definition of an interested party that is permitted to submit an EAPA allegation.

[7] *See* CBP Memorandum, "Initiation of Investigation for EAPA Case Number 7705 – Scioto Valley Woodworking, Inc.," dated March 30, 2022 (Initiation Notice).

[8] *See* Letter from the AKCA, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Request for an Investigation under the Enforce and Protect Act of Scioto Valley Woodworking, Inc. d/b/a Valleywood Cabinetry," dated February 3, 2022 (Allegation).

[9] Alno Industry SDN BHD (Alno), the reported Malaysian manufacturer, is owned by the Chinese company Qingdao Haiyan Group Co., Ltd. (Haiyan).  Valleywood is also a wholly owned sales and distribution division of Haiyan.  *Id.*, at 5.

[10] *See* Allegation at 6.  *See also Cabinets To Go, LLC v. Qingdao Haiyan Grp. Co.*, 3:21-cv-00711 (M.D. Tenn.).

[11]  *See* Allegation at 6.

[12] *Id.*, at 7.

[13] *Id.,* at 1-2.

2

Furthermore, the Alleger asserts that in July 2021 one of Cabinets to Go quality control (QC) inspectors that it hires to be located on-site at Alno, [DESCRIPTION ].[14]  The quality control inspector obtained [ DESCRIPTION ] that shows the [ SOURCE ITEM ] that show a large number of cabinets and vanities in flatpacks.[15]  The Alleger states that after Cabinets to Go received the information from the QC inspector, it asked Haiyan to certify that the products were made in Malaysia.[16]  The Alleger avers that Cabinets to Go CEO, Jason Delves, received a phone call from two Haiyan representatives who stated that they could not certify the country of origin (COO) as Malaysia because the products and/or parts thereof were COO China.[17]

As a result of the aforementioned information, the Alleger states that Cabinets to Go filed a breach of contract and breach of warranty lawsuit against Valleywood and Haiyan's other subsidiaries.[18]  During the course of the lawsuit, Valleywood and Haiyan produced a spreadsheet that indicates specifically which products* were produced in China instead of Malaysia.[19]  The Alleger further states that approximately [ITEM ] reported as COO Malaysia were actually COO China.[20]

The Alleger further avers that shipping data from [SOURCE] corroborate the information provided by Cabinets to Go.[21]  The AKCA alleges that the [SOURCE ] data show that Valleywood imported cabinets and vanities directly from Qingdao Haiyan Brouot Household Co.,[22] which is located in China, prior to implementation of the *Orders*.[23]  The AKCA further alleges that Qingdao Haiyan Brouot Household Co. is located at the same address as, and likely the same company as another manufacturer that Valleywood imported from, *i.e.*, Qingdao Haiyan Drouot Woodworking Co.[24]  The AKCA claims that this means that Haiyan and Valleywood worked together to evade the AD/CVD duties by claiming the cabinets and vanities in question were from Malaysia.[25]  It is the AKCA's contention that the timing and increase in volume of Malaysia's shipments of cabinets and vanities to the United States directly coincides with the implementation of the *Orders* in 2020.[26]  For example, the AKCA states that exports of

---

[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*, at 7-8.
[18] *Id.*, at 8.
* Note, in the initiation notice it was erroneously [ DESCRIPTION ]
[19] *Id.*, at 8 and 12.
** Note, in the initiation notice it was erroneously [ DESCRIPTION ]
[20] *Id.*
[21] *Id.*, at 8.
[22] A Chinese subsidiary of Haiyan.
[23] *Id.*, at 8 and Exhibit 5.
[24] *Id.*, at 8 and Exhibit 8.
[25] *Id.*, at 8.
[26] *Id.*, at 9.

cabinets and vanities from Malaysia to United States in 2019 was $49,619,892, while in 2020 the value significantly increased to $348,425,776.[27]

Therefore, the AKCA concludes that the evidence reasonably suggests that Valleywood is transshipping its Chinese-origin cabinets and vanities through Malaysia to the United States to avoid paying AD/CVD duties.  AKCA also notes that even if Valleywood engaged in minimal processing on cabinets and vanities they would still be subject to the *Orders*.

*Initiation Assessment*

TRLED will initiate an investigation if it determines that "{t}he information provided in the allegation ... reasonably suggests that the covered merchandise has been entered for consumption into the customs territory of the United States through evasion."[28]  Evasion is defined as "the entry of covered merchandise into the customs territory of the United States for consumption by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material, and that results in any cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the covered merchandise."[29]  Thus, the allegation must reasonably suggest not only that merchandise subject to an AD and/or CVD order was entered into the United States by the importer through evasion, but that such entry was made by a material false statement or act, or material omission, which resulted in the reduction or avoidance of applicable AD and/or CVD cash deposits or other security.

In assessing the basis for the Allegation, CBP finds that the information submitted by the AKCA reasonably suggests that Valleywood entered merchandise covered by the *Orders* A-570-106 and C-570-107 into the customs territory of the United States through evasion.  Specifically, information provided by the Alleger, specifically information obtained through the on-going civil suit against Valleywood shows that the company was transshipping cabinets and vanities from China through Malaysia during the period of investigation.[30]  Additionally, in the lawsuit, Valleywood admitted directly to a transshipment scheme.  Furthermore, commercial data reasonably available to the AKCA and submitted to CBP shows specifically that Valleywood imported cabinets from Malaysia into the United States and generally that there was a significant increase in Malaysian exports of cabinets and vanities to the United States after the imposition of the *Orders*. Consequently, TRLED initiated an investigation pursuant to 19 USC 1517(b)(1) and 19 CFR 165.15.[31]

---

[27] *Id.,* at 9 and Exhibit 14.
[28] *See* 19 CFR 165.15(b); *see also* 19 USC 1517(b)(1).
[29] *See* 19 CFR 165.1; *see also* 19 USC 1517(a)(5)(A).
[30] The period of investigation is March 9, 2021, through the pendency of the investigation.
[31] *See* 19 CFR 165.11; *see also* 19 CFR 165.15(2).  *See* Initiation.

**Interim Measures**

Not later than 90 calendar days after initiating an investigation under EAPA, TRLED will decide based on the record of the investigation if there is reasonable suspicion that merchandise covered by the AD/CVD orders was entered into the United States through evasion.  If reasonable suspicion exists, CBP will impose interim measures pursuant to 19 USC 1517(e) and 19 CFR 165.24.  As explained below, CBP is imposing interim measures because there is a reasonable suspicion that the importer entered covered merchandise into the United States through evasion by means of transshipment through Malaysia.[32]

*Other Record Evidence*

On April 16, 2022, as part of the EAPA investigation process, CBP issued a CBP Form 28, Request for Information (CF28) questionnaire to Valleywood concerning certain entries.[33] Valleywood submitted its CF28 response on June 1, 2022.[34]  In its CF28 response, Valleywood indicated that it purchased cabinets and vanities that [COMPANY]-exported from Malaysia. This information aligns with the Allegation.[35]  In the CF-28 Valleywood claimed that [COMPANY] produced all the cabinets and vanities that exported to the United States.[36]  This information runs contrary to what company officials claimed in Valleywood's civil suit, where they admitted to transshipping Chinese-origin cabinets and vanities and its on-going litigation with Cabinets to Go where it falsely declared COO Malaysia[37] The shipments at issue in the litigation were purchased between February and March 2021 and the PO date for the entry requested in the CF-28 was [DATE          ], which means the coincide with each other and within the period of investigation.[38]  As such, for those reasons and for the reasons discussed below, CBP finds Valleywood's CF-28 claims that all its cabinets and vanities are made in Malaysia questionable and possibly fraudulent.

