IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | | |
|---|---|---|
| AMERICAN KITCHEN CABINET ALLIANCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 23-00140 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SCIOTO VALLEY WOODWORKING, INC. | ) | |
| d/b/a VALLEYWOOD CABINETRY, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

## DECLARATION BY LEE BAXLEY

Lee Baxley declares and says:

1.    I am an International Trade Analyst in the Office of Trade, Trade Remedy Law
      Enforcement Directorate (TRLED), Enforcement Operations Division (EOD), at U.S.
      Customs and Border Protection (CBP). I have been employed by CBP since July
      2018, and I have held my current position since August 2021.

2.    It is my understanding that American Kitchen Cabinet Alliance has commenced the
      above-captioned action in the United States Court of International Trade challenging
      the Administrative Review in Enforce and Protect Act (EAPA) Case No. 7705.

3.    I have prepared a true and complete copy of the administrative record in the above-
      referenced proceeding.

4.    To the best of my knowledge, I have included in the administrative record all
      documents pertaining to the above-referenced proceeding presented to or obtained by
      CBP during the proceeding.

5.    Pursuant to Rule 73.3(b), the parties have stipulated to an alternative filing procedure
      and only the following documents will be filed with the Clerk of the Court:

      a.   Public and Confidential Indices of the Administrative Record that contain a complete list of the documents comprising the Administrative Record in this matter;

      b.   True and complete copies of the Final Determination and the Administrative Review Determination in EAPA Consolidated Case 7705.

6.     The remaining documents comprising the Administrative Record will be delivered to the parties via an express courier service.

7.     I affirm, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on the 17th day of August 2023.

/s/ LEE M BAXLEY
Digitally signed by LEE M BAXLEY
Date: 2023.08.17 08:58:39 -04'00'

Lee Baxley
International Trade Analyst
Enforcement Operations Division
Trade Remedy Law Enforcement Directorate
Office of Trade
U.S. Customs and Border Protection

EAPA INVESTIGATION NO. 7705

**American Kitchen Cabinets Alliance v. United States**
**Court No. 23-00140**
**Public Index**

| Document Number | Date of Document | File Name | Version |
|---|---|---|---|
| 1 | 2/3/2022 | AKCA - Valleywood Allegation - (7705) - PV | Public Version |
| 2 | 3/9/2022 | TRLED - Official Receipt Email - (7705) - PD | Public Document |
| 3 | 3/9/2022 | TRLED - Receipt Checklist - (7705) - PD | Public Document |
| 4 | 3/22/2022 | DCNTAC - Receipt Report - (7705) - PV | Public Version |
| 5 | 3/30/2022 | TRLED - Initiation Checklist - (7705) - PD | Public Document |
| 6 | 3/30/2022 | TRLED - Initiation Memo - (7705) - PV | Public Version |
| 7 | 3/30/2022 | TRLED - Internal Initiation Email - (7705) - PV | Public Version |
| 8 | 4/18/2022 | Scioto - Customs Power of Attorney - (7705) - PD | Public Document |
| 9 | 6/1/2022 | Scioto - Response to Customs CF 28 - (7705) - PV | Public Version |
| 10 | 6/1/2022 | TRLED - Response to Extension Request - (7705) - PD | Public Document |
| 11 | 6/1/2022 | TRLED - Response to Extension Request Correction - (7705) - PD | Public Document |
| 12 | 6/24/2022 | TRLED - Memo to File - (7705) - PD | Public Document |
| 13 | 6/28/2022 | TRLED - Email Implementing Interim Measures - (7705) - PD | Public Document |
| 14 | 6/28/2022 | TRLED - Internal Email Implementing Interim Measures - (7705) - PV | Public Version |
| 15 | 7/6/2022 | TRLED - Notice of Initiation and Interim Measures - (7705) - PV | Public Version |
| 16 | 7/8/2022 | TRLED - Email PV RFI - (7705) - PD | Public Document |
| 17 | 7/8/2022 | TRLED - Example of Bracketing - (7705) - PD | Public Document |
| 18 | 7/8/2022 | TRLED - Importer Request for Information - (7705) - PV | Public Version |
| 19 | 7/8/2022 | TRLED - MANUFACTURER Request for Information - (7705) - PV | Public Version |
| 20 | 7/12/2022 | TRLED - Administrative Record Email - (7705) - PD | Public Document |
| 21 | 7/18/2022 | Scioto and Alno - Extension Request for RFI - (7705) - PD | Public Document |

| | | | |
|---|---|---|---|
| 22 | 7/19/2022 | TRLED - First Extension Response - (7705) - PD | Public Document |
| 23 | 7/27/2022 | Scioto and Alno - Second Extension Request - (7705) - PD | Public Document |
| 24 | 7/29/2022 | TRLED - Second Extension Request Response - (7705) - PD | Public Document |
| 25 | 8/4/2022 | Scioto and Alno - Third Extension Request - (7705) - PD | Public Document |
| 26 | 8/8/2022 | TRLED - Third Extension Request Response - (7705) - PD | Public Document |
| 27 | 8/17/2022 | TRLED - Rejection Email - (7705) - PD | Public Document |
| 28 | 8/18/2022 | Scioto and Alno - Extension Request - (7705) - PD | Public Document |
| 29 | 8/18/2022 | TRLED - Email Task Extension Request - (7705) - PD | Public Document |
| 30 | 8/25/2022 | Alno - Exhibits Combined - (7705) - PV | Public Version |
| 31 | 8/25/2022 | Scioto & Alno - Final Response - (7705) - PV | Public Version |
| 32 | 8/25/2022 | Scioto - Exhibits - (7705) - PV | Public Version |
| 33 | 8/25/2022 | Scioto - Response FINAL - (7705) - PV | Public Version |
| 34 | 9/2/2022 | TRLED - Email Alno First Supplemental RFI - (7705) - PV | Public Version |
| 35 | 9/2/2022 | TRLED - Manufacturer First Supplemental RFI - (7705) - PV | Public Version |
| 36 | 9/2/2022 | TRLED - Manufacturer Second Supplemental RFI - (7705) - PV | Public Version |
| 37 | 9/9/2022 | Alno - Supplemental RFI - (7705) - PV | Public Version |
| 38 | 9/9/2022 | TRLED - Email  Alno Second Supplemental BC RFI - (7705) - PD | Public Document |
| 39 | 9/9/2022 | TRLED - Email Alno Second Supplemental RFI - (7705) - PV | Public Version |
| 40 | 9/12/2022 | Alno - Second Supp RFI Extension Request - (7705) - PD | Public Document |
| 41 | 9/12/2022 | TRLED - Email for Scioto Supplemental BC RFI - (7705) - PD | Public Document |
| 42 | 9/12/2022 | TRLED - Email for Scioto Supplemental PV RFI - (7705) - PD | Public Document |
| 43 | 9/12/2022 | TRLED - Importer First Supplemental RFI - (7705) - PV | Public Version |
| 44 | 9/13/2022 | Scioto -  RFI Extension Request - (7705) - PD | Public Document |
| 45 | 9/14/2022 | TRLED - Response to Extension Request - (7705) - PD | Public Document |
| 46 | 9/16/2022 | TRLED - Response to Extension Request - (7705) - PD | Public Document |

| | | | |
|---|---|---|---|
| 47 | 9/19/2022 | Alno - Extension Request - (7705) - PD | Public Document |
| 48 | 9/20/2022 | TRLED - Response to Alno Second Extension Request - (7705) - PD | Public Document |
| 49 | 9/20/2022 | TRLED - Response to Extension Request - (7705) - PD | Public Document |
| 50 | 9/26/2022 | Alno - Second Sup RFI Cover Letter - (7705) - PV | Public Version |
| 51 | 9/29/2022 | Scioto - Second RFI Cover Letter - (7705) - PV | Public Version |
| 52 | 9/29/2022 | Scioto - Second RFI Exhibits - (7705) - PV | Public Version |
| 53 | 9/29/2022 | TRLED - Administrative Record Email - (7705) - PD | Public Document |
| 54 | 10/5/2022 | TRLED - Email Third Supplemental RFI - (7705) - PD | Public Document |
| 55 | 10/5/2022 | TRLED - Manufacturer Third Supplemental RFI - (7705) - PV | Public Version |
| 56 | 10/6/2022 | Alno - Extension Request 3rd Supp Final - (7705) - PD | Public Document |
| 57 | 10/17/2022 | Alno - 3rd Supp RFI - (7705) - PV | Public Version |
| 58 | 10/17/2022 | TRLED - Site Visit Engagement Letter - (7705) - PV | Public Version |
| 59 | 11/3/2022 | Alno Verification Exhibits Combined - (7705) - PV | Public Version |
| 60 | 11/3/2022 | TRLED - Email Extension of Written Arguments Deadline - (7705) - PD | Public Document |
| 61 | 12/21/2022 | RAAAS - Verification Report - (7705) - PV | Public Version |
| 62 | 12/23/2022 | TRLED - Deadline for Written Arguments - (7705) - PD | Public Document |
| 63 | 12/23/2022 | TRLED - Email of Verification Report - (7705) - PD | Public Document |
| 64 | 1/4/2023 | Alleger - Written Comments - (7705) - PD | Public Document |
| 65 | 1/4/2023 | Scioto & Alno - Submission - (7705) - PV | Public Version |
| 66 | 1/19/2023 | Alleger - Rebuttal Comments - (7705) - PD | Public Document |
| 67 | 1/19/2023 | Alno & Scioto - Rebuttal Comments - (7705) - PV | Public Version |
| 68 | 1/24/2023 | TRLED - Internal Email Determination of Evasion - (7705) - PV | Public Version |
| 69 | 1/31/2023 | TRLED - Determination of Evasion - (7705) - PV | Public Version |
| 70 | 1/31/2023 | TRLED - Email Final Determination - (7705) - PD | Public Document |
| 71 | 3/15/2023 | RR – Request for Administrative Review Appendix 6 – (7705) – PV | Public Version |

| | | | |
|---|---|---|---|
| 72 | 3/15/2023 | Scioto – Review Request – (7705) – PV | Public Version |
| 73 | 3/15/2023 | RR – Request for Administrative Review Appendix 8 – (7705) – PV | Public Version |
| 74 | 3/15/2023 | Scioto – Review Request Resubmission – (7705) – PV | Public Version |
| 75 | 3/15/2023 | RR – Request for Administrative Review Part 13 – (7705) - PD | Public Document |
| 76 | 3/15/2023 | RR – Request for Administrative Review Part 14 – (7705) – PD | Public Document |
| 77 | 3/16/2023 | RR – Request for Administrative Review Part 2 – (7705) – PD | Public Document |
| 78 | 3/16/2023 | RR – Request for Administrative Review Part 3 – (7705) – PD | Public Document |
| 79 | 3/17/2023 | RR – Request for Administrative Review Part 1 – (7705) – PD | Public Document |
| 80 | 3/17/2023 | Scioto – Review Request Submission – Final – (7705) – PV | Public Version |
| 81 | 3/20/2023 | RR – Received Timely Request for Administrative Review – (7705) – PD | Public Document |
| 82 | 3/30/2023 | RR – Confirmation of Receipt of Response – (7705) – PD | Public Document |
| 83 | 3/302023 | Alleger – Response to Review Request – (7705) – PD | Public Document |
| 84 | 6/12/2023 | RR – Admin Review Determination of Evasion Decision – (7705) – PV | Public Version |
| 85 | 6/12/2023 | RR – Email of Final Administrative Decision – (7705) – PD | Public Document |

Public Document No. 69



**PUBLIC VERSION**

January 31, 2023

Cortney Morgan
On behalf of Scioto Valley Woodworking, Inc.
Husch Blackwell1801 Pennsylvania Ave NW, Suite 1000
Washington, DC 20006
cortney.morgan@huschblackwell.com

Luke Meisner
On behalf of the Kitchen Cabinet
Manufacturers Association
Schagrin Associates
900 Seventh Street, NW, Suite 500
Washington, D.C. 20001
lmeisner@schagrinassociates.com

Re: Notice of Determination as to Evasion - EAPA Case 7705

---

Pursuant to an examination of the record in Enforce and Protect Act (EAPA) Investigation 7705, U.S. Customs and Border Protection (CBP) has determined there is substantial evidence that Scioto Valley Woodworking, Inc. d/b/a Valleywood Cabinetry (Scioto or Importer) entered merchandise covered by antidumping duty (AD) and countervailing duty (CVD) orders A-570-106 and C-570-107[1] on wooden cabinets and vanities and components thereof (cabinets and vanities) from the People's Republic of China (China) into the customs territory of the United States through evasion. Substantial evidence demonstrates Scioto imported Chinese-origin cabinets and vanities that were transshipped to the United States with a claimed country of origin of Malaysia. As a result, no cash deposits were applied to the merchandise at the time of entry.

**Background**

---

[1] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Antidumping Duty Order*, 85 FR 22,126 (Dep't Commerce Apr. 21, 2020); *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Countervailing Duty Order*, 85 FR. 22,134 (Dep't Commerce Apr. 21, 2020) (collectively, the *Orders*).

On February 3, 2022, the American Kitchen Cabinet Alliance (AKCA or the Alleger) filed an allegation against Scioto.[2] One of Scioto's customer Cabinets to Go (CTG) had cooperated with AKCA in providing evidence that showed Alno Industry SDN BHD (Alno)[3] sold it transshipped cabinets and vanities of Chinese-origin. On March 9, 2022, the Trade Remedy Law Enforcement Directorate (TRLED), within CBP's Office of Trade, acknowledged receipt of the properly filed allegation by the Alleger, a domestic producer of cabinets and vanities.[4] TRLED found the information provided in the Allegation reasonably suggested that Scioto entered covered merchandise into the customs territory of the United States through evasion. Consequently, CBP initiated an investigation on March 30, 2022, pursuant to Title IV, Section 421 of the Trade Facilitation and Trade Enforcement Act of 2015, commonly referred to as the "EAPA."[5]

On July 6, 2022, after evaluating the information on the record at that time, CBP issued its Notice of Initiation and Interim Measures.[6] TRLED determined that reasonable suspicion existed that Scioto had evaded the *Orders* by claiming cabinets and vanities imported into the United States were of Malaysian origin when it was actually of Chinese origin.[7] TRLED based its determination on the sufficient information provided in the Allegation (*e.g.*, Scioto's admission to transshipping in an ongoing civil suit) and the stock-keeping units (SKUs) known to be of Chinese origin found in the CF-28 response.[8]

*Request for Information*

On July 8, 2022, pursuant to 19 CFR 165.5, CBP sent a Request for Information (RFI) to Scioto and to the claimed manufacturer, Alno,[9] about shipments to the Importer.[10] On August 10, 2022, CBP received an RFI responses from Alno and Scioto to CBP's July 8 RFI. On August 17, 2022, CBP rejected Scioto's and Alno's RFI responses because the documents did not conform to EAPA regulations and requested they refile them.[11] On August 25, 2022, Alno and Scioto timely

---

[2] *See* Letter from the AKCA, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Request for an Investigation under the Enforce and Protect Act of Scioto Valley Woodworking, Inc. d/b/a Valleywood Cabinetry," dated February 3, 2022 (Allegation).

[3] Alno, the reported Malaysian manufacturer, is owned by the Chinese company Qingdao Haiyan Group Co., Ltd. (Haiyan). Haiyan also owns Scioto.

[4] *See* email "EAPA 7705 - Receipt of EAPA Allegation 7705: Receipt of Properly Filed Allegation," dated March 9, 2022.

