## UNITED STATES COURT OF INTERNATIONAL TRADE

AMERICAN KITCHEN CABINET
ALLIANCE,

      Plaintiff,

  v.

UNITED STATES,

      Defendant,

  and

SCIOTO VALLEY WOODWORKING,
INC. D/B/A VALLEYWOOD
CABINETRY,

      Defendant-Intervenor.

Before: Stephen Alexander Vaden, Judge

Court No. 23-00140

### Order

    Upon consideration of Plaintiff American Kitchen Cabinet Alliance's Rule

56.2 Motion for Judgment on the Agency Record and the accompanying

memorandum, and upon all other papers filed and proceedings had herein, it is

hereby

    **ORDERED** that Plaintiff's motion is granted; and it is further

    **ORDERED** that the final administrative determination issued by U.S.

Customs and Border Protection ("CBP") in EAPA Case No. 7705 is arbitrary,

capricious, an abuse of discretion, and otherwise not in accordance with law; and it

is further

**ORDERED** that this action is remanded to CBP for proceedings consistent with this Court's opinion.

Date:_____          _____
          New York, New York                    Stephen Alexander Vaden, Judge

## UNITED STATES COURT OF INTERNATIONAL TRADE

AMERICAN KITCHEN CABINET
ALLIANCE,

      Plaintiff,

   v.

UNITED STATES,

      Defendant,

   and

SCIOTO VALLEY WOODWORKING,
INC. D/B/A VALLEYWOOD
CABINETRY,

      Defendant-Intervenor.

Before: Stephen Alexander Vaden, Judge

Court No. 23-00140

## PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the Court, the American Kitchen Cabinet Alliance ("Plaintiff") hereby moves for judgment on the agency record with respect to its complaint challenging the final administrative review determination by Regulations & Rulings, Office of Trade, U.S. Customs & Border Protection in Enforce and Protect Act Case Number 7705. *See* Letter from Jacinto P. Juarez Jr., Supervisory Attorney-Advisor re: Enforce and Protect Act Case Number 7705 (June 12, 2023) ("*Final Review Determination*").

For the reasons explained in the accompanying memorandum in support of its motion for judgment on the agency record, Plaintiff respectfully moves for the Court to hold that the *Final Review Determination* is arbitrary, capricious, and an

abuse of discretion. Plaintiff further moves for the Court to remand this matter to Commerce for disposition consistent with the order and opinion of the Court.

Respectfully submitted,

*/s/ Luke A. Meisner*
Luke A. Meisner, Esq.
Alessandra A. Palazzolo, *Law Clerk*

SCHAGRIN ASSOCIATES
900 Seventh Street, NW, Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for American Kitchen Cabinet Alliance*

Dated: November 15, 2023

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AMERICAN KITCHEN CABINET ALLIANCE, | |
| Plaintiff, | |
| v. | PUBLIC VERSION |
| UNITED STATES, | Before: Stephen Alexander Vaden, Judge |
| Defendant, | Court No. 23-00140 |
| and | |
| SCIOTO VALLEY WOODWORKING, INC. D/B/A VALLEYWOOD CABINETRY, | |
| Defendant-Intervenor. | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

Roger B. Schagrin, Esq.
Luke A. Meisner, Esq.

SCHAGRIN ASSOCIATES
900 Seventh Street, NW, Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel American Kitchen Cabinet Alliance*

Dated: November 15, 2023

PUBLIC VERSION

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................. ii

STATEMENT PURSUANT TO RULE 56.2 ........................................................ 1

I.    Administrative Determination Under Review .............................................. 1

II.   Issues Presented for Review ........................................................................ 1

STANDARD OF REVIEW ................................................................................... 2

STATEMENT OF FACTS .................................................................................... 3

SUMMARY OF ARGUMENT ............................................................................ 10

ARGUMENT ........................................................................................................ 11

I.    R&R Erred in Finding that the Application of Adverse Inferences Was Unwarranted ........ 11

      A.   Legal Standard ..................................................................................... 11

      B.   The Record Showed that Alno Failed to Cooperate to the Best of Its Ability During
           the On-Site Verification of Its Facilities ............................................. 12

      C.   R&R Erred in Reversing the Application of Adverse Inferences ........ 16

           1.   The Failure to Disclose an Additional Warehouse Supports a Finding that Alno
                Failed to Cooperate ...................................................................... 17

           2.   R&R Arbitrarily Excused Alno for Its Failure to Provide All the Packing
                Check-Lists Requested by TRLED ................................................ 20

           3.   R&R Failed to Account for Documents That Were Inexplicitly Missing from
                Alno's Records .............................................................................. 23

      D.   R&R Erroneously Failed to Credit TRLED's Findings Based on the Team's Own
           Observations During Verification ........................................................ 24

      E.   CBP Should Be Required to Explain on Remand Its Decision Not to Apply Adverse
           Inferences in Light of Alno's Lack of Cooperation ............................. 28

II.   R&R's Determination that There Was "No Evidence" of Evasion Should Be Reversed
      and Remanded ............................................................................................... 29

      A.   Substantial Evidence Demonstrates That Scioto Was Evading the *AD/CVD Orders* ... 29

      B.   R&R Arbitrarily Accepted Scioto's New Explanation for the FPIDs and
           Misinterpreted Evidence Regarding These Documents ......................... 34

      C.   R&R Erred When It Found that Alno's Documents Were Reliable Evidence that
           Alno Produced all the Cabinets It Shipped to Scioto ........................... 40

III.  CONCLUSION ............................................................................................. 45

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases**

*Ala. Aircraft Indus., Inc. v. United States*, 586 F.3d 1372 (Fed. Cir. 2009) .... 2, 32, 38

*Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791 (Fed.Cir.1993) ..................................... 26

*Arnold P'ship v. Dudas*, 362 F.3d 1338 (Fed. Cir. 2004) .............................................. 3

*Aspects Furniture Int'l, Inc. v. United States*, No. 20-03824, 2023 WL 5374441 (Ct. Int'l Trade Aug. 22, 2023) ................................................................................. 23

*Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, 624 F. Supp. 3d 1343 (Ct. Int'l Trade 2023) ............................................................................................. 28

*Bonney Forge Corp. v. U.S.*, 560 F. Supp. 3d 1303 (Ct. Int'l Trade 2022) ................ 27

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ........................... 2

*Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334 (Ct. Int'l Trade 2016) ............................................................................................. 18

*De Samo v. Dep't of Commerce*, 761 F.2d 657 (Fed. Cir. 1985) ........................... 25, 26

*Goodluck India Limited v. U.S.*, 11 F.4th 1335 (Fed. Cir. 2021) .............................. 27

*Jinko Solar Co. v. United States*, 229 F. Supp. 3d 1333 (Ct. Int'l Trade 2017) ........ 25

*Maverick Tube Corp. v. United States*, 857 F.3d 1353 (Fed. Cir. 2017) ................... 11

*Micron Tech., Inc. v. United States*, 117 F.3d 1386 (Fed. Cir. 1997) .................. 25, 27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...... 2

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003)............ 11, 21, 23

*Porter v. Sec'y of Health and Human Services*, 663 F.3d 1242 (Fed. Cir. 2011) ....... 25

*POSCO v. United States*, 353 F. Supp. 3d 1357, 1375 (2018) ................................... 19

*Royal Brush Mfg., Inc. v. United States*, 483 F. Supp. 3d 1294 (Ct. Int'l Trade 2020) ................................................................................................................. 24

*Saha Thai Steel Pipe Pub. Co., Ltd. v. United States*, 592 F. Supp. 3d 1299 (Ct. Int'l Trade 2022) ............................................................................................. 32

*SeAH Steel Corp. v. United States*, No. 22-00338, 2023 WL 6241552 (Ct. Int'l Sept. 26, 2023) ...................................................................................... 18, 19

*SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ................ 3, 22

*Skyview Cabinet USA, Inc. v. United States*, No. 1:22-CV-00080, 2023 WL 4073781 *8 (Ct. Int'l Trade June 20, 2023) ............................................. 22

*Star Fruits S.N.C. v. United States*, 393 F.3d 1277 (Fed. Cir. 2005) ......................... 3

*Wheatland Tube Co. v. United States*, 161 F.3d 1365 (Fed. Cir. 1998) ..................... 2

*Yama Ribbons & Bows Co. v. United States*, 419 F. Supp. 3d 1341 (Ct. Int'l Trade 2019) ...................................................................................................... 32

## Statutes

19 U.S.C. § 1517(c) ........................................................................................ 1, 2, 6, 11

19 U.S.C. § 1517(f) ..................................................................................................... 2, 9

19 U.S.C. § 1517(g) ......................................................................................................... 2

Trade Facilitation and Trade Enforcement Act of 2015, P.L. 114-125 (Feb. 24, 2016) ...................................................................................................................... 6

## Other Authorities

R&R Final Review Determination in EAPA 7348 (Mar. 18, 2021) ........................... 33

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Antidumping Duty Order,* 85 Fed. Reg. 22,126 (Dep't Commerce Apr. 21, 2020) ............................................................................................................... 3

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Countervailing Duty Order,* 85 Fed. Reg. 22,134 (Dep't Commerce Apr. 21, 2020) ............................................................................................................... 3

## Regulations

19 C.F.R. § 165.1 ............................................................................................................. 6

19 C.F.R. § 165.41 ........................................................................................................... 9

19 C.F.R. § 165.6(a) ...................................................................................................... 11

Plaintiff, the American Kitchen Cabinet Alliance ("AKCA" or "Plaintiff"), hereby submits the following memorandum in support of its motion for judgment on the agency record in the above-captioned action.