On June 24, 2022, CBP added a memorandum to the administrative record containing a copy of Valleywood's product catalog from Valleywood's website.[39]  The product catalog shows that Valleywood's SKUs line up with what products found on its purchase orders (POs) invoices in the CF-28 and Allegation show that the last two or three digits of the SKU generally relate to finishes. In the Allegation, Valleywood and Haiyan provided [ITEM] that indicates specifically which [DESCRIPTION                                                                          ].[40] The evidence provided by the Alleger shows that approximately [      #       ] reported as COO Malaysia were actually COO China.[41]  Analysis shows that [              DESCRIPTION

---

[32] *See* 19 CFR 165.24(a).
[33] *See* CF-28 sent to Valleywood, dated April 16, 2022 (CF-28).
[34] *See* Valleywood Response to CF-28, dated June 1, 2022 (CF-28 Response).
[35] *Id.*
[36] *Id.*, at
[37] *See* CF28 response.  *See also* Memorandum to the File, "Valleywood's Product Catalog," dated June 24, 2022
[38] *See* CF28 response.  *See also* Allegation, at Exhibit 4.
[39] *See* Memorandum to the File, "Valleywood's Product Catalog," dated June 24, 2022.
[40] *See* Allegation, at 8 and 12.
[41] *Id.*

] reported as COO China,[42] which indicates to CBP that those [      ITEM      ], are typically made in China and not at Alno's Malaysia factory. Furthermore, the timing of the disclosure of COO provided in the allegation February and March 2021,[43] is after the PO dates of the entry requested in the CF-28, *i.e.*, [DATE      ].[44]  A comparison of SKUs listed in the CF-28 response and the spreadsheet submitted with the Allegation,[45] finds [# ] out of the [# ] SKUs known to be of [ DESCRIPTION      ].[46]  Taken together, this evidence supports a reasonable suspicion that SKUs reported in the CF-28 POs were not actually [      DESCRIPTION      ] like those reported to be [ DESCRIPTION      ] in the spreadsheet submitted with the Allegation..

*Enactment of Interim Measures*

Based on the record evidence—Valleywood's on-going civil suit with Cabinets to Go where they admitted to transshipping and the [      DESCRIPTION      ] found in the CF-28 response—CBP has determined that reasonable suspicion exists that certain cabinets and vanities produced by Alno and entered into the customs territory of the United States by Valleywood are transshipped from China, and thus, are evading the *Orders* on cabinets and vanities from China.  Therefore, TRLED is imposing interim measures pursuant to this investigation.[47]  Specifically, in accordance with 19 USC 1517(e)(1)-(3), CBP shall:

> (1) suspend the liquidation of each unliquidated entry of such covered merchandise that entered on or after March 30, 2022, the date of the initiation of the investigation;
> (2) pursuant to the Commissioner's authority under section 504(b), extend the period for liquidating each unliquidated entry of such covered merchandise that entered before the date of the initiation of the investigation; and
> (3) pursuant to the Commissioner's authority under section 623, take such additional measures as the Commissioner determines necessary to protect the revenue of the United States, including requiring a single transaction bond or additional security or the posting of a cash deposit with respect to such covered merchandise.[48]

In addition, CBP will require live entry and reject any non-compliant entry summaries, as well as require refiling of entries that are within the entry summary rejection period.  CBP will also evaluate Valleywood's continuous bonds to determine sufficiency.  Finally, CBP may pursue additional enforcement actions, as provided by law, consistent with 19 USC 1517(h).

---

[42] *See* Appendix for list of [      DESCRIPTION      ].  The last three digits that appear to relate to the cabinets and vanities finish are left off.
[43] *See* Allegation, at 6-8 and Exhibit 4.
[44] *See* CF-28 Response, at 16
[45] *See* Allegation at Exhibt 12.
[46] The SKU's found in the CF-28 are: [ DESCRIPTION      ].  *See* a comparison of the CF-28 Response to the Allegation, at Exhibit 12.
[47] *See* 19 USC 1517(e); *see also* 19 CFR 165.24.
[48] *See also* 19 CFR 165.24.

Any future submissions or factual information that you submit to CBP pursuant to this EAPA investigation must be made electronically using EAPA's case management system (CMS) at https://eapallegations.cbp.gov/.  Please provide a business confidential and public version to CBP and serve the public version on the parties to this investigation (*i.e.*, to the parties identified at the top of this notice).   Public versions of administrative record documents will be available via the EAPA Portal at https:\\eapallegations.cbp.gov. [49]

Should you have any questions regarding this investigation, you may contact us at eapallegations@cbp.dhs.gov with "EAPA Case 7705" in the subject line of your email. Additional information on this investigation, including the applicable statute and regulations, may be found on CBP's website at: https://www.cbp.gov/trade/trade-enforcement/tftea/eapa.

Sincerely,

Brian M. Hoxie
Director, Enforcement Operations Division
Trade Remedy Law Enforcement Directorate
CBP Office of Trade

---

[49] *See* 19 CFR 165.4; *see also* 19 CFR 165.23(c) and 19 CFR 165.26.

Appendix:  SKUs known to be from China [

]

# ATTACHMENT 2



1300 Pennsylvania Avenue, NW
Washington, DC 20229

**U.S. Customs and Border Protection**

PUBLIC VERSION

January 31, 2023

Cortney Morgan
On behalf of Scioto Valley Woodworking, Inc.
Husch Blackwell1801 Pennsylvania Ave NW, Suite 1000
Washington, DC 20006
cortney.morgan@huschblackwell.com

Luke Meisner
On behalf of the Kitchen Cabinet
Manufacturers Association
Schagrin Associates
900 Seventh Street, NW, Suite 500
Washington, D.C. 20001
lmeisner@schagrinassociates.com

Re: Notice of Determination as to Evasion - EAPA Case 7705

Pursuant to an examination of the record in Enforce and Protect Act (EAPA) Investigation 7705, U.S. Customs and Border Protection (CBP) has determined there is substantial evidence that Scioto Valley Woodworking, Inc. d/b/a Valleywood Cabinetry (Scioto or Importer) entered merchandise covered by antidumping duty (AD) and countervailing duty (CVD) orders A-570-106 and C-570-107[1] on wooden cabinets and vanities and components thereof (cabinets and vanities) from the People's Republic of China (China) into the customs territory of the United States through evasion. Substantial evidence demonstrates Scioto imported Chinese-origin cabinets and vanities that were transshipped to the United States with a claimed country of origin of Malaysia. As a result, no cash deposits were applied to the merchandise at the time of entry.