[5] *See* Memorandum, "Initiation of Investigation for EAPA Case Number 7705 – Scioto Valley Woodworking, Inc.," dated March 30, 2022 (Initiation Notice).

[6] *See* Memorandum, "Notice of Initiation of Investigation and Interim Measures - EAPA Case 7705," dated July 6, 2022 (NOI).

[7] *Id*.

[8] *Id.*

[9] Alno Industry SDN BHD (Alno), the reported Malaysian manufacturer, is owned by the Chinese company Qingdao Haiyan Group Co., Ltd. (Haiyan). Haiyan also owns Scioto.

[10] *See* Memorandum, "EAPA CASE NUMBER 7705 - Request for Information," dated July 8, 2022 (Alno RFI). *See* Memorandum, "EAPA CASE NUMBER 7705 – Request for Information," dated July 8, 2022 (Scioto RFI).

[11] *See* email "EAPA 7705: Rejection of Submission," dated July 30, 2021.

refiled their RFI responses.[12] On September 2, 2022, CBP sent a supplemental RFI to Alno.[13] On September 8, 2022, Alno responded to Alno 1SRFI.[14] On September 9, 2022, CBP sent a second supplemental RFI to Alno.[15] On September 12, 2022, CBP sent a supplemental RFI to Scioto.[16] On September 26, 2022, CBP received Alno's second supplemental response.[17] On September 29, 2022, CBP received Scioto's supplemental RFI response.[18] On October 5, 2022, CBP sent a third supplemental RFI to Alno.[19] On October 17, 2022, CBP received Alno's third supplemental response.[20]

*Verification and Written Arguments*

On October 17, 2022, CBP sent a site engagement letter to Alno regarding verification.[21] From October 24, 2022, through October 27, 2022, CBP conducted an on-site verification of Alno in Malaysia.[22] On December 22, 2022, CBP released the Verification Report to parties to the investigation.[23] On January 4, 2022, CBP received written arguments from Scioto and the Alleger.[24] On January 19, 2022, CBP received rebuttals arguments from Scioto and the Alleger.[25]

## **Analysis**

Under 19 U.S.C. § 1517(c)(1)(A), to reach a final determination as to evasion, CBP must, "make a determination, based on substantial evidence, with respect to whether such covered merchandise entered into the customs territory of the United States through evasion." Evasion is

---

[12] *See* letter from Alno, "EAPA Case No. 7705: Third Request for Extension for Response to CBP Questionnaires," dated August 25, 2022 (Alno RFI Response); *see also* letter from Scioto, "EAPA Case No. 7705: Third Request for Extension for Response to CBP Questionnaires," dated August 25, 2022 (Scioto RFI Response).

[13] *See* Memorandum "EAPA 7705; – First Supplemental Request for Information to Alno Industry SDN BHD," dated September 2, 2022 (Alno 1SRFI).

[14] *See* letter from Alno "EAPA Case No. 7705: First Supplemental Request for Information Questionnaire Response," dated September 8, 2022 (Alno 1SRFI Response).

[15] *See* Memorandum "EAPA 7705; – First Supplemental Request for Information to Alno Industry SDN BHD," dated September 9, 2022 (Alno 2SRFI).

[16] *See* Memorandum "EAPA 7705; – First Supplemental Request for Information to Alno Industry SDN BHD {sic}," dated September 9, 2022 (Scioto 1SRFI).

[17] *See* letter from Alno, "EAPA Case No. 7705: Second Supplemental Request for Information to Alno Industry SDN BHD," dated September 22, 2022 (Alno 2SRFI Response).

[18] *See* letter from Scioto, " EAPA Case No. 7705: Second Supplemental Request for Information to Scioto Valley Woodworking, Inc. d/b/a/ Valleywood Cabinetry," dated September 29, 2022 (Scioto 1SRFI Response).

[19] *See* Memorandum, "EAPA 7705; Third Supplemental Request for Information to Alno Industry SDN BHD," dated October 5, 2022 (Alno 3SRFI).

[20] *See* letter from Alno, "EAPA Case No. 7705: Third Supplemental Request for Information to Alno Industry SDN BHD," dated October 17, 2022 (Alno 3SRFI Response).

[21] *See* Letter from CBP, "Site Engagement Letter," dated October 17, 2022.

[22] *Id.; see also* Memorandum, "On-Site Verification Report," dated December 21, 2022 (Verification Report).

[23] *See* Verification Report.

[24] *See* letter from Alleger, "Investigation Concerning the Evasion of Antidumping and Countervailing Duty Orders: Written Comments," dated January 4, 2023 (Alleger Written Arguments); letter from Scioto, "EAPA Case No. 7705: Written Submission," dated January 4, 2023 (Scioto Written Arguments).

[25] *See* letter from Alleger, "Investigation Concerning the Evasion of Antidumping and Countervailing Duty Orders: Rebuttal Comments," dated January 19, 2023 (Alleger Rebuttal Arguments); letter from Scioto, "EAPA Case No. 7705: Written Submission," dated January 19, 2023 (Scioto Rebuttal Arguments).

defined as "the entry of covered merchandise into the customs territory of the United States for consumption by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material and that results in any cash deposit or other security of any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise."[26] As discussed below, the record of this investigation indicates there is substantial evidence that covered merchandise was entered by Scioto into the United States through evasion, resulting in the avoidance of applicable AD/CVD cash deposits or other security.

The evidence demonstrates that Alno *can* produce wooden cabinets and vanities. However, Alno itself has admitted in court documents that it transshipped Chinese-origin cabinets and vanities through Malaysia to [ Name ] during the[27]for this EAPA investigation. The questions before CBP, then, are whether Alno manufactured all the cabinets and vanities it exported to Scioto, or whether Alno exported transshipped, Chinese-origin cabinets and vanities to Scioto during the POI.

*Affiliations with China*

Evidence on the record shows that Scioto and Alno have ties to China. From October 2018 to October 2019, approximately when the *Orders* were implemented, Qingdao Haiyan Drouot Household Co., Ltd. (Haiyan Drouot) exported wooden cabinets and vanities from its manufacturing plant in Qingdao, China to Scioto in Waverly, Ohio.[28] Scioto, which is 100 percent owned by the Qingdao Haiyan Group Co., Ltd. (Haiyan Group),[29] acquired Alno on July 1, 2019, and the deal was official on September 4, 2019.[30] In July 2022, Scioto transferred all its shares of Alno to the Haiyan Group.[31] The owner of Haiyan Group is Liyan Jiao, a Chinese national residing in Qingdao, China.[32] This evidence shows that control of Alno and Scioto is the Chinese company the Haiyan Group.

The RFI responses, and as confirmed at verification, show that Alno was designated as the supplier for Scioto by the Haiyan Group in 2020.[33] Evidence on the record shows that due to the Haiyan Group's ownership of both Scioto and Alno, it has discretion over the budgets for both companies' operations, production, shipping schedules for all goods produced, and the purchase prices.[34] Furthermore, the invoice terms between Alno and Scioto are designated by the Haiyan Group and are based on the amount of profit generated by Scioto.[35] The record shows that if Alno falls short, the company would go to its parent company of, *i.e.*, the Haiyan Group, for

---

[26] *See* 19 CFR 165.1; *see also* 19 USC 1517(a)(5)(A).
[27] The POI are imports entered for consumption, or withdrawn from warehouse for consumption, from March 9, 2021, through the pendency of this investigation, *i.e.*, January 31, 2023.
[28] *See* Verification Report, at 3.
[29] Haiyan Group also owns Haiyan Drouot
[30] *Id.*
[31] *Id.*
[32] *Id.*, at 2. Liyan Jiao also owns 80% of Haiyan Drouot; therefore, Haiyan Drouot has common ownership with Haiyan Group, Alno, and Scioto.
[33] *Id.*, at 8.
[34] *Id.*
[35] *See* Verification Report, at 8.

money to stay solvent.[36] Additionally, company officials at Alno confirmed that Alno owes substantial amount of money to the Haiyan Group for subsidizing Alno's budget shortfalls.[37] Furthermore, many of the correspondences related to price updates, status of purchase orders, shipment arrangements, *etc.*, were between Scioto and the Haiyan Group, not between Scioto and Alno.[38] This arrangement seems to indicate that Alno had a more closely linked production process with the Haiyan Group than would be expected by the ownership structure in which Scioto owned Alno until July 2022.[39] As a result, the evidence on the record establishes that the Chinese company the Haiyan Group has Alno and Scioto.

Finally, Alno purchases supplies, *e.g.*, wooden boards and medium density fiber (MDF) board, from Chinese suppliers.[40] In particular, the primary input for cabinets and vanities, *i.e.*, wooden boards, come from the commonly owned Chinese company [ Name           ].[41] Additionally, Alno's department heads are Chinese nationals.[42] Taken *in toto* Alno is a Malaysian company owned and controlled by a Chinese company, is operated under Chinese management, and is supplied by Chinese suppliers. As a result, there is evidence on the record showing Alno's and Scioto's ties to China.

*Evidence of Transshipment*

Evidence on the record shows that Alno transshipped Chinese origin wooden cabinets into the United States. The Allegation was filed based on information provided by CTG in cooperation with AKCA. A CTG quality control inspector (QCI) had discovered the transshipment scheme.[43] Evidence in the Allegation suggests Scioto engaged in evasion of AD/CV duties and that CTG had filed a civil suit against supplier, Alno, and its U.S. affiliate, Scioto, in the U.S. District Court for the Middle District of Tennessee based on the CTG's QCI's discovery and the Haiyan Group's admission of transshipment.[44] Evidence in the Allegation provided by CTG to the Alleger shows Scioto's evasion of the *Orders*, including direct admissions of facts that implicate Scioto in an evasion scheme.[45] In its responses to CBP in this EAPA investigation, Alno stated that it produced all goods shipped to Scioto.[46]

However, as discussed in detail below, CBP finds substantial evidence on the record shows that Alno transshipped more products than it initially admitted to in both the civil suit and in Alno's 1SRFI Response. CBP officials had discovered an "additional warehouse" during verification that was filled with finished goods from China and Malaysia that were packaged identically and ready for shipment.[47] CBP officials had no way to differentiate the country of origin of the

---

[36] *See* Verification Report, at 8.
[37] *Id.*, at 7.
[38] *Id.*, at 9.
[39] *Id.*
[40] *See* Alno RFI Response, at 8.
[41] *Id.*
[42] *See* Verification Report, at 17.
[43] *See* Allegation, at Exhibit 12.
[44] *See* Allegation at 6. *See also Cabinets To Go, LLC v. Qingdao Haiyan Grp. Co.*, 3:21-cv-00711 (M.D. Tenn.).
[45] *Id.*, at 7.
[46] *See generally* Alno RFI Response, Alno 1SRFI Response, Alno 2SRFI Response, and Alno 3RFI Response.
[47] *See* Verification Report.

finished packaged cabinets and vanities.[48] CBP was not able to verify or confirm whether all cabinets and vanities exported to Scioto were produced on site in Malaysia or imported from China due to the company's vague record keeping.[49] Finally, CBP found documents, *i.e.*, inbound delivery sheets (a document only used by Alno for items it had purchased), that showed the delivery of finished goods for Scioto.[50] The inbound delivery sheets contained SKUs and PO numbers for Scioto and were nearly identical to the ones for [ Name ] transshipped goods.[51]

Evidence on the record obtained by CBP confirms that much of the information that [Name] had provided to AKCA in the Allegation regarding Alno's transshipment was correct. The Allegation stated that Alno exported cabinets and vanities of Chinese origin to one of its customers, *i.e.*, [ Name ].[52] In the Alno 1SRFI Response, Alno confirmed that it did export cabinets and vanities of Chinese origin to [Name ].[53] The Allegation identified certain SKUs from certain purchase orders (POs) as being of Chinese origin.[54] Alno confirmed that the SKUs in question identified in the Allegation had been transshipped during the POI.[55] The PO numbers in the Allegation matched documents CBP obtained from Alno at verification.[56] Alno admits that it transshipped to one of its customers, *i.e.*, [ Name ], but claims that it produced all the cabinets and vanities in Malaysia to all the other customers.[57] When CBP asked if Alno produced all of the cabinets and vanities in Malaysia, Alno stated that it did for all but [Name] customer.[58] When CBP asked in which countries were the cabinets and vanities produced in for the sales during the POI, Alno stated that products for [Name] customer were produced in [ Country ] and that all other products were made in Malaysia.[59] However, evidence on the record cast doubt on these statements from Alno.

At verification, CBP used the documents that showed transshipment to [ Name ] a establish how Alno tracked transshipped goods in its normal books and records. CBP officials asked how Alno knew which invoices related to [ Name ] goods that it admitted to having transshipped as seen in the Allegation.[60] Company officials stated that the information is available on the Packing Check-List from Haiyan Drouot.[61] Furthermore, the transshipped goods enter the raw material warehouse on a Finished Product Inbound Delivery (FPID) sheet; this sheet shows the SKUs, quantity, the reference PO, and clearly states finished product **inbound** delivery (emphasis added).[62] However, in Alno's RFI Response, it stated that it maintained 15 documents during the normal course of business for an average period of 18-months—one of those reported documents was an "Inbound Order."[63] In its third supplemental response, Alno clarified by saying:

---

[48] *Id.*
[49] *Id.*, at 17.
[50] *Id.*
[51] *Compare* Attachment at 22-25 *with* VE-10.
[52] *See generally* Allegation.
[53] *See* Alno 1SRFI Response.
[54] *See* Allegation, at Exhibit 12.
[55] *See* Alno 1SRFI Response.
[56] *See* Allegation, at Exhibit 12; *see also* VE-11.
[57] *See* Alno 1SRFI Response.
[58] *Id.*
[59] *Id.*
[60] *See* Verification Report, at 15. See attachment at 17-20
[61] *Id.*
[62] *See e.g.*, VE-10 at 20-30.
[63] *See* RFI Response, at 29-30.

> *Alno keeps the products tracked by outbound sheets (warehouse-out sheets) for production inputs and **inbound sheets (warehouse-in sheets) for materials purchased*** (emphasis added).[64]

According to Alno's response, the FPID sheets are for materials that it purchased; therefore, the FPID sheet for the [ Name ] goods that were known to be transshipped were recorded according to their SKU, Quantity, PO number, because Alno purchased them.