## STATEMENT PURSUANT TO RULE 56.2

### I.   Administrative Determination Under Review

The AKCA seeks judicial review of the final administrative review determination by Regulations & Rulings ("R&R"), Office of Trade, U.S. Customs & Border Protection ("CBP") in Enforce and Protect Act ("EAPA") Case Number 7705. *See* Letter from R&R re: EAPA Case Number 7705 (June 12, 2023), Appx03915-03940 and Appx168259-168284 ("*Final Review Determination*"). In the *Final Review Determination*, as part of a *de novo* review conducted pursuant to 19 U.S.C. § 1517(c), R&R reversed the affirmative determination of evasion made by the Trade Remedy Law Enforcement Directorate ("TRLED"), in which CBP had initially found that the U.S. importer Scioto Valley Woodworking, Inc. d/b/a Valleywood Cabinetry ("Scioto") evaded the antidumping and countervailing duty orders on wooden cabinets and vanities and components thereof ("WCV") from China. *See* TRLED Notice of Determination as to Evasion (Jan. 31, 2023), Appx03731-03757 and Appx168197-Appx168223 ("*TRLED Affirmative Determination*").

### II.   Issues Presented for Review

(1) Was R&R's reversal of TRLED's application of adverse inferences arbitrary, capricious, or an abuse of discretion given the evidence that Scioto's affiliated Malaysian supplier Alno Industry SDN BHD ("Alno") failed to cooperate to the best of its ability during the on-site verification of Alno conducted by TRLED in Malaysia?

(2) Did R&R err in concluding that "the record contains *no evidence* that WCV produced in China were transshipped through Malaysia" given that there was substantial evidence on the record showing that such transshipment did occur?

## **STANDARD OF REVIEW**

In reviewing a determination of evasion under 19 U.S.C. § 1517(c) or an administrative review under 19 U.S.C. § 1517(f) of such a determination, the Court examines: (1) whether CBP fully complied with all procedures under 19 U.S.C. § 1517(c) and (f); and (2) whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 19 U.S.C. § 1517(g).

The statute does not define arbitrary and capricious. The U.S. Court of Appeals for the Federal Circuit has stated, however, that "{c}ourts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or the decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc. v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "Courts look for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion." *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998) (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167-68 (1962)). While "{t}he scope of review under the

'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency," the agency must have "examine{d} the relevant data and articulate{d} a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168). In addition, "{a}n agency action is arbitrary when the agency offer {s} insufficient reasons for treating similar situations differently." *SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001).

The Federal Circuit has also explained that "{a}n abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors." *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005) (citing *Arnold P'ship v. Dudas*, 362 F.3d 1338, 1340 (Fed. Cir. 2004)).

## STATEMENT OF FACTS

Following petitions filed by the AKCA in 2019, the U.S. Department of Commerce ("Commerce") issued antidumping and countervailing duty orders on WCV from China on April 21, 2020. *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Antidumping Duty Order,* 85 Fed. Reg. 22,126 (Dep't Commerce Apr. 21, 2020); *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Countervailing Duty Order,* 85 Fed. Reg. 22,134 (Dep't Commerce Apr. 21, 2020) (collectively the "*AD/CVD Orders*"). In 2018, before the AKCA had filed the petitions against WCV

3

from China, imports of WCV from Malaysia totaled only $132,000. *See* AKCA EAPA Allegation (Feb. 3, 3022), Appx01009. In 2020, after the *AD/CVD Orders* were issued, imports of WCV from Malaysia skyrocketed to $348 million. *Id.* While some of these imports represent a shift in supply chains to legitimate new production in Malaysia, a substantial amount of these imports represent Chinese merchandise that was transshipped through Malaysia to evade the payment of the AD/CVD duties that would otherwise be collected. *See id.*

The Malaysian company Alno, together with its corporate affiliates in China and the United States, perfectly exemplify this problem. Alno was incorporated in Malaysia in 1991 and was originally in the business of producing wooden furniture and original equipment manufacturing – *i.e.*, not kitchen cabinets or other forms of WCV. *See* Verification Report at Appx03607-Appx03608. After the AKCA filed petitions against WCV from China in March 2019, the Chinese company Qingdao Haiyan Group Co. Ltd. ("Haiyan Group") and its affiliated U.S. importer Scioto acquired Alno in Malaysia. *Id.* Prior to this time, the Haiyan Group's subsidiary, Qingdao Haiyan Drouot Household Co. Ltd. ("Haiyan Drouot") had been producing WCV in China and exporting this merchandise to Scioto in the United States. *Id.* Alno did not begin producing WCV in Malaysia until April 2020. *Id.* In particular, after the Haiyan Group acquired Alno, Haiyan Drouot continued producing "wooden parts" in China and shipped these "wooden parts" to Alno in Malaysia, and then Alno used these "wooden parts" as inputs in the production of WCV in Malaysia. *Id.*

PUBLIC VERSION

Spoiler alert: some of these "wooden parts" from China were actually fully finished wooden cabinets that Alno was transshipping to the United States. *See id.*

In addition to exporting WCV to its affiliated U.S. importer, Scioto, Alno also exported WCV to unaffiliated U.S. customers such as Cabinets to Go ("CTG"), one of the largest importers and distributors of WCV in the United States. *See* AKCA EAPA Allegation (Feb. 3, 3022), Appx01006. Apparently nervous about the potential for evasion, CTG hired its own inspectors to monitor Alno's manufacturing facilities in Malaysia. *Id.*, Appx01007. In July 2021, one of CTG's inspectors discovered that Alno was shipping WCV to CTG that was actually manufactured in China. *Id.* After receiving this news from its inspector, CTG asked the Haiyan Group to certify that the products Alno was shipping to the United States were actually manufactured in Malaysia instead of China. *Id.*, Appx01007-01008. In late August 2021, the Haiyan Group advised CTG by telephone that it could not certify the country of origin as being Malaysia, because the products had actually been manufactured in China. *Id.*

On May 14, 2021, CTG filed a civil lawsuit against Scioto and the Haiyan Group in the United States seeking damages for breach of contract and breach of warranty and an award of punitive or treble damages for violations of the Tennessee Consumer Protection Act. *Id.*, Appx01008 and Appx01034-01047. During the course of this lawsuit, the Haiyan Group provided [

                                                                    ] *Id.*,

Appx01008, Appx080008. As shown on the spreadsheet, around [

] *Id.* In addition to filing a civil lawsuit against Scioto and the Haiyan Group, CTG shared the evidence of evasion it had collected with the AKCA, including [

]. *See id.*

In response to this type of evasion activity, which undermines the relief that is intended to be afforded to U.S. domestic industries through the trade remedy laws, Congress passed the Enforce and Protect Act, Title IV, Section 421 of the Trade Facilitation and Trade Enforcement Act of 2015, to expand and strengthen CBP's ability to investigate claims of evasion of AD/CVD orders. *See* Trade Facilitation and Trade Enforcement Act of 2015, P.L. 114-125 (Feb. 24, 2016), codified at 19 U.S.C. § 1517 ("TFTEA"). The TFTEA also mandated the creation of the "Trade Remedy Law Enforcement Division" within the Office of Trade to conduct investigations under EAPA. *See* Title IV, Section 411 of the TFTEA; *see also* 19 C.F.R. § 165.1.

After an interested party such as the AKCA has filed an allegation of evasion, EAPA directs TRLED to make a determination as to whether merchandise covered by an AD/CVD order was entered into the customs territory of the United States through evasion. 19 U.S.C. § 1517(c). "Evasion" is defined as "entering covered merchandise into the customs territory of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material, and that results in any cash deposit or other security or any amount of applicable {AD}

6

or {CVD} duties being reduced or not applied with respect to the merchandise." *Id.* § 1517(a)(5).