**Background**

---

[1] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Antidumping Duty Order*, 85 FR 22,126 (Dep't Commerce Apr. 21, 2020); *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Countervailing Duty Order*, 85 FR. 22,134 (Dep't Commerce Apr. 21, 2020) (collectively, the *Orders*).

On February 3, 2022, the American Kitchen Cabinet Alliance (AKCA or the Alleger) filed an allegation against Scioto.[2] One of Scioto's customer Cabinets to Go (CTG) had cooperated with AKCA in providing evidence that showed Alno Industry SDN BHD (Alno)[3] sold it transshipped cabinets and vanities of Chinese-origin. On March 9, 2022, the Trade Remedy Law Enforcement Directorate (TRLED), within CBP's Office of Trade, acknowledged receipt of the properly filed allegation by the Alleger, a domestic producer of cabinets and vanities.[4] TRLED found the information provided in the Allegation reasonably suggested that Scioto entered covered merchandise into the customs territory of the United States through evasion. Consequently, CBP initiated an investigation on March 30, 2022, pursuant to Title IV, Section 421 of the Trade Facilitation and Trade Enforcement Act of 2015, commonly referred to as the "EAPA."[5]

On July 6, 2022, after evaluating the information on the record at that time, CBP issued its Notice of Initiation and Interim Measures.[6] TRLED determined that reasonable suspicion existed that Scioto had evaded the *Orders* by claiming cabinets and vanities imported into the United States were of Malaysian origin when it was actually of Chinese origin.[7] TRLED based its determination on the sufficient information provided in the Allegation (*e.g.*, Scioto's admission to transshipping in an ongoing civil suit) and the stock-keeping units (SKUs) known to be of Chinese origin found in the CF-28 response.[8]

*Request for Information*

On July 8, 2022, pursuant to 19 CFR 165.5, CBP sent a Request for Information (RFI) to Scioto and to the claimed manufacturer, Alno,[9] about shipments to the Importer.[10] On August 10, 2022, CBP received an RFI responses from Alno and Scioto to CBP's July 8 RFI. On August 17, 2022, CBP rejected Scioto's and Alno's RFI responses because the documents did not conform to EAPA regulations and requested they refile them.[11] On August 25, 2022, Alno and Scioto timely

---

[2] *See* Letter from the AKCA, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Request for an Investigation under the Enforce and Protect Act of Scioto Valley Woodworking, Inc. d/b/a Valleywood Cabinetry," dated February 3, 2022 (Allegation).

[3] Alno, the reported Malaysian manufacturer, is owned by the Chinese company Qingdao Haiyan Group Co., Ltd. (Haiyan). Haiyan also owns Scioto.

[4] *See* email "EAPA 7705 - Receipt of EAPA Allegation 7705: Receipt of Properly Filed Allegation," dated March 9, 2022.

[5] *See* Memorandum, "Initiation of Investigation for EAPA Case Number 7705 – Scioto Valley Woodworking, Inc.," dated March 30, 2022 (Initiation Notice).

[6] *See* Memorandum, "Notice of Initiation of Investigation and Interim Measures - EAPA Case 7705," dated July 6, 2022 (NOI).

[7] *Id*.

[8] *Id.*

[9] Alno Industry SDN BHD (Alno), the reported Malaysian manufacturer, is owned by the Chinese company Qingdao Haiyan Group Co., Ltd. (Haiyan). Haiyan also owns Scioto.

[10] *See* Memorandum, "EAPA CASE NUMBER 7705 - Request for Information," dated July 8, 2022 (Alno RFI). *See* Memorandum, "EAPA CASE NUMBER 7705 – Request for Information," dated July 8, 2022 (Scioto RFI).

[11] *See* email "EAPA 7705: Rejection of Submission," dated July 30, 2021.

refiled their RFI responses.[12] On September 2, 2022, CBP sent a supplemental RFI to Alno.[13] On September 8, 2022, Alno responded to Alno 1SRFI.[14] On September 9, 2022, CBP sent a second supplemental RFI to Alno.[15] On September 12, 2022, CBP sent a supplemental RFI to Scioto.[16] On September 26, 2022, CBP received Alno's second supplemental response.[17] On September 29, 2022, CBP received Scioto's supplemental RFI response.[18] On October 5, 2022, CBP sent a third supplemental RFI to Alno.[19] On October 17, 2022, CBP received Alno's third supplemental response.[20]

*Verification and Written Arguments*

On October 17, 2022, CBP sent a site engagement letter to Alno regarding verification.[21] From October 24, 2022, through October 27, 2022, CBP conducted an on-site verification of Alno in Malaysia.[22] On December 22, 2022, CBP released the Verification Report to parties to the investigation.[23] On January 4, 2022, CBP received written arguments from Scioto and the Alleger.[24] On January 19, 2022, CBP received rebuttals arguments from Scioto and the Alleger.[25]

## Analysis

Under 19 U.S.C. § 1517(c)(1)(A), to reach a final determination as to evasion, CBP must, "make a determination, based on substantial evidence, with respect to whether such covered merchandise entered into the customs territory of the United States through evasion." Evasion is

---

[12] *See* letter from Alno, "EAPA Case No. 7705: Third Request for Extension for Response to CBP Questionnaires," dated August 25, 2022 (Alno RFI Response); *see also* letter from Scioto, "EAPA Case No. 7705: Third Request for Extension for Response to CBP Questionnaires," dated August 25, 2022 (Scioto RFI Response).

[13] *See* Memorandum "EAPA 7705; – First Supplemental Request for Information to Alno Industry SDN BHD," dated September 2, 2022 (Alno 1SRFI).

[14] *See* letter from Alno "EAPA Case No. 7705: First Supplemental Request for Information Questionnaire Response," dated September 8, 2022 (Alno 1SRFI Response).

[15] *See* Memorandum "EAPA 7705; – First Supplemental Request for Information to Alno Industry SDN BHD," dated September 9, 2022 (Alno 2SRFI).

[16] *See* Memorandum "EAPA 7705; – First Supplemental Request for Information to Alno Industry SDN BHD {sic}," dated September 9, 2022 (Scioto 1SRFI).

[17] *See* letter from Alno, "EAPA Case No. 7705: Second Supplemental Request for Information to Alno Industry SDN BHD," dated September 22, 2022 (Alno 2SRFI Response).

[18] *See* letter from Scioto, " EAPA Case No. 7705: Second Supplemental Request for Information to Scioto Valley Woodworking, Inc. d/b/a/ Valleywood Cabinetry," dated September 29, 2022 (Scioto 1SRFI Response).