As can be seen in the Attachment to this notice, Scioto provided FPID sheets dated [ Date ] and [ Date ] that refute Alno's own statements of producing all the goods it shipped to Scioto.[65] The FPID references finished goods entering Alno's raw material warehouse for POs [ #s ].[66] However, as noted in the Verification Report, the FPID sheet is only generated in one specific instance, *i.e.*, when goods enter the raw materials warehouse.[67] CBP officials asked both the General Manager and Chief Accountant when the FPID sheet is generated, and they stated that the FPID sheet is generated when purchased materials are entered into the raw materials warehouse.[68] Again, CBP asked "The Inbound Delivery Sheet would not be generated without goods coming in?" The GM replied, "Yes, it is only generated when goods are checked in."[69] Alno's own company officials stated it is for when purchased goods are checked in, confirming what Alno said in its third supplemental response on three occasions.[70] Further, Alno's Chief Accountant confirmed that Alno does not track inventory movement during the production process, which provides additional support that items listed on the FDIP are goods purchased by Alno.[71] Finally, Alno also did not provide the FPID sheets for any of the sales traces that the CBP verification team conducted on site during the verification, even though Alno had provided them in RFI responses. The only other time CBP officials saw inbound sheets was for when raw materials that Alno had purchased and when Alno transshipped finished cabinets and vanities from China to [ Name ], which generated FPID sheets identical to the ones in question.[72]

It is important to note that the FPID sheets show the identical SKUs and Quantities from the POs [ #s ], as well as specifically identifying for each item the PO that it is allocated.[73] These FPID sheets mirror the FPID sheets for [ Name ]'s transshipped goods. The documents are also signed by the same person, underscoring their authenticity.[74] The POs in question are on the record, and each PO states they are from Scioto Cabinetry to Alno.[75] They clearly show "Scioto Cabinetry" listed at the top, the ship to address matches Scioto's

---

[64] *See* Alno Third Supplemental Response, at 16.
[65] *See* Attachment, at 22-25.
[66] *Id.*
[67] *See* Verification Report, at 14.
[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] *Id.*, at 6-7.
[72] *See e.g.*, VE-10 at 20-30.
[73] *See* Attachment, at 22-25.
[74] *Id.*
[75] *Id.*

reported address in Ohio, and the vendor listed is "Alno Industry SDN BHD."[76] The POs also show the same SKUs, which are described as various finished cabinets and vanities, as those having been purchased by Alno from [ Name ] with the same quantities; this means that the FPIDs in question should not exist if Alno did not transship goods for customers other than [Name ].[77] Due to the existence of FPID sheets containing SKUs and POs for Scioto, the fact that this matches the documents used by Alno in its normal course of business to distinguish products that were transshipped from China through Malaysia for [Name ], and Alno's own statements that inbound sheets are for materials purchased, CBP determines that this is significant evidence that Alno transshipped goods that were imported by Scioto during the POI.

As discussed above the inbound deliver sheets, are how Alno tracks transshipped finished goods coming from China through their Malaysian factory. The finished SKUs and PO numbers on the FPID sheet shows that transshipped finished goods entered its warehouse and then were shipped on to Scioto. CBP officials found FPID sheets for the transshipped goods to [Name ] that were identical to FPID sheets that were for Scioto and matched Scioto's POs. Taken together, these documents are evidence that Alno had purchased Chinese-origin cabinets and vanities and had them delivered to its "raw materials" warehouse to be later exported to Scioto in a transshipping scheme to evade AD/CV duties.

*Reliability of [ Name ] Sales Documents*

As discussed in detail below, evidence on the record shows that Alno has submitted to CBP inaccurate information and documents filled with discrepancies. Evidence on the record shows that Alno had provided inaccurate information from [ Name ] that is unreliable.[78] At verification, CBP discovered that the unit transfer prices between [ Name ] and Alno did not reflect market prices and fluctuated dependent on whichever company needed more funds.[79] The CBP verification team asked the Chief Accountant if Alno could explain the substantial price difference between the raw materials purchased from [ Name ] in [ Date ] and [ Date ].[80] For example, on Invoice [ # ], dated [ Date ], the price for birch and hickory was $[ # ] and $[ # ], respectively, but on Invoice [ # ], dated [ Date ], the price for birch and hickory was $[ # ] and $[ # ].[81] Alno's Chief Accountant stated that the pricing depends on the product mix in the container.[82] CBP finds this response unsatisfactory as discussed in detail below, there is no way to tell what the product mix in the container actually is for any of [ Name ]'s shipments.

Additionally, invoices from [ Name ] use vague invoice descriptions that do not specify or categorize different sizes of wood or specific hardware.[83] All purchases of wood and parts were found to be under one of the six descriptions below, which uses only four item numbers:

---

[76] *Id.*
[77] *Id.*
[78] *See generally* Verification Report.
[79] *See* Verification Report, at 5.
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*, at 4-5.

- [ Description                    ];
- [ Description                        ];
- [ Description              ];
- [ Description                          ];
- [ Description                    ]; or
- [ Description              ].[84]

Evidence on the record shows that [ Name        ] was also the supplier of the finished cabinets and vanities that were transshipped to [ Name ].[85] For the transshipped goods to [ Name ], the invoices from [ Name        ] listed them under either [ Description        ] or [ Description        ].[86] These vague descriptions mean CBP cannot confirm the contents of these purchases based solely on the commercial invoices, packing lists, bill of ladings, *etc.*, from the supplier [ Name        ] to identify shipments that had transshipped goods. At verification, CBP asked how Alno knew which shipments contained transshipped goods, and company officials stated that the information is available on the Packing Check-List from [ Name        ].[87]

Furthermore, as noted in the Verification Report, [ Name        ] invoices all contain the quantity in terms of pieces in the first column of its invoices, but the quantity in the second column varied between three types: 1) cartons; 2) packages; and 3) pallets.[88] Additionally, the quantity types would not always be consistent among invoices from the Chinese supplier.[89] This also obscures the volume and types of goods purchased from the Chinese supplier. When listed as pallets, the Packing List appeared to support what the invoice claimed, but in some cases, when packages or cartons were used as the quantity type, the matching Packing Check-Lists would contain SKUs of finished goods which then also had a related FPID sheet.[90] The inconsistent ways of documenting invoice quantities, coupled with vague invoice and packing list descriptions, seem indicative of [ Name        ] and Alno attempting to withhold information from CBP to obtain a favorable outcome in this investigation.

Also, at verification CBP officials noticed glass doors listed on invoices from Alno to [ Name ] and asked about the glass needed to make them.[91] The verification team did not see or hear Alno mention glass during the production demonstration.[92] Company officials confirmed that Alno does not make glass doors and obtains the glass from [ Name        ].[93] CBP asked Alno to provide two years of invoices for the purchase of the glass at our request.[94] CBP officials found that glass was not listed on the [ Name        ] invoices.[95] The CBP verification team learned

---

[84] *Id.*
[85] *See* VE-10.
[86] *Id.*
[87] *See* Verification Report, at 15.
[88] *Id., see also* Attachment, at 20.
[89] *Id.*
[90] *See* VE-10.
[91] *See* Verification Report, at 13.
[92] *Id.*
[93] *Id.*
[94] *Id.*
[95] *Id.*

that the glass is ordered by calling the parent company, *i.e.*, Haiyan Group, and no purchase orders are issued so there is no record of how much glass Alno ordered.[96] The glass is not separately identified on the raw material invoices and is incorrectly listed as [ Description ], which have a value as low as $[ # ] per screw. There are no inventory records for glass when it is received.[97] When imported into Malaysia, the glass is either not declared or declared as hardware/screws.[98] The CBP verification team noted the process, as described by company officials, shows no evidence that the glass entered the production process at any point.[99] The fact that glass shipments to Alno are either not declared or declared as something else is evidence that supplier [ Name ] is willing to omit or obfuscate important information in paperwork, evidence which casts doubt on the reliability of the supplier's documents to use as proof that Alno did not transship cabinets and vanities of Chinese origin.

Finally, the Allegation specifically identified container [ # ] as containing finished goods arriving at Alno for transshipment to [ Name ].[100] Additionally, in the Allegation was a picture provided by the QCI of the packaged cabinets and vanities in the container.[101] CBP officials were able to verify that the packaging of the goods in the container was like the packaging of the unshipped [ Name ] finished products in the "Additional Warehouse" at Alno when inspected during the verification.[102] Furthermore, the Verification Report noted that the packaging in the container did not match anything in the Raw Materials Warehouse on site, which is indicative that the items in the container are indeed finished goods and not raw materials.[103] CBP officials were also able to verify that the [ Name ] commercial invoice, packing list, and Packing Check-List related to container [ # ] listed the goods as [ Description ].[104] The paperwork provided by Alno conflicts with the sworn statement by the [ Name ] QCI and with the photo provided in the Allegation that the container was loaded with finished goods transshipped via China.[105] In the Verification Report, CBP identified that it was this container and information that caused [ Name ] to ask for Scioto to verify the country of origin of Alno's cabinets and that caused the subsequent admission from the Haiyan Group of providing transshipped goods.[106] While this discrepancy alone is not definitive proof of transshipment to other customers occurring, [ Name ] not declaring or misclassifying goods and other evidence on the record substantiates the QCI claims in the Allegation. This is a strong indicator that [ Name ]'s and Alno's paperwork is unreliable.

Based on the aforementioned reasons, CBP determines that the paperwork from supplier [ Name ] provided by Alno is unreliable evidence that transshipment was not occurring

---

[96] *Id.*
[97] *Id.*
[98] *Id.*
[99] *Id.*
[100] *See* Allegation, at Exhibit 11.
[101] *Id.*
[102] *See* Verification Report, at 17.
[103] *Id.*
[104] *See* VE-10, *see also* Attachment at 21
[105] *Id.*
[106] *See* Verification Report, at 17.

at Alno. Combining this information with Alno's admission to transshipping cabinets and vanities of Chinese-origin to [ Name ] during the POI, provides strong support for CBP's determination that there is substantial evidence that Alno was transshipping cabinets and vanities to Scioto.

*Adverse Inferences*

EAPA regulation at 19 CFR 165.6(a) states:

> If . . . the importer, or the foreign producer or exporter of the covered merchandise fails to cooperate and comply to the best of its ability with a request for information made by CBP, CBP may apply an inference adverse to the interests of that party in selecting from among the facts otherwise available to make the determination as to evasion. . . .

CBP finds that Alno failed to act to the best of its ability in this EAPA investigation by Alno's failure to cooperate and comply with CBP at verification. CBP encountered the following issues at verification:

- CBP discovered the existence of an additional warehouse that was not previously reported. This discovery happened after the GM was asked and provided inaccurate information that no other location existed.[107]
- CBP had to ask company officials multiple times to provide documents and each time discovered that documents were missing, *e.g.*, Packing-Check Lists.[108]
- Alno attempted to provide CBP officials unrelated or irrelevant documents that were unsolicited to cover for their error of not providing certain documents after being asked multiple times.[109]
- CBP was unsure the missing emails provided to CBP at verification were original emails since CBP was not provided with access to the original files despite asking for access.[110]

As a result of this lack of cooperation, CBP was unable to rely on the records Alno kept in its normal course of business and unable to fully understand the inventory management processes at Alno. Therefore, CBP is applying adverse inferences in drawing conclusions from other information on the record. CBP is relying on information in the Allegation and obtained from Alno, to determine <u>all</u> cabinets and vanities exported to the United States to Scioto are from China.[111] Specifically, CBP is relying on the information provided by the Alleger in the Allegation, *i.e.*, litigation documents showing Alno transshipped cabinets and vanities to CTG.[112] CBP is also relying on other evidence on the record obtained from Alno, as described above, that shows it transshipped cabinets and vanities of Chinese-origin to Scioto specifically during the POI that were entered into the United States.[113] Based on all this information, CBP finds that all

---

[107] *See* Verification Report, at 9-10.
[108] *Id.*, at 15-16.
[109] *Id.*, at 16.
[110] *Id.*, at 10-11.
[111] *See* Allegation.
[112] *Id.*, at Exhibit 4.
[113] *See e.g.*, Alno 1SRFI Response.

of the cabinets and vanities that Scioto imported into the United States from Alno are of Chinese origin.

*Written Arguments*

    1.  Adverse Inferences

Alleger:

- Alno failed to act to the best of its ability, because CBP could not verify the accuracy of critical information. Therefore, the application of adverse inferences is warranted.[114]
- Adverse inference should apply to all of Alno's exports to the United States not just the ones to Scioto.[115]

Scioto:

- A determination based on adverse facts available is not supported by information on the record.[116]
- Alno and Scioto have cooperated to the best of their ability.[117]
- The discrepancies at issue are of not material issue.[118]

CBP Position:

We disagree with Scioto based on the reasons set forth above.

    2.  Forced Labor

Alleger:

- CBP should self-initiate a forced labor probe in accordance with Section 307 of the U.S. Tariff Act of 1930, due to its verification team discovering that Alno retains foreign workers' passports.[119]
- Passport retention is a strong indicator of forced labor, which is pervasive in Malaysia.[120]

Scioto:

- CBP should not self-initiate a forced labor probe because keeping worker passports alone is an insufficient justification, based on the International Labor Organization's (ILO) eleven indicators of forced labor.[121]

---

[114] *See* Alleger Written Arguments, at 4-9.
[115] *Id.*, at 9.
[116] *See* Scioto Rebuttal Arguments, at 2-13.
[117] *Id.*
[118] *Id.*
[119] *See* Alleger Written Arguments, at 10-12.
[120] *Id.*, at 11.
[121] *See* Scioto Rebuttal Arguments, at 7-8.

- Alno only keeps the foreign workers' passports for security reasons, and the workers can retrieve them at any time.[122]

CBP Position:

The purpose of the verification is for CBP to validate the information and data submitted by either importers or foreign manufacturers participating in an EAPA investigation. As such, CBP was on site to validate information in Alno's RFI responses to aide CBP in its determination of whether Alno produced the cabinets and vanities that it exported to Scioto, not to assess labor conditions. CBP took note of the passport retention, but it is not a factor CBP will consider for this EAPA investigation.

   3.   Verification Report

Scioto:

- There are several issues with CBP's Verification Report.[123]
- CBP either misunderstood, reported descriptions are inaccurate, or its descriptions require clarification.[124]
- It was unreasonable for CBP to not accept additional documents as Alno was overwhelmed by the numerous document requests, and CBP should have expected mistakes to happen.[125]
- CBP should not presume that information in the Allegation is entirely accurate.[126]

Alleger:
- CBP should reject Scioto's written arguments because it is an attempt to rebut and clarify CBP's on site Verification Report with new factual information that was not previously on the record.[127]
- CBP has rejected such attempts in the past and those decisions have been upheld by the Court of International Trade.[128]

CBP Position:

It is the responsibility of Parties to the Investigation and Interested Parties, as defined by 19 CFR 165.1, to ensure the information they place on the record or provide to CBP is complete, true, and accurate. In the same vein, it is also their responsibility to make sure that the information they are conveying is presented clearly. This continues to hold true when CBP is conducting verification. As stated above, the purpose of verification is for CBP to validate the information and data submitted by parties, and verification allows the parties being verified to fully explain

---

[122] *Id.*
[123] *See* Scioto Written Arguments, at 1-7.
[124] *Id.*
[125] *Id.* at 6.
[126] *Id.*, at 7.
[127] *See* Alleger Rebuttal Arguments, at 1-4.
[128] *Id.*

their record responses. In this instance, CBP was on site to validate information in Alno's RFI responses to aide CBP in its determination of whether Alno produced the cabinets and vanities that it exported to Scioto. The Verification Report written by CBP and released to parties was the result of the collaboration of all seven CBP officials that attended verification. All seven officials agree that the report released to parties is a true and accurate account of what was observed, verified, and happened at verification.

CBP's verification team followed its standard practice for allowing parties to take corrective action for any deficiency or non-conforming submission found at verification. At verification, after a CBP official asked for an item or items and discovered a deficiency, CBP officials allowed Alno the opportunity to take corrective action. CBP officials only determined that anything offered after that corrective action was already taken was non-conforming. Allowing a party to take repeated corrective actions for an identified deficiency shifts the responsibility for the accuracy and completeness of information on the record from the manufacturer to CBP, whose responsibility in the matter is to maintain the record and determine its validity.[129] CBP did not force Alno to provide requested information when it knew was incomplete, nor did it set any time limits to provide the information during verification.[130] Alno provided the information only after it deemed it complete and ready to present to CBP, as evident by the CBP officials asking if Alno provided everything that CBP requested.[131] CBP believes that Alno was afforded sufficient time during the verification to present the information requested from it, but that Alno often failed to take the time and effort to ensure completeness, and instead relied on CBP to do it for them.