On February 3, 2022, based on the evidence it received from CTG, the AKCA filed the EAPA allegation that led to the underlying investigation at issue in this action. *See* AKCA EAPA Allegation (Feb. 3, 3022), Appx01006. On March 30, 2022, TRLED initiated the investigation. *Final Review Determination*, Appx03918. On July 6, 2022, TRLED issued a notice to the parties of its decision to take interim measures based upon a reasonable suspicion that the importer, Scioto, entered merchandise covered by the *AD/CVD Orders* through evasion. *Id.*, Appx03918-03919. TRLED then issued a number of requests for information ("RFIs") and supplemental RFIs to Scioto and Alno. *TRLED Affirmative Determination*, Appx03733-03734. Through these RFIs, Alno freely admitted that it had transshipped WCV to [     ], but it claimed that the WCV it exported to Scioto was actually made in Malaysia. *Id.*, Appx03737, Appx168203. Alno also provided production-related documents purporting to support these claims. *See id.*

From October 24, 2022, through October 27, 2022, TRLED conducted an on-site verification of Alno in Malaysia. *Id.*, Appx03734. As TRLED explained, "{t}he purpose of verification is for CBP to validate the information and data submitted by parties, and verification allows the parties being verified to fully explain their record responses." *Id.*, Appx03744-037 at 13-14. During the course of verification, TRLED uncovered a wide array of discrepancies and reporting failures by Alno, including but not limited to: (1) the failure to disclose the existence of a second

warehouse in Malaysia where it stored Chinese WCV that was destined for the United States; (2) the failure to provide documents that were critical to the central question of whether Alno transshipped Chinese WCV to Scioto; (3) attempts to provide TRLED officials with unrelated or irrelevant documents that were unsolicited to cover for Alno's error of not provided certain documents after being asked multiple times; and (4) the failure to retain original copies of certain emails that were part of Alno's original response and which raised questions regarding the reliability of the documents Alno had submitted to CBP. *Id.*, Appx03742. Based on these and other problems, TRLED determined that it was not able to verify the accuracy of information that was critical to determining whether Alno transshipped Chinese WCV to Scioto in the United States. *Id.*

On January 31, 2023, following a round of briefing from the parties, TRLED issued its final determination of evasion. TRLED framed its analysis as following:

> The evidence demonstrates that Alno can produce wooden cabinets and vanities. However, Alno itself has admitted in court documents that it transshipped Chinese-origin cabinets and vanities through Malaysia to [    ] during the {POI} for this EAPA investigation. The questions before CBP, then, are whether Alno manufactured all the cabinets and vanities it exported to Scioto, or whether Alno exported transshipped, Chinese-origin cabinets and vanities to Scioto during the POI.

*Id.*, Appx03735, Appx168201. After analyzing the record, TRLED determined there was substantial evidence to demonstrate that Scioto entered WCV covered by the *AD/CVD Orders* and falsely declared the WCV as being of Malaysian origin not subject to the *AD/CVD Orders*. *Id.*, Appx03736-03742. TRLED also applied adverse inferences against Alno, the alleged manufacturer of the WCV at issue here, and by

extension, Scioto, for Alno's alleged failure to cooperate by not acting to the best of its ability to comply with TRLED during the on-site verification process. *Id.*, Appx03742-03744.

Following a determination of evasion, the EAPA statute provides for an administrative review process by which CBP will conduct a *de novo* review of the determination of evasion if requested by the interested party that filed the allegation of evasion or the interested party determined to have entered the covered merchandise through evasion. 19 U.S.C. § 1517(f). CBP's implementing regulations task R&R with the responsibility of conducting the administrative review. *See* 19 C.F.R. § 165.41.

On March 15, 2023, Scioto filed a request for administrative review. *Final Review Determination*, Appx03919. On March 30, 2023, AKCA filed a response to Scioto's request for a review. *Id.* On June 12, 2023, R&R issued a response to the request for a review in which it reversed TRLED's initial determination of evasion. *Id.*, Appx03939. R&R first concluded that Alno had cooperated and complied with CBP during verification such that the application of an "adverse inference to Scioto is not justified." *Id.*, Appx03926. R&R also concluded that the record evidence showed that Alno "has the capability to, and likely did, produce the WCV in Malaysia" that it shipped to Scioto in the United States. *Id.*, Appx03928.

This appeal followed.

PUBLIC VERSION

## SUMMARY OF ARGUMENT

The record demonstrates that TRLED's initial affirmative determination of evasion was correctly decided. There was substantial evidence showing both that Alno failed to cooperate to the best of its ability, warranting the application of adverse inferences, and that Alno had transshipped Chinese merchandise to Scioto. In its review, R&R failed to address critical aspects of the record and TRLED's initial affirmative determination that go to the central issue in this investigation — whether Alno actually manufactured in Malaysia the WCV that Scioto imported into the United States. The fact that Alno has some capability to produce some WCV in Malaysia is not at issue here. What is at issue is that, because of Alno's failure to cooperate, its production records were unverifiable and unreliable evidence such that TRLED could not determine whether Alno supplemented its Malaysian production with merchandise produced by its corporate parent in China. As such, R&R's reversal of the determination of evasion was arbitrary, capricious, and an abuse of discretion. Simply put, R&R failed to adequately address the evidence showing that Alno did not cooperate to the best of its ability. Second, R&R erred in concluding that there is not substantial evidence, particularly when its conclusion was based on a finding that Alno's production documents were a reliable source of information and that these documents showed that Alno "likely" produced the WCV it exported to Scioto.

## ARGUMENT

**I.    R&R Erred in Finding that the Application of Adverse Inferences Was Unwarranted**

### A.  Legal Standard

Under the EAPA statute and CBP's regulations, if the importer or the foreign producer or exporter of the covered merchandise fails to cooperate and comply "to the best of its ability" with a request for information made by CBP, the agency may apply an inference adverse to the interests of that party in reaching a determination as to evasion. 19 U.S.C. § 1517(c)(3)(A); 19 C.F.R. § 165.6(a). While the standard for Commerce applying adverse inferences in antidumping and countervailing duty proceedings is different in some aspects, the standard is similar in that it provides Commerce with authority to rely on adverse inferences if an interested party "fail{s} to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b). The Federal Circuit has explained the meaning of the "best of its ability" standard as follows:

> While the {"best of its ability"} standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping. It assumes that importers are familiar with the rules and regulations that apply to the import activities undertaken and requires that importers, to avoid a risk of an adverse inference determination in responding to Commerce's inquiries: (a) take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce; (b) have familiarity with all of the records it maintains in its possession, custody, or control; and (c) conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers' ability to do so.

PUBLIC VERSION

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). The Federal Circuit has also held that in the event a respondent has relevant information but does not provide it, "{s}uch behavior cannot be considered 'maximum effort to provide Commerce with full and complete answers.'" *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1360 (Fed. Cir. 2017) (quoting *Nippon Steel*, 337 F.3d at 1382).

### B. The Record Showed that Alno Failed to Cooperate to the Best of Its Ability During the On-Site Verification of Its Facilities

The record overwhelmingly shows that, during the on-site verification conducted by the TRLED team in Malaysia, Alno failed to cooperate to the best of its ability. As discussed in detail below, TRLED encountered numerous problems at verification that were directly relevant to the central question of whether Alno transshipped Chinese merchandise to Scioto. These problems meant that there was no reliable evidence that Alno produced the WCV it shipped to Scioto and constituted substantial evidence in support of a finding of evasion.

***Undisclosed Warehouse.*** One of the problems that arose at verification was Alno's failure to disclose the existence of a warehouse where it kept WCV produced in China that was destined for the United States. *See* Verification Report, Appx03614. Specifically, while touring one of Alno's warehouses, TRLED asked Alno whether it had any other locations, and Alno confirmed that "no other locations exist." *Id.*, Appx03609. However, while reviewing Alno's accounts, TRLED identified payments for a [                    ]. *Id.*, Appx03609 and Appx168113. When Alno was questioned about the payments, its representatives told TRLED

that "they have an additional warehouse where they are storing finished goods that their customers would not accept due to the civil litigation and EAPA case against Alno." *Id*., Appx03614. As noted in the verification report, TRLED "had previously specifically asked if they had any other locations other than the warehouse and factory, and Alno said no." *Id.* When the TRLED team visited this warehouse, it observed "boxes and boxes piled up as far as you could see" of Malaysian and Chinese merchandise. *Id*., Appx168113-168114. However, the goods from China and Malaysia "were packaged identically," and "CBP officials had no way to differentiate the country of origin" of the finished goods. *TRLED Affirmative Determination*, Appx03736. A respondent cooperating to the best of its ability would surely have disclosed the existence of this additional warehouse rather than crossing its fingers and hoping that it would never be discovered.

***Packing Check-Lists***. Another problem that arose at verification was the failure to provide certain "Packing Check-Lists." When CBP asked Alno how it could distinguish between invoices containing transshipped goods and invoices involving goods produced in Malaysia, Alno responded that this information was available on the Packing Check-Lists. Verification Report, Appx03620-03621. Given how highly relevant this information was to the central question facing the agency, TRLED asked Alno to provide **all** Packing Check-Lists for the year 2021. *Id.* Alno provided the verification team with what it purported to be all the 2021 Packing Check-Lists. *Id.* However, after reviewing the documents, CBP discovered that Alno had failed to provide the Packing Check-Lists for the invoices related to the transshipped goods

that were provided in the AKCA's allegation. *Id.* CBP gave Alno another chance, informing the company that it had not provided all of the Packing Check-Lists which had been requested. *Id.* Alno then returned with additional documents, but CBP conducted a further review and discovered that "Alno still had not provided all of the Packing Check-Lists." *Id.* Finally, when later asked for certain missing documents, Alno not only provided the documents that were requested but also then "attempted to provide the remaining missing Packing Check-Lists unsolicited." *Id.* The CBP investigation team ultimately determined that this contributed to a finding that Alno's RFI responses were unverifiable:

> We informed Alno's counsel that it had asked for ALL Packing Check-Lists twice already, and each time had been told that our document request was complete, yet we continued to find missing documents; as a result, we would not accept the unsolicited documents due to concerns about validity. For these reasons, we are unsure that Alno provided us all the Packing Check-Lists, which are crucial to this investigation because of the detailed information they provide. As a result, *we were unable to verify whether the responses provided in Alno's first supplemental response are accurate.*

*Id.*, Appx03621 (emphasis added).