[19] *See* Memorandum, "EAPA 7705; Third Supplemental Request for Information to Alno Industry SDN BHD," dated October 5, 2022 (Alno 3SRFI).

[20] *See* letter from Alno, "EAPA Case No. 7705: Third Supplemental Request for Information to Alno Industry SDN BHD," dated October 17, 2022 (Alno 3SRFI Response).

[21] *See* Letter from CBP, "Site Engagement Letter," dated October 17, 2022.

[22] *Id.; see also* Memorandum, "On-Site Verification Report," dated December 21, 2022 (Verification Report).

[23] *See* Verification Report.

[24] *See* letter from Alleger, "Investigation Concerning the Evasion of Antidumping and Countervailing Duty Orders: Written Comments," dated January 4, 2023 (Alleger Written Arguments); letter from Scioto, "EAPA Case No. 7705: Written Submission," dated January 4, 2023 (Scioto Written Arguments).

[25] *See* letter from Alleger, "Investigation Concerning the Evasion of Antidumping and Countervailing Duty Orders: Rebuttal Comments," dated January 19, 2023 (Alleger Rebuttal Arguments); letter from Scioto, "EAPA Case No. 7705: Written Submission," dated January 19, 2023 (Scioto Rebuttal Arguments).

defined as "the entry of covered merchandise into the customs territory of the United States for consumption by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material and that results in any cash deposit or other security of any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise."[26] As discussed below, the record of this investigation indicates there is substantial evidence that covered merchandise was entered by Scioto into the United States through evasion, resulting in the avoidance of applicable AD/CVD cash deposits or other security.

The evidence demonstrates that Alno *can* produce wooden cabinets and vanities. However, Alno itself has admitted in court documents that it transshipped Chinese-origin cabinets and vanities through Malaysia to [ Name ] during the[27]for this EAPA investigation. The questions before CBP, then, are whether Alno manufactured all the cabinets and vanities it exported to Scioto, or whether Alno exported transshipped, Chinese-origin cabinets and vanities to Scioto during the POI.

*Affiliations with China*

Evidence on the record shows that Scioto and Alno have ties to China. From October 2018 to October 2019, approximately when the *Orders* were implemented, Qingdao Haiyan Drouot Household Co., Ltd. (Haiyan Drouot) exported wooden cabinets and vanities from its manufacturing plant in Qingdao, China to Scioto in Waverly, Ohio.[28] Scioto, which is 100 percent owned by the Qingdao Haiyan Group Co., Ltd. (Haiyan Group),[29] acquired Alno on July 1, 2019, and the deal was official on September 4, 2019.[30] In July 2022, Scioto transferred all its shares of Alno to the Haiyan Group.[31] The owner of Haiyan Group is Liyan Jiao, a Chinese national residing in Qingdao, China.[32] This evidence shows that control of Alno and Scioto is the Chinese company the Haiyan Group.

The RFI responses, and as confirmed at verification, show that Alno was designated as the supplier for Scioto by the Haiyan Group in 2020.[33] Evidence on the record shows that due to the Haiyan Group's ownership of both Scioto and Alno, it has discretion over the budgets for both companies' operations, production, shipping schedules for all goods produced, and the purchase prices.[34] Furthermore, the invoice terms between Alno and Scioto are designated by the Haiyan Group and are based on the amount of profit generated by Scioto.[35] The record shows that if Alno falls short, the company would go to its parent company of, *i.e.*, the Haiyan Group, for

---

[26] *See* 19 CFR 165.1; *see also* 19 USC 1517(a)(5)(A).
[27] The POI are imports entered for consumption, or withdrawn from warehouse for consumption, from March 9, 2021, through the pendency of this investigation, *i.e.*, January 31, 2023.
[28] *See* Verification Report, at 3.
[29] Haiyan Group also owns Haiyan Drouot
[30] *Id.*
[31] *Id.*
[32] *Id.*, at 2. Liyan Jiao also owns 80% of Haiyan Drouot; therefore, Haiyan Drouot has common ownership with Haiyan Group, Alno, and Scioto.
[33] *Id.*, at 8.
[34] *Id.*
[35] *See* Verification Report, at 8.

money to stay solvent.[36] Additionally, company officials at Alno confirmed that Alno owes substantial amount of money to the Haiyan Group for subsidizing Alno's budget shortfalls.[37] Furthermore, many of the correspondences related to price updates, status of purchase orders, shipment arrangements, *etc.*, were between Scioto and the Haiyan Group, not between Scioto and Alno.[38] This arrangement seems to indicate that Alno had a more closely linked production process with the Haiyan Group than would be expected by the ownership structure in which Scioto owned Alno until July 2022.[39] As a result, the evidence on the record establishes that the Chinese company the Haiyan Group has Alno and Scioto.

Finally, Alno purchases supplies, *e.g.*, wooden boards and medium density fiber (MDF) board, from Chinese suppliers.[40] In particular, the primary input for cabinets and vanities, *i.e.*, wooden boards, come from the commonly owned Chinese company [ Name ].[41] Additionally, Alno's department heads are Chinese nationals.[42] Taken *in toto* Alno is a Malaysian company owned and controlled by a Chinese company, is operated under Chinese management, and is supplied by Chinese suppliers. As a result, there is evidence on the record showing Alno's and Scioto's ties to China.

*Evidence of Transshipment*

Evidence on the record shows that Alno transshipped Chinese origin wooden cabinets into the United States. The Allegation was filed based on information provided by CTG in cooperation with AKCA. A CTG quality control inspector (QCI) had discovered the transshipment scheme.[43] Evidence in the Allegation suggests Scioto engaged in evasion of AD/CV duties and that CTG had filed a civil suit against supplier, Alno, and its U.S. affiliate, Scioto, in the U.S. District Court for the Middle District of Tennessee based on the CTG's QCI's discovery and the Haiyan Group's admission of transshipment.[44] Evidence in the Allegation provided by CTG to the Alleger shows Scioto's evasion of the *Orders*, including direct admissions of facts that implicate Scioto in an evasion scheme.[45] In its responses to CBP in this EAPA investigation, Alno stated that it produced all goods shipped to Scioto.[46]

However, as discussed in detail below, CBP finds substantial evidence on the record shows that Alno transshipped more products than it initially admitted to in both the civil suit and in Alno's 1SRFI Response. CBP officials had discovered an "additional warehouse" during verification that was filled with finished goods from China and Malaysia that were packaged identically and ready for shipment.[47] CBP officials had no way to differentiate the country of origin of the