Finally, CBP finds that much of the information in the Allegation was accurate based on Alno's responses and information reviewed during the on-site verification. The Allegation stated that Alno exported cabinets and vanities of Chinese-origin to one of its customers, *i.e.*, CTG.[132] In the Alno 1SRFI Response, Alno confirmed that it did export cabinets and vanities of Chinese-origin to [ Name ].[133] The Allegation identified certain SKUs from certain POs as being of Chinese origin.[134] Alno confirmed that the SKUs in question identified in the Allegation had been transshipped during the POI.[135] The PO numbers in the Allegation matched documents CBP obtained from Alno at verification.[136] The container number in question, *i.e.*, [ # ], did indeed arrive at Alno around the time it was claimed based on documents obtained at verification.[137] The pictures of the packaged cabinets and vanities in the container taken by the QCI matched unshipped packaged cabinets and vanities for [ Name ] found in the "Additional Warehouse."[138] Therefore, based on substantial evidence on the record, CBP finds no reason to question the accuracy of the QCI report provided in the Allegation.

---

[129] *See* 19 CFR 165.21, *see also* 19 CFR 165.25.
[130] *See generally* Verification Report.
[131] *See e.g.,* Verification Report, at 15
[132] *See generally* Allegation.
[133] *See* Alno 1SRFI Response.
[134] *See* Allegation, at Exhibit 12.
[135] *See* Alno 1SRFI Response.
[136] *See* Allegation, at Exhibit 12; see also VE-11.
[137] *Id.*
[138] *See* Verification Report.

4.  Determination

Scioto:

- A negative determination should be made as CBP has not met the requisite standard of proof to find evasion in this investigation.[139]
- The record establishes that the only covered merchandise was sent to [Name].[140]

Alleger:

- Substantial evidence supports a finding of evasion.[141]
- CBP uncovered a wide array of discrepancies during the investigation.[142]

CBP Position:

Based on the analysis described in detail above, CBP believes there is substantial evidence on the record to show that Alno exported transshipped goods of Chinese-origin through Malaysia and that Scioto imported those products into the United States.

5.  Due Process

Scioto:

- Scioto' and Alno's due process rights were violated by failing to provide its counsel with confidential record information.[143]

Alleger:

- No due process rights were violated based on Court of International Trade (CIT) decisions, because parties received public versions with public summaries.[144]

CBP Position:

The CIT has already opined on the rights of parties in EAPA investigations to have access to business confidential information. The CIT has found that the lack of access to confidential information is not a due process issue.[145] In *Royal Brush Mfg., Inc. v. United States*, the CIT

---

[139] *See* Scioto Written Arguments, at 7-9.
[140] *Id.*
[141] *See* Alleger Rebuttal Arguments, at 5-7.
[142] *Id.*
[143] *See* Scioto Written Arguments, at 9-10.
[144] *See* Alleger Rebuttal Arguments, at 7-9.
[145] *See Royal Brush Mfg., Inc. v. United States*, 545 F. Supp. 3d 1357 at 1369 (Ct. Int'l Trade Oct. 29, 2021) (*Royal Brush*) (rejecting a similar claim and holding that CBP's withholding of confidential information does not violate a respondent's due process rights where "CBP has complied with 19 CFR 165.4 by providing necessary public summaries of the confidential information….").

found that a party is only entitled to public summaries of the business confidential information, pursuant to 19 CFR 165.4(a)(1) and (e). The parties do not otherwise have a right to review business confidential information, as the statute and regulations do not provide for such. CBP has provided Scioto's counsel with the requisite public version of documents that contained public summaries of redacted business confidential information. Therefore, CBP has ensured that due process had been followed during the investigation in accordance with 19 CFR 165.4.

### Determination as to Evasion

The previously discussed facts on the record establish that there is substantial evidence that Chinese-origin cabinets and vanities were imported into the United States by evasion, specifically via transshipment through Malaysia. Additionally, by application of adverse inferences, relying on evidence provided in the Allegation and obtained from Alno, CBP determines that all the cabinets and vanities exported by Alno via Malaysia to Scioto were of Chinese origin. Furthermore, evidence on the record indicates that Scioto entered the Chinese-origin cabinets and vanities into the United States as type 01 entries and evaded the payment of AD/CV duties on cabinets and vanities from China, including by misrepresenting the cabinets and vanities as Malaysian in origin.[146] The cabinets and vanities that Scioto entered from Alno during the period of investigation should have been subject to the AD/CVD rates on cabinets and vanities from China.

### Actions Taken Pursuant to the Affirmative Determination as to Evasion

In light of CBP's determination that substantial evidence demonstrates that the Importer entered covered merchandise into the customs territory of the United States through evasion, and pursuant to 19 U.S.C. § 1517(d) and 19 CFR 165.28, CBP will suspend or continue to suspend the entries covered by this investigation, until instructed to liquidate. For those entries previously extended in accordance with Interim Measures, CBP will rate adjust and change those entries to type 03 and continue suspension until instructed to liquidate these entries. CBP will continue to evaluate the Importer's continuous bonds in accordance with CBP's policies. None of the above actions precludes CBP or other agencies from pursuing additional enforcement actions or penalties.

---

[146] Entry type "01" is the code that CBP requires importers use to designate a standard consumption entry that is not subject to AD/CVD duties. *See* https://www.cbp.gov/trade/automated/ace-transaction-details.

Sincerely,

Victoria Cho
(A) Director, Enforcement Operations Division
Trade Remedy Law Enforcement Directorate
CBP Office of Trade

Attachment

Packing check list showing transshipped SKUs, snip from VE-10, page 18[

Snip

]

FPID showing finished goods from the packing check-list arriving, snip from VE-10, page 20[

snip

]

Information provided to CTG showing transshipped goods matching information in the previous two pages, snip from Allegation, Exhibit 12 [

snip

]

Invoice showing qty inconsistencies,  snip from VE-17, page 1[

snip

]

Invoice showing qty inconsistencies,  snip from VE-17, page 5[

snip

]

Invoice showing qty inconsistencies,  snip from VE-17, page 13[

snip

]

Packing Check-list for container identified in allegation, snip from VE-10, page 12[

snip

]

FPID showing purchased finished goods arriving, snip from Alno RFI Response Exhibit IV [

snip

]

PO from customer matching the FPID, snip from Alno RFI Response Exhibit IV [

snip

]

PO from customer matching the FPID, snip from VE-4 [

snip

]

Snip from Alno's RFI Response, Exhibit 10[

snip of FPID

]

Public Document No. 84

PUBLIC VERSION



90 K Street NE
Washington, DC 20002

**U.S. Customs and Border Protection**

June 12, 2023

**PUBLIC VERSION**

OT: RR:BSTC:PEN H330744 GCS

Scioto Valley Woodworking, Inc. d/b/a Valleywood Cabinetry
c/o Jeffrey S. Neeley, Esq.
Husch Blackwell, LLP
1801 Pennsylvania Ave., NW,
Suite 1000
Washington, D.C. 20006

American Kitchen Cabinet Alliance
c/o Luke A. Meisner, Esq.
Schagrin Associates
900 Seventh Street, NW,
Suite 500
Washington, DC 20001

Re:     Enforce and Protect Act ("EAPA") Case Number 7705; *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Antidumping Duty Order*, 85 Fed. Reg. 22,126 (Apr. 21, 2020) and *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Countervailing Duty Order*, 85 Fed. Reg. 22,134 (Apr. 21, 2020); Scioto Valley Woodworking, Inc. d/b/a Valleywood Cabinetry; 19 U.S.C. § 1517

Dear Mr. Neeley and Mr. Meisner:

This is in response to the request for *de novo* administrative review of a determination of evasion dated January 31, 2023, made by the Trade Remedy Law Enforcement Directorate ("TRLED"), Office of Trade ("OT"), U.S. Customs and Border Protection ("CBP"), pursuant to 19 U.S.C. § 1517(c), EAPA Case Number 7705 ("January 31st Determination").[1]  Scioto Valley Woodworking, Inc. d/b/a Valleywood Cabinetry's ("Scioto") request for review, dated March 15,

---

[1] *See* Notice of Determination as to Evasion in EAPA Case Number 7705 (Public Version), dated January 31, 2023, available at: https://www.cbp.gov/sites/default/files/assets/documents/2023-Feb/01-31-2023%20-%20TRLED%20-%20Determination%20of%20Evasion%20%28508%20COMPLAINT%29%20-%20%287705%29%20-%20PV.pdf: (Last accessed June 7, 2023).

PUBLIC VERSION

2023, and its revised submissions, dated March 15, 2023,[2] and March 17, 2023,[3] were submitted to CBP, OT, Regulations & Rulings ("RR"), by Husch Blackwell, LLP, on behalf of Scioto. The request was filed pursuant to 19 U.S.C. § 1517(f) and 19 CFR § 165.41(a). No other parties submitted requests for review. The American Kitchen Cabinet Alliance ("AKCA") filed a response to the request for review on March 30, 2023. This matter also involves several other companies, as follows. Alno Industry SDN BHD ("Alno") is a company located in Malaysia, which Scioto alleges is the manufacturer of the subject merchandise. Qingdao Haiyan Group Co. Ltd., Qingdao Druout Woodworking Co., and Qingdao Haiyan Drouot Household Co., Ltd. are Chinese companies related to each other and to Alno and Scioto, which are commonly owned by a Chinese national residing in Qingdao, China, and which TRLED and AKCA allege are the true manufacturers of the subject merchandise.

## I.    Background

Inasmuch as the facts in this case were fully set forth in the January 31st Determination, we will not repeat the entire factual history herein. In brief, according to the record evidence, on March 30, 2022, TRLED initiated a formal investigation under Title IV, Section 421 of the Trade Facilitation and Trade Enforcement Act of 2015 ("TFTEA"), in response to an allegation of evasion.

On February 3, 2022, AKCA, a coalition of domestic producers of wooden cabinets and vanities, filed an EAPA allegation against Scioto. CBP acknowledged receipt of the allegation on March 9, 2022.

AKCA alleged that Scioto entered wooden cabinets and vanities and components thereof ("WCV") of Chinese origin into the United States by means of transshipment through Malaysia to evade the payment of antidumping and countervailing duties ("AD/CVD") on WCV from the People's Republic of China ("China"), as required in Case Nos. A-570-106 and C-570-107.[4]

---

[2] Scioto's original request, submitted on March 15, 2023, listed Alno Industry SDN BHD ("Alno"), the alleged manufacturer of the products at issue, and Scioto, as the parties requesting review. Our office informed Scioto that pursuant to 19 U.S.C. § 1517(f)(1) and 19 CFR § 165.41(a), requests for administrative review may only be filed by parties to the investigation. Parties to the investigation are defined in 19 CFR § 165.1 as "the interested party (or interested parties, in the case of consolidation pursuant to § 165.13) who filed the allegation of evasion and the importer (or importers, in the case of consolidation pursuant to § 165.13) who allegedly engaged in evasion." Further, we notified Scioto that "{a} foreign manufacturer, producer, or exporter, such as Alno Industry SDN BHD, does not have standing under the statute and regulations to file a Request for Administrative Review and we are unable to accept your submission as currently provided." Later that day on March 15, 2023, Scioto removed Alno from the request and resubmitted the request to our office listing only Scioto as the requestor.

[3] On March 17, 2023, Scioto resubmitted the public version of its request, which added public summaries of confidential information.

[4] *See* Notice of Initiation of Investigation and Interim Measures: EAPA Case 7705 (Public Version), dated July 6, 2022 ("Notice of Initiation"), available at: https://www.cbp.gov/trade/trade-enforcement/tftea/eapa/recent-eapa-actions/eapa-action-notice-investigation-and-interim-measures-eapa-case-7705-wooden-cabinets-and (Last accessed June 7, 2023).

PUBLIC VERSION

The allegation of evasion pertained to the AD/CVD Orders issued by the U.S. Department of Commerce ("Commerce") on imports of WCV from China.[5]  Commerce defined the scope of the relevant AD/CVD Orders, in pertinent part, as follows:

> {t}he merchandise subject to this order consists of wooden cabinets and vanities that are for permanent installation (including floor mounted, wall mounted, ceiling hung or by attachment of plumbing), and wooden components thereof. Wooden cabinets and vanities and wooden components are made substantially of wood products, including solid wood and engineered wood products (including those made from wood particles, fibers, or other wooden materials such as plywood, strand board, block board, particle board, or fiberboard), or bamboo. Wooden cabinets and vanities consist of a cabinet box (which typically includes a top, bottom, sides, back, base blockers, ends/end panels, stretcher rails, toe kicks, and/or shelves) and may or may not include a frame, door, drawers and/or shelves. Subject merchandise includes wooden cabinets and vanities with or without wood veneers, wood, paper or other overlays, or laminates, with or without non-wood components or trim such as metal, marble, glass, plastic, or other resins, whether or not surface finished or unfinished, and whether or not completed . . .

> Subject merchandise includes all unassembled, assembled and/or "ready to assemble" (RTA) wooden cabinets and vanities, also commonly known as "flat packs," except to the extent such merchandise is already covered by the scope of antidumping and countervailing duty orders on *Hardwood Plywood from the People's Republic of China* . . .

> Subject merchandise also includes wooden cabinets and vanities and in-scope components that have been further processed in a third country, including but not limited to one or more of the following: trimming, cutting, notching, punching, drilling, painting, staining, finishing, assembly, or any other processing that would not otherwise remove the merchandise from the scope of the order if performed in the country of manufacture of the in-scope product . . .

> Imports of subject merchandise are classified under Harmonized Tariff Schedule of the United States (HTSUS) statistical numbers 9403.40.9060 and 9403.60.8081. The subject component parts of wooden cabinets and vanities may be entered into the United States under HTSUS statistical number 9403.90.7080. Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of this order is dispositive.[6]

On July 6, 2022, in accordance with 19 CFR § 165.24, CBP issued a Notice of Initiation to all parties to the investigation, stating that the investigation had begun on March 30, 2022, and notifying the parties of CBP's decision to take interim measures based upon reasonable suspicion that the importer, Scioto, entered covered merchandise into the customs territory of the United

---

[5] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Antidumping Duty Order,* 85 Fed. Reg. 22,126 (Apr. 21, 2020) and *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Countervailing Duty Order,* 85 Fed. Reg. 22,134 (Apr. 21, 2020)  ("AD/CVD Orders").
[6] *Id.* (emphasis in the original and internal citations omitted).

PUBLIC VERSION

States through evasion.[7]  The entries subject to the investigation were those entered for consumption, or withdrawn from a warehouse for consumption, from March 9, 2021, one year before CBP's acknowledgment of receipt of the allegation, through the pendency of the investigation.[8]  During the pertinent period of investigation, Scioto entered 18 type "01"[9] consumption entries of WCV, under subheading 9403.40.9060 HTSUS, with a declared country of origin of Malaysia, into the United States.[10]

On January 31, 2023, TRLED concluded that, based on the record, there was substantial evidence to demonstrate that Scioto entered WCV covered by AD Order A-570-106 and CVD Order C-570-107, and falsely declared the WCV as being of Malaysian origin on type "01" consumption entries not subject to an AD or CVD order.[11]  As a result, no AD/CVD cash deposits or duties were paid with respect to the merchandise.[12]  TRLED also applied adverse inferences against Alno, the alleged manufacturer of the WCV at issue here, and by extension, Scioto, for Alno's alleged failure to cooperate by not acting to the best of its ability to comply with TRLED's Requests for Information ("RFIs") during an on-site verification at Alno's facilities in Malaysia.