  ***Commercial Invoices.*** Another serious verification problem involved Alno's failure to provide all commercial invoices for 2021 and 2022. *Id.* CBP discovered that these commercial invoices were missing from a binder where they were supposed to be kept, because although the invoices were kept in reverse chronological and reverse sequential order, there were particular invoice numbers that were missing from the chronology. *Id.* However, based on Alno's responses, there should have been corresponding documents associated with these invoice

numbers. *Id.* CBP found that, because of these missing documents, it was "*unable to definitively verify statements that Alno made in its first supplemental response that the company only transshipped goods to {one company} and not to other customers.*" *Id.* (emphasis added).

> ***Emails.*** The TRLED team requested that Alno pull up the original version of an email included in the RFI responses from Alno to Scioto that referred to "two sets of documents," one for billing purposes and one for CBP. *Id.*, Appx03615. As CBP explained in its verification report, "{i}f the documents were the same, there would be no reason to provide two copies in an email, one copy could simply be forwarded to two different parties." *Id.* CBP therefore wanted to see the attachments included in the original email. *Id.* CBP did not receive an answer before the end of the day and reiterated its request on the third day of verification. *Id.* It was only at that point that an Alno executive stated that original emails from "Haiyan" from [                    ] to [                         ] were deleted "due to server issues," even though somehow emails from other companies were retained until [                    ]. *Id.*, Appx03615-03616 and Appx168114-168115. TRLED noted it was not clear if the executive was referring to Haiyan Group or Haiyan Drouot but that the emails in question were from an Alno email address to a Scioto address. *Id.* In other words, in addition to being belated, the executive's explanation simply made no sense. Alno then contacted someone from the parent company who was included on the email, and they forwarded the email to Alno, but CBP found it could

not "be sure the attachments provided in the forwarded email were the ones in the original email since we did not have access to the original email." *Id.*

TRLED correctly found that all these problems during its onsite verification constituted substantial evidence that Alno had not cooperated to the best of its ability and, as a result, that TRLED was unable to rely on the records Alno kept in its normal course of business. *TRLED Affirmative Determination*, Appx03742. TRLED also correctly applied an adverse inference based on Alno's failure to cooperate to determine that all WCV exported to the United States to Scioto were from China. *Id.*

## C. R&R Erred in Reversing the Application of Adverse Inferences

In its *Final Review Determination*, R&R concluded that while Alno and Scioto "may not have acted perfectly" during the course of verification, the record as a whole showed that "they cooperated and complied" sufficiently such that AFA was not justified – "especially so given there is record evidence that the information requested was ultimately provided to CBP." *Final Review Determination*, Appx03926. In reaching this conclusion, R&R failed to address the problems that occurred during verification, failed to consider important aspects of the record evidence, and made conclusions that simply were unsupported by the record evidence. Accordingly, R&R's decision was arbitrary, capricious, and an abuse of discretion. It should be reversed.

### 1. The Failure to Disclose an Additional Warehouse Supports a Finding that Alno Failed to Cooperate

R&R found that Alno's failure to disclose the existence of an additional warehouse did not "support a conclusion that Alno did not cooperate by not acting to the best of its ability to comply with a request for information." *Id.*, Appx03926-03927. To reach this finding, R&R credited Alno's explanation that, when CBP asked if it had any other locations, Alno "misunderstood the nature of CBP's questions" and thought CBP was referring only to warehouses for "raw materials." *Id.* R&R also latched onto the fact that, in repeating its questions about additional locations, TRLED asked at one point if Alno "owned" any other land in Malaysia. *Id.* R&R found that Alno's response that it had no other warehouse facilities was "both technically correct and accurate" because "Alno was merely renting another facility, and Alno did not own the facility or the land upon which it stood." *Id.* In other words, R&R credited Alno's explanation that there was a misunderstanding and excused Alno's failure to disclose the warehouse based on this supposed misunderstanding. *See id.*

As an initial matter, R&R's review of the record focuses narrowly on one part of the verification report, where CBP is discussing the raw materials warehouse and the ownership of other land, and ignores other parts of the verification report that directly contradict R&R's findings. In particular, TRLED stated in its verification report that "{w}e had previously specifically asked if {Alno} had any other locations other than the warehouse and factory, and Alno said no." Verification Report, Appx03614. R&R's finding is thus contradicted by the plain text of the verification

17

report, which makes it clear that Alno's failure to disclose the additional warehouse full of Chinese merchandise was not a simple misunderstanding.

Indeed, the fact that Alno maintained a warehouse full of Chinese merchandise was highly probative as to whether it was transshipping Chinese merchandise to the United States. Alno's failure to disclose the existence of this warehouse to TRLED, forcing the verification team to discover the warehouse on its own through careful scrutiny of Alno's accounting records, cannot be chalked up to a "misunderstanding" based on the precise wording of TRLED's questions. Alno was asked if it had "any other locations other than the warehouse and factory, and Alno said no." Alno's failure was a deliberate concealment of relevant facts.

But even assuming there was any ambiguity in CBP's questions—ambiguity such that the questions could be construed as asking *only* for additional locations where Alno warehoused raw materials but definitely not finished goods, and *only* for locations where Alno owned the land but definitely not locations where Alno rented the land—this ambiguity would still not excuse Alno's failure to disclose the additional warehouse full of Chinese merchandise. It has long been established that the burden falls on a respondent to clarify its understanding of an investigative agency's directives and instructions rather than rely on its own interpretation. *See, e.g., Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334, 1346 (Ct. Int'l Trade 2016) ("{A}ny confusion {based on the Commerce questionnaire} should have been addressed by seeking guidance from Commerce, rather than categorically withholding the information."). Here, even if R&R is

correct that TRLED's questions could possibly be interpreted narrowly as not requesting disclosure of the additional warehouse, Alno sought no guidance from TRLED and instead relied on its own incorrect interpretation of the questions.

The Court's recent decision in *SeAH Steel Corp. v. United States*, No. 22-00338, 2023 WL 6241552 (Ct. Int'l Trade Sept. 26, 2023), is instructive in this regard. In that case, the Court upheld Commerce's finding that a respondent had failed to cooperate to the best of its ability when it failed to disclose a subsidy under the Korean Export-Import Bank ("KEXIM") Performance Guarantee program. *Id.* at *1. Commerce had asked the respondent to discuss all assistance it received under the KEXIM program during the period of investigation, which was for the calendar year of 2020. *Id.* at *2. In its written responses, the respondent stated that it "did not have any performance guarantees from KEXIM for loans that were outstanding during the investigation period." *Id.* At verification, however, Commerce discovered that there was an outstanding KEXIM guarantee that the respondent had received in 2019. *Id.* at *4. Commerce found that the respondent failed to cooperate to the best of its ability when it failed to disclose this guarantee and, accordingly, applied adverse inferences against the company. *Id.* On appeal, the respondent argued that its failure to disclose this guarantee was essentially a misunderstanding, because Commerce did not explicitly request information regarding performance guarantees received prior to 2020, and the guarantee was for non-subject merchandise rather than the subject merchandise. *Id.* The CIT rejected this argument, explaining that "the responsibility lies not with the agency, but with {the respondent} to clarify its

19

understanding of the questionnaire in the event of confusion or claimed ambiguity." *Id.* The CIT further explained that "{w}hile Commerce evaluates what is relevant for purposes of its investigation, the role of the respondent is to comply with such requests for information, regardless of the respondent's perception or substituted judgment." *Id.* (citing *POSCO v. United States*, 353 F. Supp. 3d 1357 (2018)).

Here, as in *SeAH Steel*, to the extent there was any misunderstanding in Commerce's repeated questions regarding the existence of additional locations where Alno was operating in Malaysia, the responsibility lay with Alno and not with TRLED to clarify the understanding of CBP's questions. A respondent cooperating to the best of its ability would have disclosed the existence of the additional warehouse or, at a minimum, asked TRLED to clarify that it was only asking for additional locations involving raw materials where the land was owned by the respondent. A respondent cooperating to the best of its ability would not simply sit on this highly relevant information. R&R's finding that Alno cooperated to the best of its ability is not, therefore, supported by substantial evidence.