---

[36] *See* Verification Report, at 8.
[37] *Id.*, at 7.
[38] *Id.*, at 9.
[39] *Id.*
[40] *See* Alno RFI Response, at 8.
[41] *Id.*
[42] *See* Verification Report, at 17.
[43] *See* Allegation, at Exhibit 12.
[44] *See* Allegation at 6. *See also Cabinets To Go, LLC v. Qingdao Haiyan Grp. Co.*, 3:21-cv-00711 (M.D. Tenn.).
[45] *Id.*, at 7.
[46] *See generally* Alno RFI Response, Alno 1SRFI Response, Alno 2SRFI Response, and Alno 3RFI Response.
[47] *See* Verification Report.

finished packaged cabinets and vanities.[48] CBP was not able to verify or confirm whether all cabinets and vanities exported to Scioto were produced on site in Malaysia or imported from China due to the company's vague record keeping.[49] Finally, CBP found documents, *i.e.*, inbound delivery sheets (a document only used by Alno for items it had purchased), that showed the delivery of finished goods for Scioto.[50] The inbound delivery sheets contained SKUs and PO numbers for Scioto and were nearly identical to the ones for [ Name ] transshipped goods.[51]

Evidence on the record obtained by CBP confirms that much of the information that [ Name] had provided to AKCA in the Allegation regarding Alno's transshipment was correct. The Allegation stated that Alno exported cabinets and vanities of Chinese origin to one of its customers, *i.e.*, [ Name ].[52] In the Alno 1SRFI Response, Alno confirmed that it did export cabinets and vanities of Chinese origin to [Name ].[53] The Allegation identified certain SKUs from certain purchase orders (POs) as being of Chinese origin.[54] Alno confirmed that the SKUs in question identified in the Allegation had been transshipped during the POI.[55] The PO numbers in the Allegation matched documents CBP obtained from Alno at verification.[56] Alno admits that it transshipped to one of its customers, *i.e.*, [ Name ], but claims that it produced all the cabinets and vanities in Malaysia to all the other customers.[57] When CBP asked if Alno produced all of the cabinets and vanities in Malaysia, Alno stated that it did for all but [Name] customer.[58] When CBP asked in which countries were the cabinets and vanities produced in for the sales during the POI, Alno stated that products for [Name] customer were produced in [ Country ] and that all other products were made in Malaysia.[59] However, evidence on the record cast doubt on these statements from Alno.

At verification, CBP used the documents that showed transshipment to [ Name ] a establish how Alno tracked transshipped goods in its normal books and records. CBP officials asked how Alno knew which invoices related to [ Name ] goods that it admitted to having transshipped as seen in the Allegation.[60] Company officials stated that the information is available on the Packing Check-List from Haiyan Drouot.[61] Furthermore, the transshipped goods enter the raw material warehouse on a Finished Product Inbound Delivery (FPID) sheet; this sheet shows the SKUs, quantity, the reference PO, and clearly states finished product **inbound** delivery (emphasis added).[62] However, in Alno's RFI Response, it stated that it maintained 15 documents during the normal course of business for an average period of 18-months—one of those reported documents was an "Inbound Order."[63] In its third supplemental response, Alno clarified by saying:

---

[48] *Id.*
[49] *Id.*, at 17.
[50] *Id.*
[51] *Compare* Attachment at 22-25 *with* VE-10.
[52] *See generally* Allegation.
[53] *See* Alno 1SRFI Response.
[54] *See* Allegation, at Exhibit 12.
[55] *See* Alno 1SRFI Response.
[56] *See* Allegation, at Exhibit 12; *see also* VE-11.
[57] *See* Alno 1SRFI Response.
[58] *Id.*
[59] *Id.*
[60] *See* Verification Report, at 15. See attachment at 17-20
[61] *Id.*
[62] *See e.g.*, VE-10 at 20-30.
[63] *See* RFI Response, at 29-30.

*Alno keeps the products tracked by outbound sheets (warehouse-out sheets) for production inputs and **inbound sheets (warehouse-in sheets) for materials purchased*** (emphasis added).[64]

According to Alno's response, the FPID sheets are for materials that it purchased; therefore, the FPID sheet for the [ Name ] goods that were known to be transshipped were recorded according to their SKU, Quantity, PO number, because Alno purchased them.

As can be seen in the Attachment to this notice, Scioto provided FPID sheets dated [ Date ] and [ Date ] that refute Alno's own statements of producing all the goods it shipped to Scioto.[65] The FPID references finished goods entering Alno's raw material warehouse for POs [ #s ].[66] However, as noted in the Verification Report, the FPID sheet is only generated in one specific instance, *i.e.*, when goods enter the raw materials warehouse.[67] CBP officials asked both the General Manager and Chief Accountant when the FPID sheet is generated, and they stated that the FPID sheet is generated when purchased materials are entered into the raw materials warehouse.[68] Again, CBP asked "The Inbound Delivery Sheet would not be generated without goods coming in?" The GM replied, "Yes, it is only generated when goods are checked in."[69] Alno's own company officials stated it is for when purchased goods are checked in, confirming what Alno said in its third supplemental response on three occasions.[70] Further, Alno's Chief Accountant confirmed that Alno does not track inventory movement during the production process, which provides additional support that items listed on the FDIP are goods purchased by Alno.[71] Finally, Alno also did not provide the FPID sheets for any of the sales traces that the CBP verification team conducted on site during the verification, even though Alno had provided them in RFI responses. The only other time CBP officials saw inbound sheets was for when raw materials that Alno had purchased and when Alno transshipped finished cabinets and vanities from China to [ Name ], which generated FPID sheets identical to the ones in question.[72]

It is important to note that the FPID sheets show the identical SKUs and Quantities from the POs [ #s ], as well as specifically identifying for each item the PO that it is allocated.[73] These FPID sheets mirror the FPID sheets for [ Name ]'s transshipped goods. The documents are also signed by the same person, underscoring their authenticity.[74] The POs in question are on the record, and each PO states they are from Scioto Cabinetry to Alno.[75] They clearly show "Scioto Cabinetry" listed at the top, the ship to address matches Scioto's

---

[64] *See* Alno Third Supplemental Response, at 16.
[65] *See* Attachment, at 22-25.
[66] *Id.*
[67] *See* Verification Report, at 14.
[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] *Id.*, at 6-7.
[72] *See e.g.*, VE-10 at 20-30.
[73] *See* Attachment, at 22-25.
[74] *Id.*
[75] *Id.*

reported address in Ohio, and the vendor listed is "Alno Industry SDN BHD."[76] The POs also show the same SKUs, which are described as various finished cabinets and vanities, as those having been purchased by Alno from [ Name              ] with the same quantities; this means that the FPIDs in question should not exist if Alno did not transship goods for customers other than [Name  ].[77] Due to the existence of FPID sheets containing SKUs and POs for Scioto, the fact that this matches the documents used by Alno in its normal course of business to distinguish products that were transshipped from China through Malaysia for [Name  ], and Alno's own statements that inbound sheets are for materials purchased, CBP determines that this is significant evidence that Alno transshipped goods that were imported by Scioto during the POI.