On March 15, 2023, Scioto filed a timely request for administrative review, and subsequently, on March 15, 2023, and March 17, 2023, Scioto filed revised requests for administrative review.  On March 20, 2023, RR sent an email to all parties to the investigation, notifying them of the commencement of the administrative review and the assignment of RR case number H330744.  On March 30, 2023, AKCA timely filed a response to Scioto's request for administrative review.

II.    Law & Analysis

Section 517 of the Tariff Act of 1930 ("the Tariff Act"), as amended (19 U.S.C. § 1517), provides, "with respect to covered merchandise, the Commissioner shall make a determination, based on substantial evidence, with respect to whether such covered merchandise was entered into the customs territory of the United States through evasion."[13]  The term evasion is defined as:

> {e}xcept as provided in subparagraph (B), the term "evasion" refers to entering covered merchandise into the customs territory of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material, and that results in any

---

[7] *See* Notice of Initiation (Public Version), available at:: https://www.cbp.gov/trade/trade-enforcement/tftea/eapa/recent-eapa-actions/eapa-action-notice-investigation-and-interim-measures-eapa-case-7705-wooden-cabinets-and (Last accessed June 7, 2023).

[8] *See* 19 CFR § 165.2.

[9] Type "01" entries are consumption entries which are not subject to payment of AD/CVD.  *See* CBP Entry Summary Form 7501 and Instructions and the ACE Entry Summary Business Rules and Procedure Document https://www.cbp.gov/trade/programs-administration/entry-summary/cbp-form-7501 (last visited June 7, 2023).

[10] *See* National Targeting Center ("NTAC")'s Post Receipt Report (Business Confidential Version) (March 22, 2022) at pages 1, 3.

[11] Imports that are covered by AD/CVD orders are required to be entered on type "03" AD/CVD entries; merchandise entered on type "01" consumption entries are not subject to payment of AD/CVD.  *See* CBP Entry Summary Form 7501 and Instructions and the ACE Entry Summary Business Rules and Procedure Document https://www.cbp.gov/trade/programs-administration/entry-summary/cbp-form-7501 (last visited June 7, 2023).

[12] *See* January 31st Determination (Public Version).

[13] 19 U.S.C. § 1517(c)(1)(A).

4

PUBLIC VERSION

cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise.[14]

Examples of evasion include, but are not limited to, misrepresentation of the merchandise's true country of origin (e.g., through false country of origin markings on the product itself or false sales), false or incorrect shipping and entry documentation, or misreporting of the merchandise's physical characteristics.[15]

Additionally, covered merchandise is defined as "merchandise that is subject to a CVD order issued under section 706, Tariff Act of 1930, as amended (19 U.S.C. § 1671e), and/or an AD order issued under section 736, Tariff Act of 1930, as amended (19 U.S.C. § 1673e)."[16] While "substantial evidence" is not defined by statute, the "substantial evidence" standard has been reviewed by the courts in relation to determinations by other agencies. "Substantial evidence requires more than a mere scintilla, but is satisfied by something less than the weight of the evidence."[17]

Therefore, CBP must determine whether a party has entered merchandise that is subject to an AD or CVD order into the United States for consumption by means of any document or electronically transmitted data or information, written or oral statement, or act, that is material and false, or any omission that is material, that resulted in the reduction or avoidance of applicable AD or CVD cash deposits or duties being collected on such merchandise. In doing so, CBP may apply adverse inferences where they are warranted. RR's determination as to evasion must be supported by substantial evidence.

### A. Scioto's Arguments

Scioto requests that we reverse the January 31st Determination of evasion. Scioto argues that it did not enter covered merchandise into the United States through evasion, because the WCV entered on the entries under investigation were manufactured in Malaysia by Alno, and were not manufactured in China. In support of this argument, Scioto states that TRLED's January 31st Determination was not supported by substantial evidence, and TRLED's conclusions are arbitrary and capricious.[18]

Scioto makes several arguments in support of reversal of the January 31st Determination.[19] First, Scioto contends that the administrative record demonstrates only that covered merchandise exported by Alno to the United States was entered by CTG,[20] a separate importer not involved in this EAPA investigation, and did not go to Scioto.[21] CTG, a company unrelated to Scioto and an

---

[14] 19 U.S.C. § 1517(a)(5); *see also* 19 CFR § 165.1.
[15] *See Investigation of Claims of Evasion of Antidumping and Countervailing Duties, Interim Regulations*, 81 Fed. Reg. 56,477, 56,478 (Aug. 22, 2016).
[16] 19 CFR § 165.1.
[17] *See Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (internal citations and quotation marks omitted).
[18] *See* Scioto's March 15, 2023 Request for Administrative Review, at 6 (Public Version); *see also* 19 CFR § 165.27(a).
[19] *See* Scioto's March 15, 2023 Request for Administrative Review, at 6-24 (Public Version).
[20] *See id.* at 4. We note that, although "CTG" was bracketed in Scioto's request for administrative review, the details of the federal court complaint to which Scioto refers, filed by CTG, have been released to the public in the public version of AKCA's response.
[21] *Id.* at 4.

importer of WCV, filed a complaint against Qingdao Haiyan Group, Qingdao Drouot, Alno, and Scioto, in the United States District Court for the Middle District of Tennessee Nashville Division, upon which Scioto relies.  Scioto takes issue with CBP's failure to examine CTG and commence an EAPA investigation against CTG.[22]  Accordingly, Scioto maintains that, as to its importations, the alleged transshipment of WCV from China did not occur and that no cash deposits were owed.[23]

Second, Scioto argues that the production tracking inspection reports, containing batch numbers from Alno's factory in Malaysia, demonstrate that the WCV Scioto entered was manufactured in Malaysia, not China.[24]  Scioto then points out that these batch numbers on the production tracking inspection reports match the batch numbers on Alno's production schedules, which, in turn, link the production batch numbers to particular purchase orders, shipments, and entries made by Scioto.[25]

Third, Scioto remarks that TRLED noted in the January 31st Determination that "the evidence demonstrates that Alno *can* produce wooden cabinets and vanities {in Malaysia}."[26]

Fourth, Scioto argues that the January 31st Determination is based on a misunderstanding of the Finished Product Inbound Delivery ("FPID") sheets.[27]  More specifically, Scioto observes that CBP misinterpreted that FPID sheets were only used when finished goods are purchased by Alno and that the presence of an FPID sheet for a shipment to Scioto demonstrates that Alno purchased Chinese WCV and exported them to Scioto.[28]  In contrast to CBP's interpretation of the FPID sheets, Scioto asserts that Alno uses the term "inbound" for different types of documents, and FPIDs are created whenever a finished good enters the finished goods warehouse, regardless of whether the goods were purchased or produced by Alno.[29]  Correspondingly, Scioto states that after Alno finishes production of an item in Malaysia and enters it into the finished goods warehouse, an FPID is created.[30]  Scioto points out that the difference between FPIDs created for goods produced in Malaysia and FPIDs for purchased goods is that the FPIDs for goods produced in Malaysia will list the production batch number, whereas the other FPIDs contain no such production batch number.[31]  In turn, the batch numbers from the FPID sheets match those included on the production schedules, which also bear Scioto's purchase order numbers linking production in Malaysia to specific shipments and entries made by Scioto.[32]  Scioto illustrates this by comparing an FPID sheet containing a production batch number corresponding to one of its shipments to an FPID sheet pertaining to transshipped goods to [ Co. ] from China, which contained no such production batch numbers.[33]  Additionally, Scioto asserts that the FPID sheets for the transshipped goods to [ Co. ] do not contain any of the SKUs used by Scioto.[34]

---

[22] *Id.*

[23] *Id.* at 8.

[24] *Id.* at 10.

[25] *Id.*

[26] *Id.* (quoting January 31st Determination (Public Version) at 4)(emphasis in original).

[27] *See* Scioto's March 15, 2023 Request for Administrative Review (Public Version), at 10-11.

[28] *Id.* at 11.

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.* at 11-12.

[33] *Id.* at 12 (Business Confidential Version).

[34] *Id.*

PUBLIC VERSION

Fifth, Scioto contends that the concerns with documentation which TRLED recounted in the January 31st Determination are immaterial to the issue of whether Alno produced the WCV imported by Scioto.[35]  Specifically, Scioto asserts that CBP's finding of vague recordkeeping refers to Alno's raw material purchase records, rather than the production records reviewed by CBP.[36]  Moreover, Scioto disagrees with CBP's finding that certain documents maintained by Alno regarding raw material purchases are unreliable.[37]  Scioto notes that CBP found these documents unreliable because: 1) unit transfer prices did not reflect market prices when goods were purchased from related parties; 2) invoices for purchases of raw materials and other goods contained vague descriptions; 3) the invoices for purchases of raw materials and other goods contained varied and inconsistent units of quantity; and, 4) no invoices or purchase documents existed with respect to purchases of glass.[38]  Nevertheless, Scioto maintains that these documents are not material in CBP's determination of whether the goods Scioto imported were produced in Malaysia.[39]  Rather, the only documents CBP needs to determine whether the products were produced in Malaysia are the aforementioned production documents.[40]  Moreover, Scioto argues that the similarities in the packaging of goods as referenced in AKCA's allegation and packaging of goods for CTG in Alno's warehouse and discrepancies between paperwork provided by Alno and information provided in the Allegation by AKCA are not material to this investigation.[41]  Likewise, Scioto contends that the disclosure of the "additional warehouse" is immaterial, because CBP provides no evidence that the disclosure of this warehouse at verification impeded CBP's investigation, nor does CBP cite to any evidence that any of the goods in the warehouse were produced in China.[42]  Lastly, Scioto asserts that the statute and CBP's regulations do not require a company to keep its internal records in any particular form.[43]

Sixth, Scioto claims that the application of adverse inferences was not justified, because Alno cooperated to the best of its ability in responding to CBP's numerous questions and document requests in a very limited amount of time and with only a small administrative staff, and there were no material gaps in the record.[44]  More specifically, Scioto notes that: 1) Alno disclosed the existence of the additional warehouse when CBP asked it specific questions and brought CBP officials to the warehouse without delay; the additional warehouse was not initially divulged, because Alno misunderstood the nature of CBP's questions, and the warehouse was only recently rented to store finished goods that Alno's customers would not accept due to the civil litigation and EAPA case; 2) CBP failed to clarify how asking Alno's officials multiple times when documents were missing led to a gap in the record or how these documents are material to the investigation and regardless, Alno acted to the best of its ability to respond to the numerous document requests with a small administrative staff; 3) CBP failed to elucidate how Alno's attempt at providing to CBP officials unrelated, irrelevant, or unsolicited documents led to gaps in the record, or how this supports CBP's finding that Alno did not cooperate to the best of its ability. Additionally, CBP fails to disclose the specific documents it is referring to, and CBP should take into account language differences which

---

[35] *Id.* at 13.
[36] *Id.*
[37] *Id.*
[38] *Id.* at 13-14.
[39] *Id.* at 14.
[40] *Id.*
[41] *Id.* (Business Confidential Version).
[42] *Id.* at 14-15.
[43] *Id.* at 15.
[44] *Id.* at 16.

impeded Alno's ability to understand the questions. Again, at worst, any errors are just a consequence of Alno's responding to numerous document requests with only a small administrative staff; and, 4) regarding the missing emails, Alno explained at verification that some emails were lost due to server issues, and Alno did not withhold any information.[45]

Seventh, Scioto argues that CBP's failure to provide parties with access to "confidential" record information violated Scioto's due process rights under the Fifth Amendment to the Constitution of the United States, because it curbed Scioto's opportunity to be heard.[46]  For instance, Scioto was not provided with photos taken by CBP officials.[47]  Moreover, most of the "confidential" information at issue was submitted by Alno and Scioto themselves, so Scioto should have access to it.[48]  Scioto states that the EAPA statute and regulations provide no mechanism for parties or their counsel to view confidential information that is being used against them.  This creates a procedural due process violation.[49]

### B. AKCA's Arguments

AKCA requests that we affirm the January 31st Determination.  AKCA argues that CBP's finding of evasion was based on substantial evidence.[50] AKCA sets forth various arguments as to why the January 31st Determination of evasion should be affirmed.[51]

First, AKCA contends that Scioto's argument that an EAPA investigation should be brought against CTG is irrelevant with regards to the issue of whether an affirmative evasion determination should be reached against Scioto.[52]  Even if this were relevant though, AKCA did not file an EAPA allegation against CTG because CTG returned the transshipped Chinese goods to Malaysia when it discovered that the goods were from China, and CTG provided information regarding the evasion scheme to AKCA, so that AKCA could collaborate with CBP to confront the evasion plot.[53]

Second, AKCA asserts that there is substantial evidence of evasion on the record, even if Alno had the capacity to produce WCV in Malaysia.[54]  Specifically, AKCA views the FPID sheets as substantial evidence of evasion, because the FPID sheets purportedly show that Alno received finished WCV that it purchased and which were manufactured in China.[55]  AKCA maintains that CBP's determination was not based on a misunderstanding of the FPID sheets, as TRLED concluded that "the FPID sheet is only generated in one specific instance, *i.e.*, when goods enter the raw materials warehouse."[56]  Moreover, ACKA emphasizes that TRLED officials asked both the General Manager and Chief Accountant when the FPID sheet is generated, and they stated that the FPID sheet is generated when purchased materials are entered into the raw materials warehouse,

---

[45] *Id.* at 17-19.
[46] *Id.* at 20-24.
[47] *Id.* at 22.
[48] *Id.* at 23.
[49] *Id.* at 21.
[50] *See* Alleger's Response to Request for Administrative Review, dated March 30, 2023 (Public Version) at 4.
[51] *Id.* at 4-22.
[52] *Id.* at 5.
[53] *Id.* at 5-6.
[54] *Id.* at 6; *see* January 31st Determination (Public Version) generally.
[55] Alleger's Response to Request for Administrative Review (Public Version), dated March 30, 2023, at 6-8.
[56] *Id.* at 8 (quoting January 31st Determination (Public Version) at 7).

which confirmed what Alno said in its third supplemental response.[57]  Additionally, Alno's Chief Accountant confirmed that Alno does not track inventory movement during the production process. Alno also did not provide the FPID sheets for any of the sales traces that the TRLED verification team conducted on-site during the verification, even though Alno had provided them in RFI responses.[58]  The only other instance during which TRLED officials viewed these inbound sheets was for raw materials that Alno had purchased and when Alno transshipped finished WCV from China to another company, presumably referencing [ Co. ], which gave rise to FPID sheets identical to the instant ones.[59]

     Third, AKCA points out that the information submitted by Alno was unverifiable and unreliable.[60]  AKCA views Scioto's claims – that the discrepancies and missing documents for purchases of raw materials are immaterial to this investigation – as meritless.[61]  Further, AKCA takes issue with Scioto's claim that the production documents themselves are the only documents necessary to determine that the WCV were produced in Malaysia, because production documents can easily be forged or altered.[62]  Moreover, the discrepancies in the purchase documents and the missing purchase documents are probative of evasion.[63]  The aforementioned discrepancies included inconsistent quantity types and vague invoice and packing list descriptions that concealed the volume and types of goods purchased, specifically finished WCV, from the Chinese supplier.[64]