### 2.  *R&R Arbitrarily Excused Alno for Its Failure to Provide All the Packing Check-Lists Requested by TRLED*

As discussed above, Alno itself informed TRLED that the easiest way for it to distinguish between invoices containing transshipped Chinese goods and invoices containing Malaysian goods was the Packing Check-Lists. Verification Report, Appx03620-03621. Given the importance of these documents, as affirmed by Alno, it would seem obvious that CBP would expect them to be provided in a timely and complete manner. This is precisely why TRLED concluded that Alno's repeated

failure to provide all the Packing Check-Lists it requested was evidence that Alno had not cooperated to the best of its ability.

In the *Final Review Determination*, however, R&R erroneously concluded that Alno "acted to the best of its ability" in providing these documents because "Alno did not act perfectly, in that there were delays … in providing certain Packing Check-Lists, but when Alno found the relevant documents, … it produced them to CBP 'unsolicited.'" *Final Review Determination*, Appx03927. R&R's conclusion fails to account for Alno's behavior and repeated failure to provide all the critical documents requested, even after TRLED had already provided Alno an opportunity to remedy its initial failure to provide all the documents. As CBP explained in the *TRLED Affirmative Determination*:

> CBP's verification team followed its standard practice for allowing parties to take corrective action for any deficiency or non-conforming submission found at verification. At verification, after a CBP official asked for an item or items and discovered a deficiency, CBP officials allowed Alno the opportunity to take corrective action. CBP officials only determined that anything offered after that corrective action was already taken was non-conforming. Allowing a party to take repeated corrective actions for an identified deficiency shifts the responsibility for the accuracy and completeness of information on the record from the manufacturer to CBP, whose responsibility in the matter is to maintain the record and determine its validity. CBP did not force Alno to provide requested information when it knew was incomplete, nor did it set any time limits to provide the information during verification. Alno provided the information only after it deemed it complete and ready to present to CBP, as evident by the CBP officials asking if Alno provided everything that CBP requested. CBP believes that Alno was afforded sufficient time during the verification to present the information requested from it, but that Alno often failed to take the time and effort to ensure completeness, and instead relied on CBP to do it for them.

*TRLED Affirmative Determination*, Appx03745. The Federal Circuit has explained that the "best of its ability" standard requires a respondent to "conduct prompt, careful, and comprehensive investigations of all relevant records" which the investigating agency has requested with respect to the imports in question "to the full extent" of its ability to do so." *Nippon Steel*, 337 F.3d at 1382. Alno did not live up to this standard. Moreover, R&R failed to apply the proper standard of conduct to Alno and, as a result, failed to account for Alno's uncooperative conduct in reaching its *Final Review Determination*. R&R's determination should, therefore, be reversed.

In prior EAPA investigations, CBP has correctly applied adverse inferences against foreign manufacturers that fail to respond to requests for information despite being provided multiple opportunities to do so. *See, e.g., Skyview Cabinet USA, Inc. v. United States*, No. 1:22-CV-00080, 2023 WL 4073781, at *8 (Ct. Int'l Trade June 20, 2023). In this case, R&R failed to explain why it excused Alno's failure and held it to a lower standard of conduct than other exporters in other EAPA cases. For this reason, as well, R&R's determination is arbitrary and capricious and must be reversed. *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("{A}n agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently.") (citation omitted); *SunEdison, Inc. v. United States*, 179 F. Supp. 3d 1309, 1316 (CIT 2016) ("{A}n agency determination … is arbitrary when it ... treats similar situations in dissimilar ways.").

### 3. R&R Failed to Account for Documents That Were Inexplicitly Missing from Alno's Records

As discussed above, during verification, TRLED found that there were original emails missing from Alno's computer systems that also led TRLED to apply adverse inferences against the company. These emails referenced two sets of documents, one for billing and one to be presented to CBP, which raised questions as to the reliability of the documents being presented to CBP. *See* Verification Report, Appx03614; *see also Yantai Xinke Steel Structure Co. v. United States*, 36 C.I.T. 1035, 1050 (2012) (holding that the respondents' creation of two sets of documents, one set for its customers and a second set for CBP, called into question the accuracy of the respondents' questionnaire responses). In its *Final Review Determination*, R&R accepted Alno's explanation that there were "server issues" for these emails that somehow did not affect other emails, noting that a person from the parent company ultimately forwarded similar emails to CBP officials, and found that "the evidence with respect to the emails is mixed." *Final Review Determination*, Appx03928. R&R agreed that this evidence was "sufficient to call into question the reliability of the attachments and emails so as to not rely upon them for purposes of a determination." *Id.* Nevertheless, R&R found that Alno had cooperated to the best of its ability. *See id.* R&R's analysis in this regard is flawed.

The Federal Circuit has explained that the "best of its ability" standard contemplates that a respondent "take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce." *Nippon Steel*, 337 F.3d at 1382.

23

Alno should have reasonably anticipated that it would be called upon to produce the original versions of the emails that it provided to CBP in its RFI responses. Its failure to take reasonable steps to keep and maintain full and complete records of these emails evinced a failure to cooperate to the best of its ability. Once again, R&R failed to apply the correct standard of conduct in weighing whether Alno's failure to keep the original emails warranted the application of adverse inferences.

Significantly, this Court has previously upheld CBP for finding that "evidence of document destruction was relevant to {CBP's} determination of evasion and the question of whether {a respondent} cooperated to the best of its ability during the verification process." *Aspects Furniture Int'l, Inc. v. United States*, No. 20-03824, 2023 WL 5374441, at *5 (Ct. Int'l Trade Aug. 22, 2023). Indeed, CBP's practice in other EAPA investigations has been to apply adverse inferences when respondents fail to provide documents or have deleted documents so that they cannot be provided. *Royal Brush Mfg., Inc. v. United States*, 483 F. Supp. 3d 1294, 1300 (Ct. Int'l Trade 2020). Here, R&R failed to explain why, unlike in prior cases, Alno's deletion of original emails was not evidence of its failure to cooperate to the best of its ability. For this reason, as well, R&R's *Final Review Determination* should be reversed.

### D. R&R Erroneously Failed to Credit TRLED's Findings Based on the Team's Own Observations During Verification

As TRLED explained in its affirmative determination, its verification report was based on the observations of the team members that were on-site at Alno's facility in Malaysia:

> The Verification Report written by CBP and released to parties was the result of the collaboration of all seven CBP officials that attended verification. All seven officials agree that that the report released to parties is a true and accurate account of what was observed, verified, and happened at verification.

*TRLED Affirmative Determination*, Appx03745. These observations included:

- "{W}e are unsure that Alno provided us all the Packing Check-Lists, which are crucial to this investigation because of the detailed information they provide. As a result, we were unable to verify whether the responses provided in Alno's first supplemental response are accurate." Verification Report, Appx03621.

- "{W}e were further unable to definitively verify statements that Alno made in its first supplemental response that the company only transshipped goods to [      ] and not to other customers." *Id.*, Appx03622 and Appx168121.

- "{W}e were unable to definitively verify what was in shipments that Alno received from [                    ]." *Id.*

In sum, based on their personal observations of the documents and their personal interactions with the Alno officials while on-site in Malaysia, the TRLED team was not able to verify the accuracy of Alno's reported information in numerous critical aspects.

The Federal Circuit has recognized that, when reviewing the determination of a fact finder, if findings are based on the credibility of a witness, "such credibility determinations 'are virtually unreviewable on appeal'" because of the fact finder's "unique position to see the witnesses and hear their testimony." *Porter v. Sec'y of Health and Human Services*, 663 F.3d 1242, 1248-49 (Fed. Cir. 2011) (citations omitted). This Court has recognized that this same principle applies when reviewing Commerce's findings at verification. In *Jinko Solar Co. v. United States*,

229 F. Supp. 3d 1333, 1358 (Ct. Int'l Trade 2017), for example, the petitioner sought to overturn Commerce's finding at verification that a respondent had, in fact, fully cooperated and submitted information was accurate and reliable. The Court noted that Commerce had met with company officials for the respondent and "made credibility determinations in person during the verification procedure." *Id.* The Court stated that it would not substitute its judgment for the agency's findings that the information presented was verified. *Id.* (citing *De Samo v. Dep't of Commerce*, 761 F.2d 657, 661 (Fed. Cir. 1985) ("Where, as here, the presiding official expressly found a witness ... credible, this court cannot substitute a contrary credibility determination based on a cold paper record.")).

The Federal Circuit applied a similar principle in its decision in *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1399 (Fed. Cir. 1997). There, the appellant argued that Commerce had not verified a respondent's questionnaire responses as accurate by pointing to language in the verification report that the agency had "attempted" to tie information in the responses to the respondent's ordinary business records at verification. *Id.* The appellant argued that "{i}f Commerce merely attempted to tie the information in the response to {the respondent's} ordinary business records, but did not succeed, then it did not 'verify' the response." *Id.* The Federal Circuit rejected the appellant's argument because it "contradicts Commerce's finding that verification was successful." *Id.* The Federal Circuit also held that "{w}ithout evidence to the contrary, it is assumed that Commerce only used questionnaire response that Commerce believed were verified."