As discussed above the inbound deliver sheets, are how Alno tracks transshipped finished goods coming from China through their Malaysian factory. The finished SKUs and PO numbers on the FPID sheet shows that transshipped finished goods entered its warehouse and then were shipped on to Scioto. CBP officials found FPID sheets for the transshipped goods to [Name  ] that were identical to FPID sheets that were for Scioto and matched Scioto's POs. Taken together, these documents are evidence that Alno had purchased Chinese-origin cabinets and vanities and had them delivered to its "raw materials" warehouse to be later exported to Scioto in a transshipping scheme to evade AD/CV duties.

*Reliability of [ Name          ] Sales Documents*

As discussed in detail below, evidence on the record shows that Alno has submitted to CBP inaccurate information and documents filled with discrepancies. Evidence on the record shows that Alno had provided inaccurate information from [ Name         ] that is unreliable.[78] At verification, CBP discovered that the unit transfer prices between [ Name            ] and Alno did not reflect market prices and fluctuated dependent on whichever company needed more funds.[79] The CBP verification team asked the Chief Accountant if Alno could explain the substantial price difference between the raw materials purchased from [ Name           ] in [ Date          ] and [ Date          ].[80] For example, on Invoice [ #            ], dated [ Date         ], the price for birch and hickory was $[ # ] and $[ # ], respectively, but on Invoice [ #       ], dated [ Date            ], the price for birch and hickory was $[ #    ] and $[ #    ].[81] Alno's Chief Accountant stated that the pricing depends on the product mix in the container.[82] CBP finds this response unsatisfactory as discussed in detail below, there is no way to tell what the product mix in the container actually is for any of [ Name           ]'s shipments.

Additionally, invoices from [ Name           ] use vague invoice descriptions that do not specify or categorize different sizes of wood or specific hardware.[83] All purchases of wood and parts were found to be under one of the six descriptions below, which uses only four item numbers:

---

[76] *Id.*
[77] *Id.*
[78] *See generally* Verification Report.
[79] *See* Verification Report, at 5.
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*, at 4-5.

- [ Description                                    ];
- [ Description                                    ];
- [ Description                        ];
- [ Description                                        ];
- [ Description                            ]; or
- [ Description                        ].[84]

Evidence on the record shows that [ Name          ] was also the supplier of the finished cabinets and vanities that were transshipped to [ Name ].[85] For the transshipped goods to [ Name ], the invoices from [ Name        ] listed them under either [ Description          ] or [ Description          ].[86] These vague descriptions mean CBP cannot confirm the contents of these purchases based solely on the commercial invoices, packing lists, bill of ladings, *etc.*, from the supplier [ Name        ] to identify shipments that had transshipped goods. At verification, CBP asked how Alno knew which shipments contained transshipped goods, and company officials stated that the information is available on the Packing Check-List from [ Name        ].[87]

Furthermore, as noted in the Verification Report, [ Name        ] invoices all contain the quantity in terms of pieces in the first column of its invoices, but the quantity in the second column varied between three types: 1) cartons; 2) packages; and 3) pallets.[88] Additionally, the quantity types would not always be consistent among invoices from the Chinese supplier.[89] This also obscures the volume and types of goods purchased from the Chinese supplier. When listed as pallets, the Packing List appeared to support what the invoice claimed, but in some cases, when packages or cartons were used as the quantity type, the matching Packing Check-Lists would contain SKUs of finished goods which then also had a related FPID sheet.[90] The inconsistent ways of documenting invoice quantities, coupled with vague invoice and packing list descriptions, seem indicative of [ Name        ] and Alno attempting to withhold information from CBP to obtain a favorable outcome in this investigation.

Also, at verification CBP officials noticed glass doors listed on invoices from Alno to [ Name ] and asked about the glass needed to make them.[91] The verification team did not see or hear Alno mention glass during the production demonstration.[92] Company officials confirmed that Alno does not make glass doors and obtains the glass from [ Name        ].[93] CBP asked Alno to provide two years of invoices for the purchase of the glass at our request.[94] CBP officials found that glass was not listed on the [ Name        ] invoices.[95] The CBP verification team learned

---

[84] *Id.*
[85] *See* VE-10.
[86] *Id.*
[87] *See* Verification Report, at 15.
[88] *Id., see also* Attachment, at 20.
[89] *Id.*
[90] *See* VE-10.
[91] *See* Verification Report, at 13.
[92] *Id.*
[93] *Id.*
[94] *Id.*
[95] *Id.*

that the glass is ordered by calling the parent company, *i.e.*, Haiyan Group, and no purchase orders are issued so there is no record of how much glass Alno ordered.[96] The glass is not separately identified on the raw material invoices and is incorrectly listed as [ Description ], which have a value as low as $[ # ] per screw. There are no inventory records for glass when it is received.[97] When imported into Malaysia, the glass is either not declared or declared as hardware/screws.[98] The CBP verification team noted the process, as described by company officials, shows no evidence that the glass entered the production process at any point.[99] The fact that glass shipments to Alno are either not declared or declared as something else is evidence that supplier [ Name ] is willing to omit or obfuscate important information in paperwork, evidence which casts doubt on the reliability of the supplier's documents to use as proof that Alno did not transship cabinets and vanities of Chinese origin.

Finally, the Allegation specifically identified container [ # ] as containing finished goods arriving at Alno for transshipment to [ Name ].[100] Additionally, in the Allegation was a picture provided by the QCI of the packaged cabinets and vanities in the container.[101] CBP officials were able to verify that the packaging of the goods in the container was like the packaging of the unshipped [ Name ] finished products in the "Additional Warehouse" at Alno when inspected during the verification.[102] Furthermore, the Verification Report noted that the packaging in the container did not match anything in the Raw Materials Warehouse on site, which is indicative that the items in the container are indeed finished goods and not raw materials.[103] CBP officials were also able to verify that the [ Name ] commercial invoice, packing list, and Packing Check-List related to container [ # ] listed the goods as [ Description ].[104] The paperwork provided by Alno conflicts with the sworn statement by the [ Name ] QCI and with the photo provided in the Allegation that the container was loaded with finished goods transshipped via China.[105] In the Verification Report, CBP identified that it was this container and information that caused [ Name ] to ask for Scioto to verify the country of origin of Alno's cabinets and that caused the subsequent admission from the Haiyan Group of providing transshipped goods.[106] While this discrepancy alone is not definitive proof of transshipment to other customers occurring, [ Name ] not declaring or misclassifying goods and other evidence on the record substantiates the QCI claims in the Allegation. This is a strong indicator that [ Name ]'s and Alno's paperwork is unreliable.