     Fourth, AKCA asserts that TRLED properly applied adverse inferences, because Alno did not cooperate to the best of its ability with CBP's requests for information, as follows.[65]  Specifically, among other things, AKCA notes that TRLED discovered the existence of an additional warehouse, not previously disclosed, after an Alno employee inaccurately stated that no other location existed. TRLED had to ask company officials multiple times to provide documents and each time discovered that documents were missing. Alno attempted to provide TRLED officials unrelated or irrelevant documents that were unsolicited to cover for Alno's error of not providing certain documents after being asked multiple times.  TRLED was unsure the missing emails provided to TRLED at verification were original emails since TRLED was not provided with access to the original files despite asking for access.[66]  Finally, AKCA insists that the EAPA statute is different from the AD/CVD statutes with regards to adverse facts available, because under the EAPA statute, CBP does not have to find a "gap in the record" before it applies adverse inferences, as Commerce must in AD/CVD proceedings.[67]  CBP only has to find that an interested party has failed to cooperate to the best of its ability before CBP is authorized to apply adverse inferences.[68]

     Fifth, AKCA proclaims that CBP may collect duties based on its application of adverse inferences based upon the statutory language of EAPA, as CBP can find that the WCV is covered merchandise, Scioto evaded the AD/CVD Orders, and Alno failed to cooperate to the best of its

---

[57] Alleger's Response to Request for Administrative Review (Public Version), dated March 30, 2023, at 8.
[58] Id.
[59] Id. at 8-9; see also January 31st Determination (Business Confidential Version) at 7.
[60] Alleger's Response to Request for Administrative Review (Public Version), dated March 30, 2023, at 9.
[61] Id.
[62] Id.
[63] Id. at 10.
[64] Id. at 11.
[65] Id. at 12.
[66] Id. at 14.
[67] Id. at 16.
[68] Id.

ability with regards to CBP's requests for information.[69]  This is consistent with the intent behind granting the power to apply adverse inferences to TRLED, which is "to provide respondents with an incentive to cooperate."[70]

Finally, AKCA expostulates with Scioto's argument that its due process rights were violated under the U.S. Constitution, since the U.S. Court of International Trade ("CIT") has rejected similar claims.  The CIT has found that when CBP provides public summaries of sufficient detail to permit a reasonable understanding of the substance of the information, the parties have been provided with an adequate opportunity to respond to adverse evidence.[71]  AKCA then notes that all confidential information on the record was properly summarized in sufficient detail to permit a reasonable understanding of the substance of the information.  Therefore, Scioto's due process rights were not infringed.[72]

## III.    Administrative Review Analysis

As an initial matter, pursuant to 19 U.S.C. § 1517(f)(1) and 19 CFR § 165.45, upon request for administrative review, RR will apply a *de novo* standard of review, based solely upon the facts and circumstances on the administrative record in the proceeding.  In making our determination, we reviewed: (1) the administrative record upon which the January 31st Determination was made, as provided to RR by TRLED; and, (2) the timely and properly filed request for review and response.

The purpose of this *de novo* review is to analyze the January 31st Determination and the accompanying administrative record to determine whether substantial evidence of evasion exists. Our review of the administrative record clearly indicates that Scioto's WCV were entered on type "01" consumption entries and, therefore, AD/CVD deposits and duties were not paid.  The only fact in contention is whether the WCV at issue are, in fact, of Chinese origin, and thus, considered covered merchandise under the applicable AD/CVD Orders.  If so, no one disputes that when entered on type "01" entries, they would have been entered into the customs territory of the United States by means of a document or electronically transmitted data or information, written or oral statement, or act, that is material and false, or an omission that is material; and that such entry resulted in the reduction or avoidance of applicable AD or CVD cash deposits or duties being collected on such merchandise.

The record contains extensive documentation regarding the presence of raw materials at Alno's warehouse in Malaysia and Alno's ability to produce, and production of, WCV from those raw materials using machinery and its workforce, which we find credible.  Moreover, the record contains substantial evidence linking Alno's production records to Scioto's entries into the United States.  In contrast, the record contains no evidence that WCV produced in China were transshipped through Malaysia and imported into the United States by Scioto.  Accordingly, in our view, there is not substantial evidence in the record that covered merchandise was entered into the customs territory of the United States through evasion, as we explain in detail below.

---

[69] *Id.* at 19-20.
[70] *Id.* at 20 (quoting *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000).
[71] *Id.* at 20-21.
[72] *Id.* at 21.

PUBLIC VERSION

### A. Our *de novo* administrative review is limited to a determination as to Scioto, not CTG.

No EAPA investigation was conducted as to CTG, and no determination was made as to CTG's imports. As such, our determination herein necessarily relates to Scioto's imports and not those of CTG. However, given that Scioto's request for administrative review contains arguments related to CTG, we briefly address the issue of CTG. The issue of whether CTG engaged in evasion is not properly before us. Nor are facts related to CTG's conduct and transactions relevant to our decision as to whether Scioto engaged in evasion, given that the record is devoid of any evidence of a relationship between Scioto and CTG.

We do note one fact, contained in the record, which is relevant to our decision. As acknowledged in the January 31st Determination, "Alno itself has admitted in court documents that it transshipped Chinese-origin cabinets and vanities through Malaysia to [Co.] during the for {sic} this EAPA investigation."[73] Indeed, Alno admitted in response to CBP's RFI that it transshipped WCV to [Co.], but it did not so admit with regards to Scioto's importations.[74]

### B. The use of adverse inferences against Alno and Scioto is not supported by substantial evidence.

TRLED's application of adverse inferences encompasses both the alleged non-responsive manufacturer, Alno, and the importer, Scioto. Based on such inferences, TRLED's finding of transshipment extended to all entries of WCV sourced from Alno, which Scioto imported during the period of investigation. 19 CFR § 165.6(a), provides, in part, as follows:

> {i}f the party to the investigation that filed an allegation, the importer, or the foreign producer or exporter of the covered merchandise fails to cooperate and comply to the best of its ability with a request for information made by CBP, CBP may apply an inference adverse to the interests of that party in selecting from among the facts otherwise available to make the determination as to evasion pursuant to 165.27 and subpart D of this part.

However, while Alno and Scioto may not have acted perfectly in responding to information requests by CBP, in our view, when the record is examined as a whole, it supports a conclusion that they cooperated and complied with requests for information made by CBP such that application of a wholesale adverse inference to Scioto is not justified. This is especially so given there is record evidence that the information requested was ultimately provided to CBP.

First, the January 31st Determination applied adverse inferences against Alno, because, among other reasons, Alno did not initially disclose an additional warehouse[75] when asked if it owned any other locations. Scioto claims that Alno did not initially disclose the existence of this warehouse, because it misunderstood the nature of CBP's questions, and the warehouse was only recently rented to store finished goods that Alno's customers would not accept due to the civil

---

[73] January 31st Determination (Business Confidential Version) at 4.
[74] Alno's September 8, 2022 Supplemental CF 28 Response (Business Confidential Version) at 1.
[75] January 31st Determination (Public Version) at 11.

litigation and EAPA case.[76]  It is clear from the record that when Alno realized that CBP also wanted information on this warehouse, Alno disclosed the existence of the warehouse to CBP and further provided CBP with access to the warehouse.[77]  According to the verification report, "Alno claimed they misunderstood the question and thought we {CBP officials conducting verification} meant raw materials."[78]  In this regard, we note that Alno had both a "raw materials warehouse" and an "additional . . . (Finished Goods Warehouse)."[79]  We also note that, after being asked about other locations, Alno's employee "confirmed that Alno did not own any other land in the area{,}" according to the verification report.[80]  This statement of Alno's employee to CBP officials appears to be both technically correct and accurate, as CBP officials noted that they "identified payments for a  [  description  ] which was actually the additional finished goods warehouse.[81]  Alno truly did not own any other land or factories in the area, as corroborated by the payments for a [ description] which CBP officials identified; Alno was merely renting another facility, and Alno did not own the facility or the land upon which it stood.[82]  On balance, in our view, the facts discussed above do not support a conclusion that Alno did not cooperate by not acting to the best of its ability to comply with a request for information, especially given that Alno did in fact disclose the additional finished goods warehouse and subsequently brought CBP officials to the warehouse location.[83]

        Secondly, the January 31st Determination employed adverse inferences against Alno because, initially, Alno failed to provide missing packing checklists, when requested to do so by CBP.[84]  Later during the on-site visit, company officials and Alno's counsel attempted to provide the missing Packing Check-Lists, unsolicited, at a time when CBP officials were focused on obtaining other documents (commercial invoices and bills of lading).[85]  The statutory provision on when the application of adverse inferences is appropriate does not require perfection, but rather, it requires acting to the best of one's ability to comply with a request for information.[86]  Alno did not act perfectly, in that there were delays– of indeterminate length pursuant to the record before us– in providing certain Packing Check-Lists, but when Alno found the relevant documents, later during the course of the verification, it produced them to CBP "unsolicited."[87]  Thus, Alno acted to the best of its ability.[88]

        Thirdly, the January 31st Determination employed adverse inferences against Alno because CBP was unsure whether the missing emails provided to CBP at verification were original emails, since CBP was not provided with access to the original files, despite asking for access.[89]  The verification report notes that the Alno employee stated that this was due to "server issues."[90]  There

---

[76] Scioto's March 15, 2023 Request for Administrative Review (Public Version) at 14-15.
[77] Id. at 17; Regulatory Audit and Agency Advisory Services' ("RAAAS") verification report, dated December 21, 2022, (Public Version) at 9.
[78] RAAAS verification report, dated December 21, 2022, (Public Version) at 9.
[79] Id. at 3, 9.
[80] Id. at 9.
[81] Id. (Business Confidential Version).
[82] Id.
[83] See 19 U.S.C. § 1517(c)(3)(A).
[84] January 31st Determination at 11 (Public Version).
[85] RAAAS verification report, dated December 21, 2022, (Public Version) at 16.
[86] See Nippon Steel Corp. v. United States, 337 F.3d 1373,1382 (Fed. Cir. 2003).
[87] See id.; RAAAS verification report, dated December 21, 2022, (Public Version) at 16.
[88] See 19 U.S.C. § 1517(c)(3)(A).
[89] January 31st Determination at 11 (Public Version).
[90] RAAAS verification report, dated December 21, 2022, at 11 (Public Version).

is insufficient evidence in the verification report or otherwise regarding the veracity of the claims made concerning the server issues. It appears the issue surrounding the server and corresponding emails was unresolved.[91] Consequently, it is difficult to draw any conclusion on this point.[92] Lastly, according to the verification report, it is noteworthy that:

> Alno did contact someone from the parent company who was included on the email, and they forwarded the email to Alno. While we {CBP Officials} did not find any concerns with the attachments provided, we cannot be sure the attachments provided in the forwarded email were the ones in the original email since we did not have access to the original email.[93]

There is no proof on the record that the person from the parent company forwarded an email to CBP officials containing different attachments from those accompanying the original email.[94] Regardless, the forwarded email and its attachments were not included in the attachments to the verification report, so we are unable to examine them, and we were unable to locate the email and its attachments within the 18 verification exhibits Alno submitted.[95] Thus, on balance, we believe that the evidence with respect to the emails is mixed. In our view, the evidence is sufficient to call into question the reliability of the attachments and emails so as to not rely upon them for purposes of a determination; however, this example, when considered with all of the other evidence, is insufficient to draw a wholesale adverse inference against Scioto for all of its imports during the period in question.

We thus conclude that the use of adverse inferences against Alno and Scioto is not supported by substantial evidence.

### C. There is record evidence that Alno has the capability to, and likely did, produce the WCV in Malaysia.

#### 1. Alno's production records are direct evidence of production of WCV in Malaysia of WCV imported by Scioto.

The record evidence demonstrates not only that Alno *could* produce WCV in Malaysia, but that Alno *did* produce the WCV at issue in Malaysia. Production documentation, including FPID sheets, production tracking inspection reports, and production schedules, submitted by Alno, link specific production batch records from Alno's factory in Malaysia to specific purchase orders, commercial invoices, and entry numbers for WCV which Scioto imported, and which are the subject of this EAPA investigation. The January 31st Determination dismisses the FPID sheets based on the view that they are only for occasions when Alno purchased finished goods from China; however, based on our review of the evidence, as discussed herein, such a conclusion is not justified. The record demonstrates that the FPID are used for purchased and manufactured finished goods inventory.

---

[91] *See id.*
[92] *See* 19 U.S.C. § 1517(c)(3)(A).
[93] RAAAS verification report, dated December 21, 2022, at 11 (Public Version).
[94] *See id.*
[95] *See id.* at Attachments 1-11, pp. 19-56 (Business Confidential Version); Alno's Verification Exhibits 1-18, dated November 3, 2022 (Business Confidential Versions).

No mention is made in the January 31st Determination of the production tracking inspection reports, and production schedules, submitted by Alno.[96]  The record evidence supports a conclusion that Alno did produce the WCV in Malaysia.  More specifically, the batch number listed on Alno's FPID sheet, reproduced in the January 31st Determination, [ batch no. ] matches the batch number listed on Alno's production tracking inspection sheets, [ batch no.], and the batch number, [batch no. ] listed in the production batch lot checklist for Alno's factory in Malaysia.[97]  The production batch checklists link the production batch number [batch no.   ] to a Scioto purchase order number [ example ], a SKU [  example   ], and a line item on an entry number (e.g., [XXXXXXXX]7716, entry line 6).[98]  The production batch number from the production batch checklists [batch no.] also matches the batch number on the production schedule [  batch no. ][99]  The production schedule links a batch number, [batch no.], to Scioto's purchase order numbers [P.O. no.].[100]  We note that Alno's August 25, 2022 CF 28 Response Part VII also listed different batch numbers that are unrelated to the FPID sheet reproduced in the January 31st Determination, such as batch nos. [ batch nos.                            ] supporting a conclusion that Alno also produced other batches of WCV in Malaysia and that these WCV were not produced in China.[101]  Alno's August 25, 2022 CF 28 Response Part VIII Part 2 also contains some production tracking inspection sheets with the matching batch number [batch no. ][102]  The matching batch number in the FPID and production documents (which are linked to specific entries made by Scioto) strengthens the claim that Alno produced the WCV at its factory in Malaysia, which were then imported by Scioto, and that the WCV were not manufactured by Qingdao Haiyan in China.[103]

Notwithstanding the fact that some of the production tracking inspection sheets that were placed on the record contain foreign language text without English translations,[104] these documents nonetheless contain alphanumerical batch numbers with English letters [batch no.           ], which can be read by our office, and which link to purchase orders, commercial invoices, and entries/importations of WCV by Scioto.[105]

Dismissing this record evidence, AKCA contends that "{p}roduction documents can easily be forged or altered."[106]  Such a statement, without any support, is not a proper basis for dismissing the evidence contained in the record.  AKCA fails to detail which production documents, in particular, are allegedly forged or altered, or how CBP or AKCA can discern which production documents are forged or altered.[107]  No citation to the administrative record was provided by AKCA for its contentions regarding forgery or alteration of specific production documents.[108]  Regardless,