*Id.* (citing *Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 795 (Fed.Cir.1993) ("'{T}here is a presumption that public officers perform their duties correctly, fairly, in good faith, and in accordance with the law and governing regulations....' ... And this presumption stands unless there is 'irrefragable proof to the contrary.'" (additional citations omitted)).

Here, R&R's review of TRLED's findings at verification flies in the face of this bedrock principle. There were seven CBP officials that participated in the on-site verification in Malaysia, and all seven officials agreed that the findings presented in their report reflected their personal observations – *i.e.*, that Alno's reported information could not be verified as accurate and reliable based on their interactions with Alno's company officials and their review of the company documents. R&R should not be able to reverse findings that were based on TRLED's own personal observations and interactions as a result of its technical parsing of the "cold paper record." *De Samo*, 761 F.2d at 661. R&R paid no heed whatsoever to the presumption that the TRLED officials performed their duties correctly, fairly, in good faith, and in accordance with the law and governing regulations when they found Alno's responses to be unverifiable. Indeed, R&R fails to grasp that "the purpose of verification is 'to test information provided by a party for accuracy and completeness.'" *Goodluck India Limited v. U.S.*, 11 F.4th 1335, 1344 (Fed. Cir. 2021) (citing *Micron Tech.*, 117 F.3d at 1396); *see also Bonney Forge Corp. v. U.S.*, 560 F. Supp. 3d 1303, 1307 (Ct. Int'l Trade 2022) at n.2 (recognizing that "verification is the process by which Commerce probes the information it collects in its

investigations. It is 'like an audit, the purpose of which is to test information provided by a party for accuracy and completeness.'") (other citation omitted). While Alno clearly failed the verification test, R&R nevertheless gave it a passing grade.

The bottom line is that, based on their personal observations of the documents and their interactions with the Alno officials while on-site in Malaysia, the TRLED team specifically found that Alno did not cooperate to the best of its ability and, as a result, that the TRLED team was not able to verify the accuracy of Alno's reported information. R&R's substitution of its own judgment based on the cold paper record to find that the information was, in fact, verifiable was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

### E. CBP Should Be Required to Explain on Remand Its Decision Not to Apply Adverse Inferences in Light of Alno's Lack of Cooperation

As discussed above, R&R's finding that Alno cooperated to the best of its ability was erroneous in numerous aspects. The appropriate remedy under these circumstances is a remand to the agency. For example, in *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, this Court remanded Commerce's decision not to apply adverse facts available when it was based on a factual finding that a respondent had cooperated to the best of its ability, and Commerce had failed to reconcile that factual finding with evidence that detracted from it. *Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, 624 F. Supp. 3d 1343, 1376-1378 (Ct. Int'l Trade 2023). If CBP finds on remand that Alno did not cooperate to the best of its ability, CBP should either draw an adverse inference against Alno or, at a minimum, explain its decision not to draw an adverse inference in light of

Alno's failure to cooperate. *See id.* (recognizing that while Commerce has the discretion not to apply adverse inferences, it must exercise that discretion reasonably, and its explanation must be supported by the record evidence).

## II.   R&R's Determination that There Was "No Evidence" of Evasion Should Be Reversed and Remanded

In its *Final Review Determination*, R&R found that "the record contains **no evidence** that WCV produced in China were transshipped through Malaysia and imported into the United States by Scioto." *Final Review Determination*, Appx03925 (emphasis added). For all the reasons discussed below, this finding was arbitrary and capricious because R&R ignored the vast amount of evidence on the record that did support a finding of evasion, R&R misinterpreted evidence that was on the record, and R&R relied on production documents and other business records that TRLED had correctly found were not a reliable source of information. Accordingly, R&R's finding in the *Final Review Determination* that there was "no evidence" of evasion should be reversed and remanded.

### A.   Substantial Evidence Demonstrates That Scioto Was Evading the *AD/CVD Orders*

As detailed in TRLED's initial affirmative determination of evasion, the evidence on the record shows that Alno transshipped Chinese origin WCV that were covered by the *AD/CVD Orders* to Scioto in the United States. *See TRLED Affirmative Determination*, Appx03734-03739. First of all, the evidence shows that prior to the imposition of the *AD/CVD Orders*, Haiyan Drout was exporting WCV to its U.S. sales affiliate, Scioto, which is 100-percent owned by the Haiyan Group. *Id.*, Appx03735. It was only after the *AD/CVD Orders* were issued that the Haiyan

Group acquired Alno in Malaysia and caused it to begin exporting WCV to the United States. *Id.*; *see also* Verification Report, Appx03607-03608. Due to the Haiyan Group's ownership of Scioto and Alno, it has total control and discretion over the companies' operations, production, shipping schedules, purchase prices, sales prices, and profit generated. *TRLED Affirmative Determination*, Appx03735-03736. In fact, Alno owes a substantial amount of money to the Haiyan Group for subsidizing Alno's budget shortfalls. *Id.* Alno purchases wooden parts from the affiliated Chinese cabinets producer Haiyan Drouot. *Id.*, Appx03736. As TRLED summarized the situation, "{t}aken *in toto* Alno is a Malaysian company owned and controlled by a Chinese company, is operated under Chinese management, and is supplied by Chinese suppliers." *Id.*

Second, there is undisputed evidence on the record that Alno transshipped Chinese WCV to CTG. *Id.* Indeed, Alno conceded that it had engaged in evasion of the *AD/CVD Orders* by transshipping Chinese WCV to [        ]. *Id.*, Appx03736, Appx168202.

Third, the evidence showed that Alno also transshipped Chinese WCV to Scioto. CBP officials discovered an "additional warehouse" during verification that was filled with finished goods from China and Malaysia that were packaged identically and ready for shipment. *Id.* CBP officials had no way to differentiate the country of origin of these finished WCV. *Id.*, Appx03736-03737. Moreover, CBP was not able to verify or confirm whether the WCV exported to Scioto were produced on

site in Malaysia or imported from China due to the company's vague record keeping. *Id.*, Appx03737.

A fourth piece of evidence was Alno's Finished Product Inbound Delivery ("FPID") sheets. *Id.* During verification, after Alno had admitted to transshipping Chinese merchandise, CBP officials asked Alno how it knew which invoices related to transshipped goods and which invoices related to goods made in Malaysia. *Id.* Alno stated that the information was available on the Packing Check-List from Haiyan Drout and that the transshipped goods enter Alno's warehouse on the FPID. *Id.* Alno officials repeatedly confirmed that these FPID sheets are for materials that Alno "purchased," which was consistent with statements that Alno had made in its written RFI responses. *Id.*, Appx03738. Notably, Alno did not provide the FPID sheets for any of the sales that the TRLED verification team conducted on site during the verification, even though Alno had provided them in its RFI responses. *Id.* The only other time that TRLED officials had seen the FPID sheets was when Alno transshipped WCV from China to its customer. *Id.* Critically, during verification, TRLED examined FPIDs that were generated for goods that were sold by Alno to Scioto during the POI. As TRLED in its determination of evasion:

> Due to the existence of FPID sheets containing SKUs and {purchase orders ("POs")} for Scioto, the fact that this matches the documents used by Alno in its normal course of business to distinguish products that were transshipped from China through Malaysia for [     ], and Alno's own statements that inbound sheets are for materials purchased, CBP determines that this is significant evidence that Alno transshipped goods that were imported by Scioto during the POI.

*Id.*, Appx03739, Appx168205.

31

PUBLIC VERSION

Finally, TRLED found that Alno had submitted "inaccurate information and documents filled with discrepancies." *Id.* In its affirmative determination, TRLED catalogued these problems in great detail. *Id.*, Appx03739-03742. TRLED ultimately concluded that because of these problems, the documents were unreliable evidence that Alno had produced the WCV it shipped to Scioto and that transshipment was not occurring at Alno. *Id.*, Appx03741. Moreover, combining this information with Alno's admission to transshipping Chinese WCV provided strong support for a determination that there is substantial evidence that Alno was transshipping WCV to Scioto. *Id.*, Appx03741-03742.

It is simply absurd that, despite all this evidence, R&R found that there was "no evidence" whatsoever that Alno had transshipped merchandise to Scioto. R&R "entirely failed to consider an important aspect of the problem" and its "decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft*, 586 F.3d at 1375 (citation and quotation omitted). This Court has not hesitated to reverse and remand agency decisions that blatantly ignore evidence that is contrary to the decision. *See, e.g. Saha Thai Steel Pipe Pub. Co., Ltd. v. United States*, 592 F. Supp. 3d 1299, 1308 (Ct. Int'l Trade 2022) ("the agency cannot ignore relevant information which is before it") (citation omitted); *Yama Ribbons & Bows Co. v. United States*, 419 F. Supp. 3d 1341, 1350 (Ct. Int'l Trade 2019) ("Commerce was not free to ignore record evidence that Yama did not benefit from the EBCP."). The Court should not hesitate to do the same here.