Based on the aforementioned reasons, CBP determines that the paperwork from supplier [ Name ] provided by Alno is unreliable evidence that transshipment was not occurring

---

[96] *Id.*
[97] *Id.*
[98] *Id.*
[99] *Id.*
[100] *See* Allegation, at Exhibit 11.
[101] *Id.*
[102] *See* Verification Report, at 17.
[103] *Id.*
[104] *See* VE-10, *see also* Attachment at 21
[105] *Id.*
[106] *See* Verification Report, at 17.

at Alno. Combining this information with Alno's admission to transshipping cabinets and vanities of Chinese-origin to [ Name ] during the POI, provides strong support for CBP's determination that there is substantial evidence that Alno was transshipping cabinets and vanities to Scioto.

*Adverse Inferences*

EAPA regulation at 19 CFR 165.6(a) states:

> If . . . the importer, or the foreign producer or exporter of the covered merchandise fails to cooperate and comply to the best of its ability with a request for information made by CBP, CBP may apply an inference adverse to the interests of that party in selecting from among the facts otherwise available to make the determination as to evasion. . . .

CBP finds that Alno failed to act to the best of its ability in this EAPA investigation by Alno's failure to cooperate and comply with CBP at verification. CBP encountered the following issues at verification:

- CBP discovered the existence of an additional warehouse that was not previously reported. This discovery happened after the GM was asked and provided inaccurate information that no other location existed.[107]
- CBP had to ask company officials multiple times to provide documents and each time discovered that documents were missing, *e.g.*, Packing-Check Lists.[108]
- Alno attempted to provide CBP officials unrelated or irrelevant documents that were unsolicited to cover for their error of not providing certain documents after being asked multiple times.[109]
- CBP was unsure the missing emails provided to CBP at verification were original emails since CBP was not provided with access to the original files despite asking for access.[110]

As a result of this lack of cooperation, CBP was unable to rely on the records Alno kept in its normal course of business and unable to fully understand the inventory management processes at Alno. Therefore, CBP is applying adverse inferences in drawing conclusions from other information on the record. CBP is relying on information in the Allegation and obtained from Alno, to determine <u>all</u> cabinets and vanities exported to the United States to Scioto are from China.[111] Specifically, CBP is relying on the information provided by the Alleger in the Allegation, *i.e.*, litigation documents showing Alno transshipped cabinets and vanities to CTG.[112] CBP is also relying on other evidence on the record obtained from Alno, as described above, that shows it transshipped cabinets and vanities of Chinese-origin to Scioto specifically during the POI that were entered into the United States.[113] Based on all this information, CBP finds that all

---

[107] *See* Verification Report, at 9-10.
[108] *Id.*, at 15-16.
[109] *Id.*, at 16.
[110] *Id.*, at 10-11.
[111] *See* Allegation.
[112] *Id.*, at Exhibit 4.
[113] *See e.g.*, Alno 1SRFI Response.

of the cabinets and vanities that Scioto imported into the United States from Alno are of Chinese origin.

*Written Arguments*

1. Adverse Inferences

Alleger:

- Alno failed to act to the best of its ability, because CBP could not verify the accuracy of critical information. Therefore, the application of adverse inferences is warranted.[114]
- Adverse inference should apply to all of Alno's exports to the United States not just the ones to Scioto.[115]

Scioto:

- A determination based on adverse facts available is not supported by information on the record.[116]
- Alno and Scioto have cooperated to the best of their ability.[117]
- The discrepancies at issue are of not material issue.[118]

CBP Position:

We disagree with Scioto based on the reasons set forth above.

2. Forced Labor

Alleger:

- CBP should self-initiate a forced labor probe in accordance with Section 307 of the U.S. Tariff Act of 1930, due to its verification team discovering that Alno retains foreign workers' passports.[119]
- Passport retention is a strong indicator of forced labor, which is pervasive in Malaysia.[120]

Scioto:

- CBP should not self-initiate a forced labor probe because keeping worker passports alone is an insufficient justification, based on the International Labor Organization's (ILO) eleven indicators of forced labor.[121]

---

[114] *See* Alleger Written Arguments, at 4-9.
[115] *Id.*, at 9.
[116] *See* Scioto Rebuttal Arguments, at 2-13.
[117] *Id.*
[118] *Id.*
[119] *See* Alleger Written Arguments, at 10-12.
[120] *Id.*, at 11.
[121] *See* Scioto Rebuttal Arguments, at 7-8.

- Alno only keeps the foreign workers' passports for security reasons, and the workers can retrieve them at any time.[122]

CBP Position:

The purpose of the verification is for CBP to validate the information and data submitted by either importers or foreign manufacturers participating in an EAPA investigation. As such, CBP was on site to validate information in Alno's RFI responses to aide CBP in its determination of whether Alno produced the cabinets and vanities that it exported to Scioto, not to assess labor conditions. CBP took note of the passport retention, but it is not a factor CBP will consider for this EAPA investigation.

3. Verification Report

Scioto:

- There are several issues with CBP's Verification Report.[123]
- CBP either misunderstood, reported descriptions are inaccurate, or its descriptions require clarification.[124]
- It was unreasonable for CBP to not accept additional documents as Alno was overwhelmed by the numerous document requests, and CBP should have expected mistakes to happen.[125]
- CBP should not presume that information in the Allegation is entirely accurate.[126]

Alleger:
- CBP should reject Scioto's written arguments because it is an attempt to rebut and clarify CBP's on site Verification Report with new factual information that was not previously on the record.[127]
- CBP has rejected such attempts in the past and those decisions have been upheld by the Court of International Trade.[128]

CBP Position:

It is the responsibility of Parties to the Investigation and Interested Parties, as defined by 19 CFR 165.1, to ensure the information they place on the record or provide to CBP is complete, true, and accurate. In the same vein, it is also their responsibility to make sure that the information they are conveying is presented clearly. This continues to hold true when CBP is conducting verification. As stated above, the purpose of verification is for CBP to validate the information and data submitted by parties, and verification allows the parties being verified to fully explain

---

[122] *Id.*
[123] *See* Scioto Written Arguments, at 1-7.
[124] *Id.*
[125] *Id.* at 6.
[126] *Id.*, at 7.
[127] *See* Alleger Rebuttal Arguments, at 1-4.
[128] *Id.*

their record responses. In this instance, CBP was on site to validate information in Alno's RFI responses to aide CBP in its determination of whether Alno produced the cabinets and vanities that it exported to Scioto. The Verification Report written by CBP and released to parties was the result of the collaboration of all seven CBP officials that attended verification. All seven officials agree that the report released to parties is a true and accurate account of what was observed, verified, and happened at verification.

CBP's verification team followed its standard practice for allowing parties to take corrective action for any deficiency or non-conforming submission found at verification. At verification, after a CBP official asked for an item or items and discovered a deficiency, CBP officials allowed Alno the opportunity to take corrective action. CBP officials only determined that anything offered after that corrective action was already taken was non-conforming. Allowing a party to take repeated corrective actions for an identified deficiency shifts the responsibility for the accuracy and completeness of information on the record from the manufacturer to CBP, whose responsibility in the matter is to maintain the record and determine its validity.[129] CBP did not force Alno to provide requested information when it knew was incomplete, nor did it set any time limits to provide the information during verification.[130] Alno provided the information only after it deemed it complete and ready to present to CBP, as evident by the CBP officials asking if Alno provided everything that CBP requested.[131] CBP believes that Alno was afforded sufficient time during the verification to present the information requested from it, but that Alno often failed to take the time and effort to ensure completeness, and instead relied on CBP to do it for them.