---

[96] See January 31st Determination at 7 and generally (Public Version).
[97] January 31st Determination of evasion at 23 (Business Confidential Version); Alno's August 25, 2022 CF 28 Response Part IV at pages 540-749, Part VII at 574, 577 (Business Confidential Version).
[98] Alno's August 25, 2022 CF 28 Response Part VII at p. 574 (Business Confidential Version).
[99] Alno's August 25, 2022 CF 28 Response, Part IV at p. 141 (Business Confidential Version).
[100] Id.
[101] Alno's August 25, 2022 CF 28 Response Part VII at p. 21 (Business Confidential Version).
[102] Alno's August 25, 2022 CF 28 Response Part VIII Part 2, pages 406-610 (Business Confidential Version).
[103] See Scioto's March 15, 2023 Request for Administrative review at 10 (Business Confidential Version).
[104] Alno's August 25, 2022 CF 28 Response Part IV at pages 540-749 (Business Confidential Version); see 19 CFR 165.5(b)(1).
[105] Alno's August 25, 2022 CF 28 Response Part IV pages 141, 540-749, Part VII at 574, 577 (Business Confidential Versions).
[106] Alleger's Response to Request for Administrative Review, dated March 30, 2023, at 9 (Public Version).
[107] Id.
[108] Id.

the production tracking inspection reports for batch number [batch no.], allegedly comprising transshipped merchandise per the January 31st Determination, appear to be authentic, at least chronologically speaking, as the production dates on the reports, ranging from July 30, 2021 through August 6, 2021, occur <u>before</u> the entry date on the corresponding entry, entry no. [XXXXXX]7716, with an entry date of [date          ].[109] Alno provided evidence tracking inventory movements, through batch numbers, and there has been no demonstration on the record that these documents were falsified, forged, or altered.[110]

Again, we observe that Scioto and Alno linked certain production batches in production documentation from Alno's factory and warehouse to specific entries of WCV imported by Scioto, which provides evidence that the WCV were produced in Malaysia.[111]   For example, Scioto provided a copy of a warehouse inbound order which contained an FPID sheet containing production batch number [batch no. ] matching the batch number on the production tracking inspection sheet [batch no. ] and in turn, the purchase order numbers on the FPID sheets [P.O. nos.        ] match those of the commercial invoices for entry [XXXXXX]142-0 [P.O. nos.].[112]   In sum, Scioto and Alno provided documentation that tracks production of WCV in Malaysia to the sale to and importation of WCV by Scioto in the United States.[113]   While we find that production records provide strong evidence concerning production in Malaysia, these documents are not the only relevant documents, as contended by Scioto.   Rather, raw material documentation is also relevant to the issue, as recognized *infra*.

We also note that the January 31st Determination contains certain statements as to the FPID sheets that are at odds with the verification report.   The January 31st Determination, concludes that "Alno's own company officials stated it {the FPID sheet} is for when purchased goods are checked in, confirming what Alno said in its third supplemental response on three occasions."[114]   By "purchased goods" it appears that the January 31st Determination meant "finished cabinets and vanities . . . having been purchased by Alno from [ Co.          ]."[115]   However, according to the verification report, Alno's company official never said that these were purchased goods from [Co.        ] coming in --- they are merely described as "goods{:}"

> {d}uring the verification, we showed the Chief Accountant and GM a sample of a Finished Product Inbound Delivery sheet that was submitted as part of its RFI responses and asked when that sheet is generated. They both responded that it is generated when goods are entered into the materials warehouse. We confirmed by asking again, "The Inbound Delivery Sheet would not be generated without goods coming in?" The GM replied, "Yes, it is only generated when goods are checked in."[116]

---

[109] *See* January 31st Determination at 23 (Business Confidential Version); Alno's August 25, 2022 CF 28 Response Part IV" pages 540-749, Part VII" at 574, 577 (Business Confidential Versions); RAAAS verification report, dated December 21, 2022, Attachment 3, page 1 (Business Confidential Version).

[110] *See id.*

[111] Alno's August 25, 2022 CF 28 Response Part IV at 141, 540-749, Part VII at 574, 577 (Business Confidential Versions).

[112] Scioto's June 1, 2022 CF 28 Response Attachments 3, pages 54-56, 8-4, page 243, and 8-5, pages 245-49 (Business Confidential Version).

[113] *See id.*

[114] January 31st Determination at 7 (Public Version).

[115] *Id.* at 8 (Business Confidential Version).

[116] RAAAS verification report, dated December 21, 2022, at 14 (Business Confidential Version); *see also* Alleger's Response to Request for Administrative Review, dated March 30, 2023, at 8 (Public Version).

PUBLIC VERSION

Likewise, the January 31st Determination is inconsistent with Alno's Third Supplemental Response, as Alno never said that these were "purchased goods," i.e., finished WCV purchased by Alno from [Co.      ].  Instead, Alno said that the FPID sheets were also for "{raw} materials purchased" as evidenced by CBP's RFI question and Alno's response:

> {CBP request for information}  3. Inbound delivery sheets for hardware accessors (Exhibit VII page 80), runner and hinges (Exhibit VII page 82-87), paint (Exhibit VII page 113) and plywood (Exhibit VII page 125-130).  These raw materials were purchased from various vendors and tracked on an inbound delivery sheet. We identified finished product inbound delivery sheets in Exhibit VII page 56 and 75 lists, which SKU numbers received for each sheet dated separately. The listed SKU numbers are also listed on commercial invoices for Scioto and the product catalog. Generally, inbound delivery is for material entering a facility for stock purposes.

> a. Please explain why these products would be tracked as inbound delivery and not outbound forms. Where did this shipment inbound from?

> Response: The package documents we submitted include materials inbound sheets which are for materials entering the factory and outbound sheets which are for materials withdrawn from Alno's warehouse as production inputs. Alno keeps the products tracked by outbound sheets (warehouse-out sheets) for production inputs and inbound sheets (warehouse-in sheets) for materials purchased. Please see Exhibit S-Part VII-Q3 for a sample outbound sheet.[117]

The January 31st Determination seems to conclude that Alno admitted it purchased transshipped finished goods (WCV) from China and sent them to Scioto; however, neither the verification report nor Alno's RFI response supports such a conclusion.  Rather, the information extracted above appears to support Scioto's argument in the request for administrative review, that "FPID's are generated whenever a finished good enters the finished goods warehouse regardless of whether the goods were purchased or were produced by Alno.  Therefore, once Alno completes production of an item in Malaysia and enters it into the finished goods warehouse, an FPID is also generated."[118]  Unlike the FPIDs for the goods destined to Scioto, the FPIDs for transshipped goods destined to [Co.] on the record did not contain batch numbers, instead, they contained the notation "N/A."[119]  The inclusion or absence of production batch numbers would differentiate transshipped goods to [Co.] versus non-transshipped goods to Scioto, manufactured in production batches in Malaysia.[120]

The January 31st Determination also points out that Alno's Chief Accountant confirmed that Alno does not track inventory movement *during* the production process, which the Determination relies upon to provide additional support that items listed on the FPID are goods purchased by Alno from a Chinese manufacturer.  However, this statement does not address inventory tracking after completion of the production process (as opposed to during the production

---

[117] Alno's October 17, 2022 3rd Supplemental CF 28 Response, at 16 (Public Version).
[118] Scioto's March 15, 2023 Request for Administrative Review, at 18 (Public Version).
[119] Verification Exhibit 10 at page 21 (Business Confidential Version).
[120] *See id.*

process). The FPID sheets contain production batch numbers for the manufactured products that enter inventory.[121] In other words, Alno did track inventory movements for finished goods, through batch numbers, and there has been no demonstration on the record that these documents were falsified, forged, or altered.[122]

Moreover, Alno explained in its Third Supplemental response that the term "inbound" means input of either a raw material from China or a finished product made in Malaysia:

> Response: There are two types of inbound orders for solid wood. An "inbound order" means that the input is inbound into the production process. It does not refer to whether the input coming from abroad or whether it is produced in Malaysia. One type of inbound order is for the purchase of solid wood from China. This solid wood from China is not cut-to-size planed solid wood, but instead is "Long-piece Planed Wood" which is a kind of wood boards with various lengths and widths with a thickness of 21mm. Please see Exhibit S-Part VII-Q1-1 for an inbound order of long-piece planed wood and a picture of the long-piece planed wood. A second type of inbound order is for a product made in Malaysia. That second product is produced in Malaysia by Alno.[123]

Finally, the record is devoid of any evidence of shipments in the form of finished WCV from China into Malaysia, in terms of Malaysian import records, and then to the United States, to Scioto, in terms of U.S. import records.[124] Thus, in addition to the evidence related to production of WCV in Malaysia, there is an absence of evidence of any shipments of Chinese-origin WCV covered by the Orders and transshipped to Scioto.

### 2.    CBP's on-site visit corroborated that Alno can produce WCV.

As discussed above, Scioto and Alno provided substantial documentary evidence to support a conclusion that the WCV Scioto imported into the United States was manufactured by Alno in Malaysia. Moreover, CBP was also able to corroborate Alno's production capabilities during an on-site verification at Alno in Malaysia.

Importantly, the January 31st Determination states that the "evidence demonstrates that Alno *can* produce wooden cabinets and vanities {in Malaysia}."[125] When CBP officials conducted an on-site verification at Alno's raw materials warehouse in Malaysia, CBP officials found raw materials that can be used to manufacture the goods at issue here: "{t}he warehouse was filled with stacks of mostly medium density fiberboard (MDF), plywood, wood boards, etc."[126] This corroborates that Alno had the raw materials to manufacture the WCV in Malaysia.[127] CBP officials also took note of where Alno purchased raw materials from, which further supports the claim that Alno used raw

---

[121] January 31st Determination at 7, Attachment p. 23 (Business Confidential Version).
[122] *See id.*
[123] Alno's Third Supplemental CF 28 response dated October 17, 2022, at 15 (Public Version).
[124] January 31st Determination generally (Business Confidential Version); NTAC Post Receipt Report (March 22, 2022) generally (Business Confidential Version); *see also, e.g.*, Commercial invoice for entry no. 791-357[XXXXXX] issued by Alno listing a Malaysian address to Scioto with a U.S. address (Business Confidential Version).
[125] January 31st Determination at 4 (emphasis in original) (Public Version).
[126] RAAAS verification report, dated December 21, 2022, at 3 (Public Version).
[127] *See id.*

materials to make cabinets in Malaysia.  The three most significant raw materials used to manufacture WCV are solid wood boards, plywood, and paint; Alno purchased solid wood boards from Haiyan Drouot China; plywood from seven various suppliers in Vietnam and Malaysia; and, paint from two suppliers in Malaysia.  The other materials used in the process of manufacturing cabinets are MDF, and hardware, which Alno sourced from Malaysian and Chinese suppliers.[128]  Moreover, photos in the verification report of Alno's facility in Malaysia depict raw materials made of wood.[129]

        Although the January 31st Determination recognizes that "Alno *can* produce wooden cabinets and vanities," it states that, from October 2018 to October 2019, approximately when the Orders were implemented, Qingdao Haiyan Drouot Household Co., Ltd. (Haiyan Drouot) exported WCV from its manufacturing plant in Qingdao, China, to Scioto in Waverly, Ohio (disputed by Scioto), since, among other reasons, "there is evidence on the record showing Alno's and Scioto's ties to China."[130]  More specifically, Scioto, which is 100 percent owned by the Qingdao Haiyan Group Co., Ltd. (Haiyan Group), acquired Alno on July 1, 2019, and the deal was official on September 4, 2019;[131] in July 2022, Scioto transferred all its shares of Alno to the Haiyan Group;[132] the owner of Haiyan Group is Liyan Jiao, a Chinese national residing in Qingdao, China;[133] and Alno's department heads are Chinese nationals.[134]  Nevertheless, evidence of common ownership by a Chinese national does not necessarily prove that the goods associated with these entries were produced in China rather than Malaysia (especially given that Alno acknowledges that it sourced solid wood boards from Haiyan Drouot in China).  Moreover, the evidence shows that this Chinese national's company also owns a factory in Malaysia, which CBP visited, and which is capable of producing WCV.  The January 31st decision explicitly acknowledges that Alno can produce WCV in Malaysia.[135]  Thus, in light of all of the evidence, the common origin and ties to China do not justify a conclusion of transshipment.

        ### 3.    Alno's raw material records, machinery, and packaging operations are direct evidence of production of WCV in Malaysia.

        According to the verification report, CBP officials questioned Alno as to why Alno had so much raw material if it had not been producing cabinets in months.[136]  Alno's General Manager ("GM") responded that:

        they do not stock inventory based on orders, instead they keep enough stock on hand to produce [number ] shipping containers of cabinets. The GM could not provide a process time for a cabinet from start to finish, and instead stated they could fill [no. ] shipping containers in an 8-hour day.  He also confirmed that it takes approximately

---

[128] *Id.* at 4 (Business Confidential Version).
[129] *Id.* at attachment 4, Photos 3-7, pages 2-4 (Business Confidential Version).
[130] January 31st Determination at 4 (Public Version) (emphasis in original).
[131] *Id.*
[132] *Id.*
[133] *Id.*
[134] *Id.* at 5.
[135] *Id.* at 4.
[136] RAAAS verification report, dated December 21, 2022, at 4 (Public Version).

[no. ] months lead time for raw materials by sea shipment regardless of origin location.[137]

The verification report did not provide any information which would call into question the GM's explanation as to why Alno had the amount of raw materials that were present.[138] If anything, the presence of ample and abundant raw materials suggests that Alno had everything it needed in Malaysia to produce the WCV in Malaysia, as opposed to not having enough raw materials in Malaysia to produce the WCV in Malaysia.[139] CBP also observed the machinery needed to produce WCV in Malaysia, specifically, machines used to dovetail and precisely trim wood.[140] This suggests that Alno had the capacity to produce the WCV in Malaysia.[141] Additionally, CBP officials observed a packaging area for finished products during the on-site verification; again, this constitutes direct evidence of Alno's production capacity for the manufacture of WCV in Malaysia.[142]

The evidence relied upon in the January 31st Determination to dismiss the substantial evidence of capacity is insufficient. The determination concludes that [Co.        ] sales documents, consisting of invoices issued by [Co.       ] to Alno for sales of raw materials, are unreliable because of the discrepancy in sales prices of raw materials for invoices examined at the on-site verification: "on Invoice [ no.                  ], dated [date            ], the price for birch and hickory was $[    no.] and $[     no. ], respectively, but on Invoice [     no. ], dated [    date], the price for birch and hickory was $[no. ] and $[no.   ] . . ."[143] While this difference raises questions, CBP officials asked about the difference and Alno's Chief Accountant indicated that the difference is: "{n}ormal based on the volume they purchase, and the mix in the container. The smaller the size boards, the bigger the quantity they can order and better price they can receive. It all depends on the product mix in the container."[144]

More importantly, this difference does not in any way establish that these raw materials were actually finished products manufactured in China, which link to a specific entry of WCV imported by Scioto.[145] The January 31st Determination did note that "Alno owes substantial amount of money (sic) to the Haiyan Group for subsidizing Alno's budget shortfalls."[146] The increase or decrease in sales price is likely a mechanism to transfer money between related companies to make up for debts owed between the related companies, and a device used to reallocate funds amongst related companies based upon each company's current needs.[147] We do

---

[137] Id. (Business Confidential Version).
[138] Id.
[139] See id. (Public Version).
[140] See id. at 5-6.
[141] See id.
[142] See id. at 6.
[143] Id. at 8 (Business Confidential Version) (quoting RAAAS verification report, dated December 21, 2022, at 5 (Business Confidential Version).
[144] RAAAS verification report, dated December 21, 2022, at 5 (Public Version).
[145] See id.
[146] January 31st Determination at 4-5 (Public Version).
[147] See id. See also Alno's Third Supplemental Response, dated October 17, 2022 (Business Confidential Version):

    Response: The unit transfer prices between [Co.        ] and Alno do not reflect the market
    price for the materials. Since the companies are related to each other, if [Co.        ] needs to
    get more fund to purchase raw wood boards, the unit prices for the solid is increased so that the
    total payment made by Alno to [Co.        ] for that purchase is increased. The invoice
    [No.   ] dated [ date ] is one such situation. In the same way, if Alno needs more fund

PUBLIC VERSION

not discuss here the implications of such a practice, in terms of the reliability of the transfer prices related to raw materials and/or finished goods purchased by Alno from China, but note that such types of intra-corporate pricing policies are a key reason why government agencies often do not rely upon, or minimally rely upon, related-party transfer prices.[148]  We further note that there has been no allegation, nor has evidence been provided, that prices on the importation-related documents which were submitted to CBP for Scioto's entries were inaccurate or false such that a finding of evasion could be made based on false valuation.