PUBLIC VERSION

The need for a remand is particularly great in this case because R&R failed to see the relevance of information that R&R had previously considered relevant to a finding of evasion in prior EAPA investigations. As discussed above, the record evidence indisputably showed that Alno and Scioto were both owned and controlled by a Chinese WCV producer. In this case, R&R found this was "no evidence" of evasion, but in prior cases, R&R has found this type of ownership information supported a finding of evasion. For example, in EAPA Case Number 7348, in affirming TRLED's determination of evasion, R&R agreed that "{w}hile Kingtom may have produced some of the aluminum extrusions it exported to the United States, the record does not support a finding that Kingtom produced all of the aluminum extrusions it exported." R&R Final Review Determination in EAPA 7348 (Mar. 18, 2021) at 12, available at https://www.cbp.gov/trade/trade-enforcement/tftea/eapa/requests-administrative-review/final-administrative-determinations. In affirming the determination of evasion, R&R relied on Kingtom's ties to China as substantial evidence demonstrating that the imports from Kingtom included Chinese merchandise:

> In this case, Kingtom does have strong ties to China. The record evidence shows that Kingtom is both owned by Chinese citizens and employs many Chinese citizens. Kingtom has also sourced both supplies and equipment from China. The record does not indicate that Kingtom has any such ties to other countries not subject to AD/CV duty orders, nor does the record indicate Kingtom having ties to other aluminum extrusion manufacturers in the Dominican Republic who could have supplied additional merchandise to cover the full amount exported. Therefore, when looking at the totality of the circumstances regarding evidence of Kingtom's actual production levels coupled with Kingtom's affiliations with China, a finding of evasion due to the commingling of Chinese-origin aluminum extrusions with Dominican

Republic-origin aluminum extrusions is supported by substantial evidence in the record. There is more than a 'mere scintilla' of evidence to support this finding of evasion.

*Id.* at 12-13. (citations omitted). The facts in this case are almost identical, yet R&R treated this situation completely differently. R&R disregarded the evidence that the Haiyan Group in China controlled Haiyan Drouot, Alno, and Scioto, finding this was "no evidence" of evasion. The *Final Review Determination* is thus the very definition of arbitrary.

### B.  R&R Arbitrarily Accepted Scioto's New Explanation for the FPIDs and Misinterpreted Evidence Regarding These Documents

As discussed above, during the on-site verification process, because Alno had admitted that it did transship Chinese merchandise to CTG, the TRLED team asked Alno to explain how it was possible to determine whether shipments contained transshipped Chinese merchandise as opposed to merchandise produced in Malaysia. *See* Verification Report, Appx03620. This was a golden opportunity for Alno to clarify for CBP how its own production and sales documents could be used to determine whether, in addition to transshipping Chinse merchandise to CTG, Alno had also transshipped any Chinese merchandise to Scioto. In response to this request, Alno stated that the information is available on the Packing Check-Lists. *Id.* Alno did not say that this information was available on the FPIDs. *See id.*, Appx03620-Appx03621. In fact, Alno represented that the information on the Packing Check-List was "the only way to see what was in the shipments Alno received" from [          ]. *Id.*, Appx03620 and Appx168119-168120. Moreover, after TRLED asked for all the Packing Check-Lists from [          ] for the year 2021, Alno

34

failed to provide the Packing Check-Lists for invoices related to the transshipped goods. *Id.*

Then, after TRLED issued its final determination of evasion, Scioto attempted to rewrite the record of the investigation by claiming that TRLED's findings with respect to the FPIDs "seems to be a misunderstanding due to translation issues." Scioto Review Request, Appx03865. Scioto asserted that "FPIDs are generated whenever a finished good enters the finished goods warehouse regardless of whether the goods were purchased or were produced by Alno" and thus "the existence of an FPID for sales to Scioto does not demonstrate that the goods were purchased by Alno, rather than produced in Malaysia." *Id.*, Appx03866. Significantly, Scioto also claimed for the first time that it was possible to determine whether goods are transshipped because "the FPID for goods produced in Malaysia will contain the production batch number," whereas the FPIDs for transshipped Chinese merchandise does not contain any batch numbers. *Id.*, Appx03865-03866.

In the *Final Review Determination*, R&R accepted Scioto's belated explanation of the significance of the FPIDs based on a review of certain production batch numbers that appear on some of the FPIDs on the record. *See Final Review Determination*, Appx03928-03932. However, Scioto's new and belated explanation of the FPIDs was directly contradicted by the record evidence developed during the investigation and during the on-site verification. In fact, TRLED took great pains in its verification report and in its final determination to explain the significance of the FPIDs, concluding that "the FPID sheet is only generated in one specific

instance, i.e., when goods enter the raw materials warehouse." *TRLED Affirmative Determination*, Appx03738. In fact, TRLED officials asked both the General Manager and Chief Accountant when the FPID sheet is generated, and they stated that the FPID sheet is generated when purchased materials are entered into the raw materials warehouse. *Id.* Alno's own company officials stated that it is for when purchased goods are checked in, confirming what Alno said in its third supplemental response on three occasions. *Id.* Further, Alno's Chief Accountant confirmed that Alno does not track inventory movement during the production process, which provided additional support that items listed on the FDIP are goods purchased by Alno. *Id.* Finally, Alno did not provide the FPID sheets for any of the sales traces that the TRLED verification team conducted on site during the verification, even though Alno had provided them in RFI responses. *Id.* The only other time TRLED officials saw these inbound sheets was for raw materials that Alno had purchased and when Alno transshipped finished cabinets and vanities from China to another company, which generated FPID sheets identical to the ones in question. *Id.*

In the *Final Review Determination*, R&R criticized the TRLED team for the fact that "{n}o mention is made" of the production records submitted by Alno and the fact that the batch number listed on Alno's FPID sheet matches the batch number listed on Alno's other production documents. *Final Review Determination*, Appx03929. This analysis overlooks the fact that, prior to TRLED's affirmative determination of evasion, neither Alno nor Scioto had ever stated that the FPID

sheets could be used as a tool to determine whether Alno was transshipping Chinese merchandise. The time to disclose such a critical fact would have been during the on-site verification process, when TRLED asked how Alno's own documents could be used to track whether Alno's shipments to Scioto included transshipped Chinese merchandise. If Alno had provided this explanation of its FPID sheets during verification, the TRLED team could have – as it did when told about the function of Packing Check-Lists – verified the accuracy of the explanation by requesting all FPID sheets for the merchandise that Alno shipped to Scioto. In the *Final Review Determination*, by blindly accepting this belated explanation of its FPID sheets, R&R fails to appreciate that Alno denied TRLED the opportunity to verify the explanation during the verification process. This failure to grasp a critical aspect of the problem renders R&R's analysis arbitrary and capricious.

R&R's analysis of the FPID sheets is fundamentally flawed for another reason. In the *Final Review Determination*, R&R devotes considerable time justifying its finding that FPID sheets can be generated for both "purchased" goods and goods manufactured in Malaysia. *Final Review Determination*, Appx03930-03932. This is important, because R&R's finding contradicts everything that the TRLED heard and observed while on verification in Malaysia. R&R's justification focuses on Alno's third written supplemental response. *Id.*, Appx03931. In a supplemental questionnaire issued to Alno, TRLED noted that Alno's prior response included "finished product inbound delivery sheets" that contain SKU numbers which were also listed on commercial invoices for Scioto and the product catalog.

*See* Alno Third Supp. Resp. (Oct. 17, 2022), Appx03485 (emphasis added). TRLED noted that these documents are generally "for material entering a facility for stock purposes." *Id.* In light of this, TRLED asked Alno to "explain why these products would be tracked as inbound delivery and not outbound forms." *Id.* In other words, TRLED was pointedly asking Alno to explain why it had "inbound delivery" sheets for the type of "finished products" that Alno ultimately shipped to Scioto. Alno responded as follows:

> The package documents we submitted include materials inbound sheets which are for materials entering the factory and outbound sheets which are for materials withdrawn from Alno's warehouse as production inputs. Alno keeps the products tracked by outbound sheets (warehouse-out sheets) for production inputs and ***inbound sheets (warehouse-in sheets) for materials purchased***.

*Id.* (emphasis added).

In its affirmative determination, TRLED relied on this response to show that Alno's statements during verification that FPID sheets are only for "purchased" goods are consistent with earlier statements in its written RFI responses that FPID sheets are for "purchased" goods. *TRLED Affirmative Determination*, Appx03737-03738. In the *Final Review Determination*, R&R contorts Alno's response, going so far as adding words not present in the original response, to justify a different interpretation. In particular, R&R characterizes the above response as Alno stating that "the FPID sheets were also for '***{raw}*** materials purchased.'" *Final Review Determination*, Appx03931 (alteration by R&R) (emphasis added). This characterization of the response makes no sense. As explained above, CBP was specifically asking Alno why it had inbound delivery sheets for ***finished*** products

PUBLIC VERSION

and was not asking about inbound delivery sheets for ***raw*** materials. In addition, as the name suggests, the FPID sheets are by definition for "finished" products and not for "raw" materials. Thus, it was wholly inappropriate for R&R to insert the term "raw" in front of the term "materials" in the passage quoted above. Because R&R's misreading of Alno's response led it to find that FPID sheets could also be for manufactured goods in addition to purchased goods, and because this finding led it to a negative determination of evasion, the *Final Review Determination* should be reversed. *See Ala. Aircraft*, 586 F.3d at 1375 (holding that an agency decision is arbitrary when it "offered an explanation for its decision that runs counter to the evidence before the agency") (citation and quotation omitted).