Finally, CBP finds that much of the information in the Allegation was accurate based on Alno's responses and information reviewed during the on-site verification. The Allegation stated that Alno exported cabinets and vanities of Chinese-origin to one of its customers, *i.e.*, CTG.[132] In the Alno 1SRFI Response, Alno confirmed that it did export cabinets and vanities of Chinese-origin to [ Name ].[133] The Allegation identified certain SKUs from certain POs as being of Chinese origin.[134] Alno confirmed that the SKUs in question identified in the Allegation had been transshipped during the POI.[135] The PO numbers in the Allegation matched documents CBP obtained from Alno at verification.[136] The container number in question, *i.e.*, [ # ], did indeed arrive at Alno around the time it was claimed based on documents obtained at verification.[137] The pictures of the packaged cabinets and vanities in the container taken by the QCI matched unshipped packaged cabinets and vanities for [ Name ] found in the "Additional Warehouse."[138] Therefore, based on substantial evidence on the record, CBP finds no reason to question the accuracy of the QCI report provided in the Allegation.

---

[129] *See* 19 CFR 165.21, *see also* 19 CFR 165.25.
[130] *See generally* Verification Report.
[131] *See e.g.,* Verification Report, at 15
[132] *See generally* Allegation.
[133] *See* Alno 1SRFI Response.
[134] *See* Allegation, at Exhibit 12.
[135] *See* Alno 1SRFI Response.
[136] *See* Allegation, at Exhibit 12; see also VE-11.
[137] *Id.*
[138] *See* Verification Report.

4. Determination

Scioto:

- A negative determination should be made as CBP has not met the requisite standard of proof to find evasion in this investigation.[139]
- The record establishes that the only covered merchandise was sent to [Name].[140]

Alleger:

- Substantial evidence supports a finding of evasion.[141]
- CBP uncovered a wide array of discrepancies during the investigation.[142]

CBP Position:

Based on the analysis described in detail above, CBP believes there is substantial evidence on the record to show that Alno exported transshipped goods of Chinese-origin through Malaysia and that Scioto imported those products into the United States.

5. Due Process

Scioto:

- Scioto' and Alno's due process rights were violated by failing to provide its counsel with confidential record information.[143]

Alleger:

- No due process rights were violated based on Court of International Trade (CIT) decisions, because parties received public versions with public summaries.[144]

CBP Position:

The CIT has already opined on the rights of parties in EAPA investigations to have access to business confidential information. The CIT has found that the lack of access to confidential information is not a due process issue.[145] In *Royal Brush Mfg., Inc. v. United States*, the CIT

---

[139] *See* Scioto Written Arguments, at 7-9.
[140] *Id.*
[141] *See* Alleger Rebuttal Arguments, at 5-7.
[142] *Id.*
[143] *See* Scioto Written Arguments, at 9-10.
[144] *See* Alleger Rebuttal Arguments, at 7-9.
[145] *See Royal Brush Mfg., Inc. v. United States*, 545 F. Supp. 3d 1357 at 1369 (Ct. Int'l Trade Oct. 29, 2021) (*Royal Brush*) (rejecting a similar claim and holding that CBP's withholding of confidential information does not violate a respondent's due process rights where "CBP has complied with 19 CFR 165.4 by providing necessary public summaries of the confidential information….").

found that a party is only entitled to public summaries of the business confidential information, pursuant to 19 CFR 165.4(a)(1) and (e). The parties do not otherwise have a right to review business confidential information, as the statute and regulations do not provide for such. CBP has provided Scioto's counsel with the requisite public version of documents that contained public summaries of redacted business confidential information. Therefore, CBP has ensured that due process had been followed during the investigation in accordance with 19 CFR 165.4.

**Determination as to Evasion**

The previously discussed facts on the record establish that there is substantial evidence that Chinese-origin cabinets and vanities were imported into the United States by evasion, specifically via transshipment through Malaysia. Additionally, by application of adverse inferences, relying on evidence provided in the Allegation and obtained from Alno, CBP determines that all the cabinets and vanities exported by Alno via Malaysia to Scioto were of Chinese origin. Furthermore, evidence on the record indicates that Scioto entered the Chinese-origin cabinets and vanities into the United States as type 01 entries and evaded the payment of AD/CV duties on cabinets and vanities from China, including by misrepresenting the cabinets and vanities as Malaysian in origin.[146] The cabinets and vanities that Scioto entered from Alno during the period of investigation should have been subject to the AD/CVD rates on cabinets and vanities from China.

**Actions Taken Pursuant to the Affirmative Determination as to Evasion**

In light of CBP's determination that substantial evidence demonstrates that the Importer entered covered merchandise into the customs territory of the United States through evasion, and pursuant to 19 U.S.C. § 1517(d) and 19 CFR 165.28, CBP will suspend or continue to suspend the entries covered by this investigation, until instructed to liquidate. For those entries previously extended in accordance with Interim Measures, CBP will rate adjust and change those entries to type 03 and continue suspension until instructed to liquidate these entries. CBP will continue to evaluate the Importer's continuous bonds in accordance with CBP's policies. None of the above actions precludes CBP or other agencies from pursuing additional enforcement actions or penalties.

---

[146] Entry type "01" is the code that CBP requires importers use to designate a standard consumption entry that is not subject to AD/CVD duties. *See* https://www.cbp.gov/trade/automated/ace-transaction-details.

16

Sincerely,

Victoria Cho
(A) Director, Enforcement Operations Division
Trade Remedy Law Enforcement Directorate
CBP Office of Trade

17

Attachment

Packing check list showing transshipped SKUs, snip from VE-10, page 18[

<span style="color:red">Snip</span>

]

FPID showing finished goods from the packing check-list arriving, snip from VE-10, page 20[

snip

]

Information provided to CTG showing transshipped goods matching information in the previous two pages, snip from Allegation, Exhibit 12 [

snip

]

Invoice showing qty inconsistencies, snip from VE-17, page 1[

snip

]

Invoice showing qty inconsistencies, snip from VE-17, page 5[

snip

]

Invoice showing qty inconsistencies, snip from VE-17, page 13[

snip

]

Packing Check-list for container identified in allegation, snip from VE-10, page 12[

snip

]

FPID showing purchased finished goods arriving, snip from Alno RFI Response Exhibit IV [

snip

]

PO from customer matching the FPID, snip from Alno RFI Response Exhibit IV [

snip

]

PO from customer matching the FPID, snip from VE-4 [

snip

]

Snip from Alno's RFI Response, Exhibit 10[

snip of FPID

]