Furthermore, regardless of the listed prices, because the documentation shows sales of raw materials from [Co.               ] to Alno in Malaysia, it supports a conclusion that Alno manufactured the raw materials into WCV in Malaysia and then exported the finished products to Scioto.[149]  Alno acknowledged that it purchased both birch and hickory from China in one of its responses to a request for information.[150]  Moreover, packing checklists, warehouse out slips, and inbound order forms provided to CBP identify birch and hickory (raw materials) sold from [ Co.         ] to Alno, and photographs present in the record inside of Alno's factory in Malaysia validate sales of raw materials from [Co.        ] to Alno.[151]

The January 31st Determination acknowledged that the factory in Malaysia can produce WCV, and the documentation of purchases of raw materials, as well as the actual presence of raw materials at Alno's warehouse, corroborate production in Malaysia.[152]

The January 31st Determination further notes that "invoices from [Co.                ] use vague invoice descriptions that do not specify or categorize different sizes of wood or specific hardware."[153]  Given the presence of actual raw materials at the factory, this fact related to the invoices does not equate to a conclusion that, behind the invoice descriptions claimed to be raw materials sent to Alno, are actually finished products manufactured in China and transshipped through Malaysia.[154]  The January 31st Determination also considers discrepancies, in terms of unit transfer prices, and finds that units of quantity were inconsistent (cartons, packages, and pallets) in the invoices for purchases of raw materials, and there were no invoice documents for purchases of glass.[155]  Again, without more, as discussed herein, this does not demonstrate transshipment.[156]

The January 31st Determination indicates that, in some cases, when packages or cartons were used as the quantity type, the matching Packing Check-Lists would contain SKUs of finished

---

to run its operation, the unit prices for the solid wood would be decreased so that the total payment made by Alno to [Co.     ] for that purchase will be less than what they should pay.  The invoice [No. ] dated [date ] meets this situation.

[148] See, e.g., 19 U.S.C. § 1677b(f)(2)("A transaction directly or indirectly between affiliated persons may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration.").
[149] January 31st Determination at 4-5 (Public Version).  See also Alno's Third Supplemental Response, dated October 17, 2022 (Business Confidential Version).
[150] Scioto's June 1, 2022 CF 28 Response at p. 96 (Business Confidential Version).
[151] See, e.g., id. at 125-241; see also verification report at Attachment 4, Photos 3-6, pp. 2-3 (Business Confidential Version).
[152] January 31st Determination at 4 (Public Version).
[153] Id. at 8 (Business Confidential Version).
[154] See id (Public Version).
[155] Id. at 8-9.
[156] See id.

goods, which then also had a related FPID sheet.[157]  However, when one examines Verification Exhibit 10, cited by the January 31st Determination, it appears that these only pertain to purchase order numbers from [Co. ], <u>not</u> Scioto, because the documentation lacks production batch numbers (which denotes purchased goods, rather than manufactured goods) and the purchase order numbers are in a different format from those used for Scioto's purchases.[158]  As discussed above, evidence as to [Co. ] does not demonstrate evasion by Scioto.

Moreover, we disagree with the conclusions drawn in the January 31st Determination as to the FPID sheets.  As demonstrated in the summary table provided herein (which is based on our examination of the record), a review of the SKUs for the WCV imported by [Co. ] shows that the SKUs are not the same as the SKUs for WCV imported by Scioto.  The January 31st Determination states that the FPID sheets contained SKUs and purchase order numbers for Scioto and "were *nearly* identical to the ones for [Co.        ] transshipped goods."[159]  (Emphasis added.)  However, only two out of Scioto's fourteen SKUs <u>approximately</u> match the documentation cited by the January 31st Determination, including the FPID sheets, and even those two SKUs do not match exactly.[160]  As such, in our view, this evidence does not support the proposition that Alno also transshipped WCV to Scioto.

---

[157] *Id.* at 9; Verification Exhibit 10 (Business Confidential Version).

[158] Verification Exhibit 10 (Business Confidential Version).  *Compare* January 31st Determination FPID sheet on page 23 for goods sent to Scioto: "*Batch no.* [batch no.] and Purchase Order number  [no.    ]  *with e.g.* FPID sheet from Verification Exhibit 10 page 24 [batch no.] purchase order no. [no.            ] (Business Confidential Versions) (emphasis added).

[159] January 31st Determination (Business Confidential Version) at 6, Attachments 22-25 (citing Verification Exhibit 10 (Business Confidential Version).

[160] *Id.* at 23-25; Verification Exhibit 10 (Business Confidential Version) at pages 19, 21, 23, 26, 32, 33.

[

Comparison of SKUs

]

Finally, the use of different quantity type designations, without more, is not probative as to the issue of evasion.

Likewise, with regards to the lack of invoices for glass, this pertained to shipments to [Co. ], not Scioto, per the verification report.[161]  The lack of invoices for glass with respect to products shipped to [Co. ] is of limited to no relevance here, where the record demonstrates that 1) the verification report mentions no evidence of Scioto's having ordered products with glass from Alno, 2) the same or similar invoices for glass were lacking for Scioto's orders, and, 3) most importantly, glass was not among the materials listed in Scioto's product and batch material lists, obviating any reason for Alno to possess such invoices for WCV sold to Scioto.[162]

### 4.  Alno's employee records are direct evidence of production of WCV in Malaysia.

CBP noted in the verification report that Alno's GM stated that "about [no.] employees . . . run the facility . . . (and) there are four production areas: 1. [area          ]; 2. [          area ]; 3. [area  ]; and 4. [area               ]."[163]  Thus, it appears that Alno had the workforce necessary to complete the various stages of producing WCV.[164]  The verification report did not include any information to cast doubt on the GM's aforementioned statements regarding production at Alno's facility in Malaysia.[165]  We note that Alno stopped production of WCV as of [date               ], after the last dates of entry concerning the entries subject to this investigation, [date          ], because "{c}ustomers would not accept orders due to ongoing litigation and EAPA investigation…"[166]

Although the factory was shut down during the verification, Alno brought in employees to demonstrate that the factory in Malaysia could produce WCV at the factory location.[167]  Even though Alno's bringing in employees during the shutdown to demonstrate the production process does not demonstrate that the workers were previously present and that they produced the goods at issue in this investigation in Malaysia, CBP acknowledged in the January 31st Determination that Alno could produce the products in Malaysia.[168]  In addition, CBP found machinery present at Alno's factory used to manufacture WCV, including machines used to dovetail wood and make precise trims to make the WCV presently at issue.[169]

### D.  Scioto was not denied procedural due process, and other arguments raised by Scioto are unpersuasive.

Finally, we will address Scioto's argument that it was denied due process, and other tangential or unpersuasive arguments raised by Scioto.  In *Royal Brush v. United States*, the CIT

[161] RAAAS verification report, dated December 21, 2022, at 13 (Business Confidential Version).
[162] *See id*.; Scioto's June 1, 2022 CF 28 Response at Attachments 11–2–11–3, p. 1622-1759 (Business Confidential Version).
[163] RAAAS verification report, dated December 21, 2022, at 5 (Business Confidential Version).
[164] *See id*.
[165] *See id*.
[166] *Id*. at 3, Attachment 3, p. 1.
[167] *Id*. at 5 (Public Version).
[168] *Id*. at 5; January 31st Determination at 4 (Public Version).
[169] RAAAS verification report, dated December 21, 2022, at 6 (Public Version).

examined an EAPA case presenting similar due process claims around public summaries of confidential documents required by 19 CFR § 165.4.[170]  The court found that "CBP has shared information with Royal Brush consistent with its regulation and in a manner that balances the need to disclose evidence against an importer with the need to protect certain information from unauthorized disclosure," and concluded that "CBP has complied with 19 CFR § 165.4 by providing necessary public summaries of the confidential information."[171]  In the present case, we find that TRLED provided public summaries consistent with the requirements of 19 CFR § 165.4, as stated by *Royal Brush*, and that Scioto's due process rights were not infringed by a lack of access to the confidential record, although we do recognize that an appeal of the *Royal Brush* decision is currently pending before the U.S. Court of Appeals for the Federal Circuit, but not yet decided.[172]

Scioto also argues that the determination should be reversed because CBP "never asked to verify Scioto despite the fact that it was the subject of this investigation, yet made a finding of evasion against Scioto."[173]  This factor is not one that we use to support our determination and we agree with TRLED that a verification of Scioto was not necessary under the circumstances; a finding of evasion could be made without a verification of Scioto.  The issue here is whether the WCV were produced in Malaysia or in China.  Thus, the critical on-site verification with respect to this issue was an on-site verification of the factory in Malaysia, owned by Alno, to determine if the WCV at issue were produced in Malaysia, or produced in and transshipped from China.[174]  CBP already had the entry records as filed by Scioto, because, by statute, Scioto was required to make entry by filing the required documentation necessary for CBP to determine whether the merchandise can be released (subject to exceptions inapplicable here).[175]  The information that CBP needed, with respect to Scioto, was the entry records, as filed, to determine: a) the entry type claimed (consumption vs. AD/CVD), and b) the claimed country of origin, and CBP already had this information;- thus, an on-site verification of this information at Scioto's premises was unnecessary.  Finally, Scioto's argument ignores the fact that on-site verification is discretionary under the EAPA statute, not mandatory, and it is focused only on the relevant issues at play in a particular case:

> {i}n making a determination under paragraph (1) with respect to covered merchandise, the Commissioner **may** collect such additional information **as is necessary** to make the determination through such methods as the Commissioner considers appropriate, including by— . . . conducting verifications, including **on-site verifications**, of **any relevant information**.[176]

Scioto's argument regarding missing invoices also makes undue assumptions.  The verification report states that a review of the documents discovered that invoices [no.        ], [no.        ], and [no.        ] were missing, as well as the corresponding packing lists and shipping invoices.[177]  Additionally, there were no corresponding Packing Check-Lists in the folder

---

[170] *See Royal Brush Mfg., Inc. v. United States,* 545 F. Supp. 3d 1357,1367-69 (Ct. Int'l Trade Oct. 29, 2021); *appeal filed and docketed*, No. 22-1226 (Fed. Cir. filed Sept. 9, 2022).

[171] *Id.* at 1367, 1369.

[172] *Royal Brush Mfg., Inc. v. United States*, No. 22-1226 (Fed. Cir. filed Sept. 9, 2022).

[173] Scioto's March 15, 2023 Request for Administrative Review at 5 (Public Version).

[174] *See* 19 U.S.C. § 1517(c)(2)(B).

[175] *See* 19 U.S.C. § 1484(a)(1).

[176] 19 U.S.C. § 1517(c)(2)(B)(emphasis added).

[177] RAAAS verification report, dated December 21, 2022, at 16 (Business Confidential Version).

related to the period of the missing invoices.[178]  As a result, TRLED found that CBP was not able to verify or confirm whether all cabinets and vanities exported to Scioto were produced on-site in Malaysia or imported from China, due to the company's vague record keeping.[179]  Scioto claims that "CBP's finding of vague record keeping refers to Alno's material purchase records, rather than the production records reviewed by CBP."[180]  However, Scioto's argument unnecessarily assumes that these missing purchase records pertain to raw materials from China, not finished products from China.[181]  Regardless though, we find that there is substantial evidence on the record demonstrating that the WCV at issue were produced in Malaysia based upon the aforementioned production records, and the presence of ample raw materials and machinery at Alno's raw materials warehouse in Malaysia.

In asking us to reverse the January 31st Determination, Scioto makes two additional and tangential requests, both of which we dismiss for purposes of our determination.

First, Scioto requests that: CBP "must provide Scioto with the opportunity to demonstrate that individual shipments during the period of investigation and going into the future were produced in Malaysia in order to avoid antidumping and countervailing duty liability."[182]  In light of reversal of the finding of evasion, this argument is moot and we take no position on this point.

Secondly, Scioto also argues that "{f}or new entries and for entries on which cash deposits are claimed, Scioto should be allowed to submit additional documentation during the entry process to demonstrate that the cabinets were produced in Malaysia.  CBP should make it clear in its final determination that such procedures will be available to Scioto."[183]  Again, given our reversal of the finding of evasion, this argument is not relevant to our determination.  However, we note that 19 U.S.C. § 1484 and 19 CFR § 142.3 already detail the entry documentation requirements.[184]  Moreover, CBP's regulation provides for importers to submit "Other documentation. Other documents which may be required by CBP . . . for a particular shipment."[185]

Based on the foregoing, irrespective of Scioto's arguments and requests which we find unpersuasive or inapposite, particularly Alno's production capacity and documentation relating to production of the WCV and linked to Scioto's entries at issue, we conclude that there is not substantial evidence of evasion as defined by EAPA.

**IV.    Decision**

Based upon our *de novo* review of the administrative record in this case, including the administrative record as transmitted to RR by TRLED, the request for administrative review and response, the January 31st Determination of evasion under 19 U.S.C. § 1517(c) is **REVERSED.**

---

[178] *Id.* (Public Version).
[179] January 31st Determination at 5-6 (Public Version).
[180] Scioto's March 15, 2023 Request for Administrative Review at 13 (Public Version).
[181] *See id.*
[182] *Id.* at 5.
[183] *Id.*
[184] 19 U.S.C. § 1484; 19 CFR § 142.3.
[185] 19 CFR § 142.3(a)(5).

PUBLIC VERSION

A copy of this determination is being provided to TRLED so that the interim measures may be modified consistent with this decision.  TRLED may also take any other appropriate actions consistent with this decision.

This decision does not preclude CBP or other agencies from pursuing additional enforcement actions or penalties.  Pursuant to 19 CFR § 165.46(a), this final administrative determination is subject to judicial review pursuant to Section 421 of the TFTEA.


Sincerely,



JACINTO P JUAREZ JR
Digitally signed by JACINTO P JUAREZ JR
Date: 2023.06.12 18:44:14 -04'00'

Jacinto P. Juarez, Jr.
Supervisory Attorney-Advisor
Regulations & Rulings, Office of Trade
U.S. Customs & Border Protection


Approved by:

ALICE A KIPEL
Digitally signed by ALICE A KIPEL
Date: 2023.06.12 19:01:46 -04'00'

Alice A. Kipel
Executive Director,
Regulations & Rulings, Office of Trade
U.S. Customs and Border Protection