Even accepting for the sake of argument that Scioto's belated explanation of the FPID sheets could be true, R&R still erred in finding that that a few FPID sheets with production batch numbers linked to a few purchase orders for sales to Scioto constituted substantial evidence that Alno produced **<u>all</u>** the merchandise that it exported to Scioto. As previously mentioned, after CTG filed a lawsuit against Scioto, Alno, and the Haiyan Group, the companies provided [


]. *See* AKCA EAPA Allegation, Appx01008, Appx080008, and Appx080069-080080. This shows that, just because Alno may have produced **<u>some</u>** of the cabinets it sold to Scioto, it did not necessarily mean that it produced **<u>all</u>** the cabinets. This is another critical aspect of the problem that R&R failed to address in its *Final Review Determination*.

### C. R&R Erred When It Found that Alno's Documents Were Reliable Evidence that Alno Produced all the Cabinets It Shipped to Scioto

In the *Final Review Determination*, R&R found that Alno's production documents were reliable evidence showing that all cabinets sold to Scioto were produced in Malaysia. *Final Review Determination* at 14, Appx03929. This finding ignores widespread discrepancies and other problems with Alno's submitted documents. R&R failed to address most of these discrepancies, and for the few that it did address, it made unreasonable conclusions.

In its verification report and affirmative determination, TRLED described numerous discrepancies that led it to conclude—even putting aside Alno's failure to cooperate—that the evidence Alno had submitted was inaccurate and unreliable. For example, CBP discovered that the unit transfer prices between [            ] and Alno did not reflect market prices and fluctuated substantial differences. *TRLED Affirmative Determination*, Appx03739, Appx168205. When asked to explain why the price for birch and hickory from [            ] was [      ] and [      ] in [            ] on one invoice, but the price for these same two materials was [      ] and [      ] on another invoice in [            ], Alno's Chief Accountant stated that "the pricing depends on the product mix in the container." *Id*. TRLED found this explanation for a difference in price of [

            ] unsatisfactory. *Id*. However, R&R dismissed this discrepancy on the basis it "does not in any way establish that these raw materials were actually finished products manufactured in China." *Final Review Determination*, Appx03934. R&R misses the point that—while perhaps not conclusively showing

that the [

]—the discrepancies and Alno's unsatisfactory explanations

for these discrepancies undermined the reliability of Alno's production documents to

establish its legitimate production of WCV in Malaysia.

A second major discrepancy noted by TRLED was the fact that the invoices

from [                    ] use vague invoice descriptions that do not specify of

categorize different sizes of wood or specific hardware. *TRLED Affirmative*

*Determination*, Appx03739, Appx168205. Indeed, all purchases of wooden materials

were described as [                                                    ].

*Id.* Critically, for the finished cabinets that Alno admitted transshipping to [      ],

the invoices from [                    ] listed the merchandise [

]. *Id.*,

Appx03740, Appx168206. Thus, it was impossible to use these documents to

determine whether the shipments from [                    ] to Alno contained raw

materials for production or finished goods for transshipment. *See id.* In its *Final

Review Determination*, R&R reviewed this same evidence but found that "{g}iven

the presence of actual raw materials at the factory, this fact related to the invoices

does not equate to a conclusion that, behind the invoice descriptions claimed to be

raw materials sent to Alno, are actually finished products manufactured in China

and transshipped through Malaysia." *Final Review Determination*, Appx03935. The

presence of raw materials at the factory has nothing, however, to do with the

reliability of Alno's production documents. Moreover, it is simply indisputable that

behind the invoices describing the raw materials [

], there actually were finished products

manufactured in China and transshipped through Malaysia. R&R is just flatly

wrong on this issue.

A third discrepancy TRLED discussed was that [                    ] invoices all

report the quantity of the merchandise shipped using inconsistent units which

obscures the volume and types of goods being purchased from the Chinese supplier.

*TRLED Affirmative Determination*, Appx03740, Appx168206. TRLED concluded

that this was "indicative of [                    ] and Alno attempting to withhold

information from CBP to obtain a favorable outcome in this investigation." *Id*. R&R,

for its part, dismissed this discrepancy on the basis that "without more, … this does

not demonstrate transshipment." *Final Review Determination*, Appx03935. But

again R&R misses the point. While this discrepancy may not demonstrate

transshipment, it does undermine the reliability of Alno's submitted information.

A fourth discrepancy that TRLED discussed was the issue of the raw

materials needed to make glass doors. *TRLED Affirmative Determination*,

Appx03740. Invoices examined by TRLED showed that Alno had sold cabinets with

glass doors. *Id*. At verification, Alno officials stated that it obtained the glass for

these doors from [                    ]. *Id., Appx03740, Appx168206. When TRLED

asked for the invoices showing the purchases of glass, Alno provided documents that

did not list any glass on the invoices. *Id*. Instead, the glass was identified on the

raw material invoices as hardware/screws. *Id.*, Appx03740-03741. TRLED correctly

concluded that this shows that [                    ] is "willing to omit or obfuscate important information in paperwork, evidence that casts doubt on the reliability of the supplier's documents to use as proof that Alno did not transship cabinets and vanities of Chinese origin." *Id.*, Appx03741, Appx168207. As parts of its review, R&R dismissed these discrepancies as having "limited to no relevance" because there was no evidence that Scioto ordered products with glass doors, there were no similar invoices for glass for Scioto's orders, and glass was not listed as a material for Scioto's product and batch material lists. *Final Review Determination*, Appx03935. R&R once again failed, however, to reconcile this discrepancy with its finding that Alno's production documents were reliable and accurate.

TRLED also pointed in its final determination of evasion to the fact there were numerous other discrepancies that were detailed in its verification report. These include but are not limited to the following:

- Alno stated during verification that all finished cabinets on hand were produced in [                    ], but all the boxes observed by the verification team were labeled as produced in [        ], not [      ] or [                ]. Verification Report, Appx03610 and Appx168109.

- Alno said that all the pallets observed on location "are made in this factory" except the metal ones from "bits and pieces" of wood left over, but as the team walked through, they noted that the pallets were stamped as being treated in China. *Id.*, Appx03611 and Appx168110.

- Alno stated that prices are based on the cost of raw materials, electricity, and labor cost, but this explanation contradicted the explanation of how pricing is determined in Alno's RFI response, when Alno stated that [                    ] sets the purchase price for products purchased from Alno by Scioto. *Id.*, Appx03612 and Appx168111.

- Scioto claimed to have imported a value of [                ] from Alno from [                        ], but Alno claimed to have exported only

43

[                ] to Scioto during that same period. *Id.*, Appx03613 and Appx168112.

In its *Final Review Determination*, R&R failed to account for any of these discrepancies in its analysis.

Incredibly, R&R also states that despite all the myriad discrepancies detailed above, there was not "any support" on the record for believing that Alno altered any of its documents to avoid detection of evasion. *Final Review Determination*, Appx03929. R&R also found that, even if some documents had been forged or altered, there was no way it could "discern which production documents are forged or altered." *Id.*, Appx03929-03930. It then concluded that Alno's production documents "appear to be authentic, at lease chronologically speaking," and that these documents were thus reliable evidence that Alno produced **all** the merchandise it shipped to Scioto as "there has been no demonstration on the record that these documents were falsified, forged, or altered." *Id.*, Appx03930. This is outrageous. What about the finished products described as wooden parts on the purchase invoices? What about the glass described as hardware/screws? What about the missing commercial invoices, the destroyed emails, and the failure to turn over the packing checklists? R&R's willful ignorance of Alno's practice of creating, losing, and destroying documents to obfuscate its transshipment scheme cannot be allowed to stand. This case should be remanded so that CBP can explain how it could possibly find Alno's production documents reliable and accurate in light of all the substantial problems catalogued by TRLED during verification.

**III.    CONCLUSION**

For the foregoing reasons, the AKCA requests that this Court: (i) hold that R&R's *Final Review Determination* is arbitrary, capricious, and an abuse of discretion; and (ii) remand R&R's *Final Review Determination* with instructions to issue a new determination consistent with the Court's decision.

Respectfully submitted,

*/s/ Luke A. Meisner*
Luke A. Meisner, Esq.
Alessandra A. Palazzolo, *Law Clerk*
SCHAGRIN ASSOCIATES
900 Seventh Street, NW
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for Cambria Company LLC*

Dated: November 15, 2023

PUBLIC VERSION

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief contains 11,801 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in the Court's Chamber's Procedures.


Dated: November 15, 2023                                  /s/ Luke A. Meisner
                                                         Luke A. Meisner